## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA**     :

     **v.**     :     **CRIMINAL NO. 24-270**

**JOSH S. VERNE**     :

## GOVERNMENT'S SENTENCING MEMORANDUM

For more than three years, the defendant, Josh S. Verne, did not simply cut corners or make bad business bets—he built and sustained a sprawling series of fraud schemes. Verne marketed himself as a visionary entrepreneur. In reality, he was an extraordinarily capable conman who methodically exploited trust as his primary asset. He lied about his track record. He inflated his net worth. He fabricated the financial health of his companies. And when words were not enough, he forged documents—manufacturing signatures and paper trails to give his deceit the appearance of legitimacy.

The result was staggering. Verne defrauded dozens of investors, prospective investors, employees, business partners, and friends out of millions and millions of dollars. He did not invest their funds as promised. Instead, he siphoned their money to prop up his failing ventures and to line his own pockets, funding a lifestyle he had not earned—private jet travel, renovations to a luxury shore property, and country club payments. And he committed fraud again and again, in similar and in different ways. In doing so, he stole not only wealth, but trust, security, and confidence from those who believed in him.

For at least one victim, the betrayal went even further. Verne forged a former employee's signature to conceal an unauthorized $150,000 sale of that employee's shares and pocketed the proceeds. When he later learned that the employee had provided information to law enforcement, Verne retaliated—contacting the employee and his wife and threatening to divulge false, embarrassing allegations. Fraud gave way to intimidation.

Verne's crimes are all the more reprehensible given the many advantages in life that he enjoyed. Despite a privileged upbringing and a loving family, Verne chose to steal rather than earn. Over years, across victims, and through escalating misconduct, Verne demonstrated that his fraud was not an aberration—it was a business model. Given the duration of the scheme, the breadth of victims, the calculated forgeries, the threats, and the profound financial and emotional harm inflicted, a sentence within the properly calculated Sentencing Guidelines range is not only warranted—it is necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

## I.     FACTUAL BACKGROUND

On March 3, 2025, the defendant Josh S. Verne appeared before the Court and, pursuant to a written plea agreement, pleaded guilty to Counts 1, 2, 5, 8, 9, 11, 12, 13, 16, 17, 20, 21, and 24 of the indictment charging him with securities fraud, in violation of 15 U.S.C. § 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (Counts 1, 11, and 21); wire fraud, in violation of 18 U.S.C. § 1343 (Counts 2, 5, 9, 12, 13, 16, 17, 20, and 24); and aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(l), (c)(5) (Count 8).

At the change of plea hearing, the defendant admitted to the following facts:

Defendant Josh S. Verne was a businessman, entrepreneur, and investor who previously lived in Gladwyne, Pennsylvania, and owned or controlled several companies. From in or before about July 2017 through at least in or about December 2020, Verne engaged in a series of fraud schemes through which he defrauded dozens of investors, prospective investors, employees, and business partners out of millions of dollars. Verne also stole the identity of a former employee from his company (Employee 1), forging Employee 1's signature on a sales agreement to disguise an unauthorized sale of the employee's shares of stock, on or about March 9, 2020.

### A. Counts 1 and 2 – Securities Fraud and Wire Fraud Involving Ownable, Ownable Capital, and Investor A

These securities fraud and wire fraud counts are based on Verne's scheme to defraud Investor A and others through a series of materially false representations in connection with the purchase and sale of securities in Ownable LLC and Ownable Capital Partners I LLC.

*False Representations to Investor A*

The scheme began when Verne started a business, FlockU LLC, an online content platform for college students, and Verne began raising a substantial amount of capital to fund the business. Investor A, a well-known and well-connected member of the Philadelphia business community with a reputation for financial acumen, made initial investments into FlockU totaling about $1 million. Investor A's willingness to invest, and the size of his investment, were based on a personal presentation that Verne made at

Investor A's home in or around 2016. In this presentation, Verne falsely represented his prior business success, including falsely stating that he had sold a prior business for $90 million and that his personal net worth was in excess of $100 million. Verne also shared with Investor A a copy of a document that purported to be an account statement from Goldman Sachs that showed family holdings for Verne of more than $50 million (the "Goldman Sachs Portfolio Statement"). The Goldman Sachs Portfolio Statement was forged and fabricated. Verne did not have an investment account at Goldman Sachs in his own name or in his family's names, much less an account with a market value of more than $50 million.

Ultimately, FlockU was not successful, and Verne conceived a business plan for a new business, to be called Ownable, that used a rent-to-own model allowing consumers to purchase expensive electronics products from retailers, using funds made available by Ownable. Verne changed the name of FlockU LLC to Ownable LLC ("Ownable") to start this new business. Verne was Ownable's chief executive officer from its renaming in about 2018 until he was dismissed in around the fall of 2020. Despite the failure of FlockU, Verne convinced Investor A to make new investments in Ownable, with an initial investment of $150,000 in about August 2018, followed by a conversion of Investor A's FlockU debt to equity in Ownable.

Again, Investor A's decision to invest in Ownable, and the size of his investment, was based on false representations made by Verne to Investor A. These included Verne's false representation that Verne himself was investing $2 million to $3 million of his own additional funds in Ownable; Verne's alleged prior business success, including that he

4

had sold a prior business for $90 million; Verne's false representation that his personal net worth was in excess of $100 million; and the forged Goldman Sachs Portfolio Statement.

*False Representations to Other Ownable Investors*

Verne raised funds for Ownable from other investors through the sale of shares, or units. In connection with the sale of units in Ownable ("Ownable Units"), Verne provided to each investor a Limited Liability Company Agreement (the "Ownable Operating Agreement") and a Subscription Agreement (the "Ownable Subscription Agreement"). Verne signed the Ownable Operating Agreement and the Ownable Subscription Agreements on behalf of Ownable as its chief executive officer. In the Ownable Subscription Agreements, Verne represented that the Ownable Units were securities. Verne identified only one purpose for which the proceeds from the sale of Ownable Units would be used: "to develop a digital membership and shopping platform for the rent to own market." The Ownable Subscription Agreements did not provide that any of the proceeds would be used to fund the prior debts or obligations of Ownable or of its predecessor company, or to pay the personal debts, expenses, or obligations of Verne. Yet, as described below, that is exactly what Verne did.

The Ownable Subscription Agreements signed by Verne included a "Risk Factors Supplement," which purported to itemize a "representative listing" of risks "currently contemplated" as potentially involved in an investment in Ownable. That Supplement consisted of 25 delineated risks, along with explanations of each. None of the listed risks identified misapplication of funds by Verne as a contemplated risk.

In or about November 2018, Verne formed a new related business, to be called

Ownable Capital Partners I LLC ("Ownable Capital"), which would provide capital

financing for the acquisition of Ownable's inventory. Verne was Ownable Capital's chief

executive officer. Verne raised funds for Ownable Capital through the sale of interests. In

connection with the sale of interests in Ownable Capital ("Capital Interests"), Verne

provided to each investor a Private Placement Memorandum (the "Capital Placement

Memo") and an Ownable Capital Agreement (the "Capital LLC Agreement"). Verne

signed the Capital LLC Agreement and the Capital Placement Memo on behalf of

Ownable Capital as its chief executive officer. In the Capital Placement Memos signed by

him, Verne represented that the Capital Interests were securities. In the Capital Placement

Memos, Verne identified three purposes for which the proceeds from the sale of Capital

Interests would be used: (i) establishing, implementing, and administering a rent to own

e-commerce business; (ii) paying the costs and expenses associated with offering the

Capital Interests; and (iii) paying the ongoing expenses and liabilities of Ownable

Capital. The Capital Placement Memos signed by Verne had attached as Exhibit B a

schedule of uses of funds raised from the sale of the Capital Interests. That schedule

identified a maximum of 3.3% as being used for legal fees, a maximum of 1.3% as being

used for "miscellaneous," and the remaining 95.4% to 99.3% being used for "business

operations and working capital." Neither the Capital Placement Memos, nor the attached

schedule of uses of funds, provided that any of the proceeds would be used to fund the

debts or obligations of Ownable or of its predecessor company, or to pay the personal

debts, expenses, or obligations of Verne.

The Capital Placement Memos signed by Verne included a list of "Risk Factors," that purported to itemize a list of risks that a potential investor should "carefully consider." That list consisted of 35 delineated risks, along with explanations of each. None of the listed risks identified misapplication of funds by Verne as a contemplated risk. In fact, the identified risk of broad management discretion advised that Verne could only use funds of Ownable Capital for "proper business purposes" of that company.

Verne convinced potential investors to invest in Ownable and Ownable Capital by falsely representing that he had sold a prior business for tens of millions of dollars; and/or that he had made new investments of millions of his own dollars in the businesses.

Verne earned immediate credibility for Ownable and Ownable Capital, and for himself, by telling potential investors that Investor A was a major investor in those businesses. When asked by others, Investor A, acting in reliance on Verne's representation to Investor A, generally confirmed that he had invested in Ownable and Ownable Capital and would relay that he had seen the Goldman Sachs Portfolio Statement which showed that Verne had holdings of in excess of $50 million. Verne did not tell potential investors that Investor A had been induced to invest in Ownable and Ownable Capital based on false representations and forged documents.

As Ownable's and Ownable Capital's chief executive officer, Verne reported to advisory boards of directors. Verne, however, had access to and effective day-to-day control over the conduct of Ownable's and Ownable Capital's businesses and the deposits of funds to, and the withdrawal of funds from, those companies' bank accounts.

Verne repeatedly told the advisory boards and investors in Ownable and Ownable Capital that the companies were financially successful and that their bad debt was within acceptable limits. Verne used these false representations to raise additional capital for Ownable and Ownable Capital and to maintain his position as those companies' chief executive officer. In fact, the financial situations of Ownable and Ownable Capital were so far deteriorated and tenuous, and their resources had been so far impaired, that Verne resorted to borrowing funds from employees and others in order to meet such ordinary business needs as purchases of new inventory.

Verne repeated and amplified his claims that funds raised for Ownable and Ownable Capital would be used solely for those companies' business purposes by telling their advisory boards and investors that he was not taking any salary as a result of his work for Ownable and Ownable Capital, but would be compensated solely through the anticipated increase in the value of his personal investment in those companies. Despite his representations that company funds would be used solely for legitimate business purposes, and despite his obligation to his employees, investors, and companies, Verne repeatedly used funds that had been raised for business purposes, and funds belonging to Ownable and Ownable Capital, for his own personal purposes.

*Verne's Misapplication of Investor Funds*

Verne improperly diverted business and investor funds for personal use and to finance an affluent lifestyle that he could not afford, such as renovations to a showcase vacation property at the Jersey Shore, travel on private jets, contributions to political candidates, personal charitable contributions, expenditures on his daughters' bat

mitzvahs, and country club payments. Verne also used business and investor funds to make payments to prior investors in entities unrelated to Ownable or Ownable Capital, and to fund his personal investments in other ventures. On August 3, 2018, for example, Investor A transferred $150,000 to Ownable. Subsequently, Verne transferred over $40,000 of those investor funds to his personal bank account, using those funds for payments on his mortgage, credit card bills, and personal debts. Verne also transferred over $20,000 of those funds to an interior designer who performed work on his vacation property.

*Ownable's Financial Troubles and Verne's Resignation*

Ownable became delinquent on many debts, and Verne began bouncing checks to Ownable Capital investors. Verne knew he was bouncing checks and commingling funds to cover checks; however, he continued to tell the advisory boards and investors in Ownable and Ownable Capital that the companies were financially successful. He also continued to solicit investments, and investors continued to send money. For example, on November 27, 2019, Verne caused to be transmitted the following interstate wire communication: a wire transfer of $300,000 by Investor CY from his bank account in Philadelphia, Pennsylvania, to Ownable's bank account, which was processed through a server in Toronto, Canada. In or about September 2020, Ownable board members learned that Verne had accrued large amounts of debt and had issued numerous insufficient fund checks to investors. As a result, the board called for Verne's resignation, and in or around December 2020, Verne resigned from Ownable.

## B. Count 5 – Wire Fraud Involving Employee 1, Investor K, and the Forgery and Unauthorized Sale of Ownable Shares

This wire fraud count is based on Verne's scheme to defraud Employee 1 and Investor K through the forgery and unauthorized sale of Ownable shares. In March 2020, knowing Ownable was not doing well financially, Verne met with Investor K and falsely told him that Employee 1, a lifelong friend of Verne and a former employee and executive at Ownable, wished to sell his Ownable shares. Verne told Investor K that he was selling them at the request of Employee 1's spouse, and Verne falsely represented to Investor K that Verne was authorized to sell the shares. Verne also convinced Investor K to invest in Ownable by making misrepresentations about the financial condition of Ownable and Verne's prior investments into Ownable and representing that Investor A was a board member and investor in the business. Investor K agreed to invest and purchased Employee 1's Ownable shares for $150,000.

In order to hide this unauthorized sale from Employee 1, Verne forged or caused to be forged Employee 1's name and signature on the sales agreement for the Ownable shares. Employee 1 never agreed to this sale, Verne never discussed this sale with him, and the signature affixed to the agreement was not Employe 1's. Investor K signed a sales agreement, without knowledge that Employee 1's signature had been forged on the agreement and that Verne did not have legal authority to transfer ownership of these shares to Investor K. On March 9, 2020, at about 11:03 a.m., in furtherance of the fraud scheme, Verne transmitted or caused to be transmitted the following interstate wire communication: an internet transmission of email concerning the signed sales agreement

for Employee 1's Ownable shares from Verne, via AOL, which was processed through a server outside of Pennsylvania, to Investor K, who received the email in the Eastern District of Pennsylvania.

Verne directed Investor K to send the $150,000 in exchange for the Ownable shares. After receiving the $150,000, Verne used the funds for personal purposes, such as making payments to himself and to a prior business investor. It was not until October 2020 that Employee 1 discovered Verne had sold his shares and confronted Verne. Employee 1 never received any proceeds from the sale of his shares.

In April 2020, Verne obtained an additional follow-on investment into Ownable from Investor K, after again misrepresenting Ownable's financial condition and not disclosing Verne's misappropriation of Ownable's funds.

In or around October 2020, in order to induce Employee 1 not to report the forgery and prevent discovery by law enforcement, Verne sent messages to Employee 1 admitting that he had sold some of Employee 1's Ownable shares, that he would be personally responsible for paying the full amount back to Employee 1, and that he "chose lies and ego over transparency" in his dealings with Employee 1 over the prior year.

### C.    Count 8 – Aggravated Identity Theft

On March 9, 2020, in furtherance of the fraud scheme, Verne used the means of identification of another person, that is, the name and signature of Employee 1, on the sales agreement for Employee 1's Ownable shares. Verne knew that the name of Employee 1 belonged to another actual person, and Verne used and signed the name without consent or authorization from Employee 1. Verne did so in order to fraudulently

obtain $150,000 from Investor K for the unauthorized sale of Employee 1's Ownable shares.

**D.      Counts 9 – Wire Fraud Involving $850,000 Personal Loan from Investor A**

This wire fraud count is based on Verne's scheme to obtain a $850,000 personal loan from Investor A after making a series of false representations and providing another forged Goldman Sachs Portfolio Statement. In or about January 2020, Verne reached out to Investor A and said he was facing serious short-term liquidity problems. Verne asked Investor A to provide him with a short-term personal loan until he could liquidate some of his investments. Verne falsely represented to Investor A that he had more than enough assets, but that they were tied up in non-liquid investments. To support this request for a personal loan, Verne met with Investor A in-person and presented him with another version of the Goldman Sachs Portfolio Statement, this one bearing a date of October 31, 2019 (the "Goldman Sachs Portfolio Statement II"). Verne represented to Investor A that the money was needed to fund existing investments of his that required immediate capital infusions, and specifically an investment in a company known as Dropps. Like the Goldman Sachs Portfolio Statement that he had previously shown to Investor A, the Goldman Sachs Portfolio Statement II showed that Verne and his family had assets at Goldman Sachs with a market value in excess of $50 million. Also like the earlier statement, the Goldman Sachs Portfolio Statement II was false, fraudulent, and forged as Verne had no investment account with, and no assets at, Goldman Sachs.

On January 15, 2020, at about 7:04 p.m., in furtherance of the fraud scheme, Verne transmitted or caused to be transmitted the following interstate wire communication: an internet transmission of email concerning the Goldman Sachs statement from Verne, which was processed through a server outside of Pennsylvania, to Investor A, who received the email through a server in the Eastern District of Pennsylvania.

To further support his request for the loan, Verne represented to Investor A that he had a broker at Goldman Sachs, Acquaintance 1. Although Acquaintance 1 was an employee of Goldman Sachs, a social acquaintance of Verne, and an investor in Ownable, she at no time was Verne's broker, nor did she have any banking relationship with Verne and his family.

Based on these false and fraudulent representations and the two forged Goldman Sachs Portfolio Statements, Investor A provided Verne with a $850,000 personal loan. On or about January 13, 2020, Verne signed a promissory note in the amount of $850,000 to support the personal loan granted by Investor A.

Verne used funds from the $850,000 personal loan for purposes unrelated to Dropps or any urgent investment purposes. Despite this, on or about March 10, 2020, Verne sent an email to Investor A, reconfirming that the purpose of the loan was for an investment in Dropps and promising that he would make good on the loan. In that email, Verne also admitted to Investor A that he withheld information, telling him, "You [Investor A] gave me every opportunity to be transparent and I [Verne] wasn't."

**E.    Count 11 and Counts 12, 13, 16, 17, and 20 – Securities Fraud and Wire Fraud Involving Company C and Pooled Investments through KHV Cred LLC**

These securities fraud and wire fraud counts are based on Verne's scheme to defraud investors through a series of materially false representations in connection with the purchase and sale and securities of Company C and KHV Cred LLC. In about early 2018, Verne became aware of an investment opportunity in Company C, a company that made credit-type cards available to college students and other persons with limited or impaired credit histories.

On or about June 15, 2018, Verne executed a purchase agreement to purchase $1 million worth of units in Company C. Despite his claims to the contrary, Verne did not in fact have enough money to fund the $1 million worth of units that he had committed to buy. In signing the purchase agreement, Verne represented that he was investing for his own account, not as a nominee or agent, and not with a view to reselling or distributing his units to others. Because of the highly-regulated industry in which it operated, Company C prohibited pooled investments.

Notwithstanding the prohibition on pooled investments, between about June 2018 and about December 2018, Verne solicited friends, family members, and associates to contribute to a pool to be used to invest in Company C. That pool was called KHV Cred LLC (the "KHV-Cred investment pool"), and members of the pool became members of KHV Cred LLC, with an ownership interest in the investment in Company C.

Verne collected a total of at least $1.5 million from friends, family members, and other persons who wished to participate in this pooled investment. In October and

December 2018, Verne used total of about $1 million of those funds to purchase shares in Company C on behalf of the KHV-Cred investment pool. Verne used the rest of the funds from the pooled investment for improper personal and unrelated business purposes such as a private jet and payments to his creditors.

When the management of Company C learned that Verne was not financially stable and had, in fact, made an improper pooled investment, they told Verne that he would have to divest himself of his $1 million investment. Verne divested himself through a pair of transactions:

- On or about February 18, 2020, Company C agreed to re-purchase one-half of the units held by Verne for a payment of $500,000.

- On or about March 11, 2020, Investor A, who was a founding member of Company C and its largest stockholder, agreed to purchase the remaining one-half of the units held by Verne in return for Investor A's forgiveness of $500,000 of the outstanding personal debt that Verne owed him.

In the latter transaction, Investor A agreed to accept these units in lieu of cash based on Verne's express representation that the units that were to be transferred belonged to Verne and that those units were Verne's to transfer. Indeed, in the agreement of sale, Verne expressly represented in writing that he was the "record and sole beneficial owner" of the units in Company C being sold by him pursuant to the agreement, and that no third parties had any right, interest, or claim upon those units.

Although he had disposed of their stock in Company C, Verne did not distribute the proceeds of those sales to the members of the KHV-Cred investment pool. Instead, Verne used those funds for his own personal purposes, such as payments to his creditors.

Despite the fact that all of the units in Company C had been disposed of by him, Verne continued to act as though the KHV-Cred investment pool still owned the units. For example:

- On or about June 23, 2020, at 5:04 p.m., Verne wrote an email to Investor T assuring him that his investment in Company C was doing well. Verne transmitted or caused to be transmitted this email, which was sent from Verne in New Jersey to Investor T in the Eastern District of Pennsylvania.

- On or about July 15, 2020, at 7:31 p.m., Verne wrote an email to the members of the KHV-Cred investment pool falsely advising them that he was backing out of the investment in Company C because of a conflict of interest between Company C and Ownable. Verne falsely represented that the pooled funds were being returned in full by Company C and, despite the fact that he no longer had the money from the units, promised that he would return the pool members' funds "quickly." Verne transmitted or caused to be transmitted this email, which was sent from Verne in New Jersey to Investor M, Investor T, and Investor J in the Eastern District of Pennsylvania.

Furthermore, Verne continued to send communications to members of the KHV-Cred investment pool, in attempts to disguise the fact that he did not have the funds to

repay the members of the KHV-Cred investment pool, and in order to prevent discovery by law enforcement of his own misconduct. For example:

- On or about August 26, 2020, at 9:33 p.m., Verne sent an email to Investor R and Investor L purporting to enclose a bank email confirmation that cashier's checks had been sent via FedEx. The purported bank email was false and fraudulent. The next day, on or about August 27, 2020, at 7:35 a.m., Verne sent an email to Investor R, sending what purported to be a tracking number for Investor R's cashier's checks. Verne transmitted or caused to be transmitted this email, which was sent from Verne in New Jersey to Investor R in the Eastern District of Pennsylvania.

- On or about August 27, 2020, at 8:22 a.m., Verne sent an email to, among others, Investor M in which he falsely claimed that cashier's checks to the pool members were being sent by FedEx and were in route to Verne's home address. Verne also emailed a document that falsely purported to be a FedEx delivery confirmation of that non-existent delivery. Verne transmitted or caused to be transmitted this email, which was sent from Verne in New Jersey to Investor M in the Eastern District of Pennsylvania. That same day, Verne sent another email to Investors M and J in which he falsely confirmed that he was expecting to receive their cashier's checks by FedEx that day by 8 p.m., and promised to advise them "once received." The next day, on or about August 28, 2020, Verne sent an email to Investor J, in which he falsely claimed

that there was a bank related problem and claimed that her money would be wired into her account that day or overnight.

- On or about October 5, 2020, at about 4:38 a.m., Verne sent an email to members of the KHV-Cred investment pool, in which he again admitted that once the units had been sold, "it would have been best if I had wired out money immediately afterward but that wasn't done." Verne also admitted that his previous repayment promises had not been truthful, stating, "To be frank, I don't know why I did not just tell the truth." Verne, however, insisted that he had "every intention to pay what is owed," and therefore enclosed a "revised note," signed by himself and his wife, purporting to personally guarantee the obligation. Verne transmitted or caused to be transmitted this email, which was sent through a server outside of Pennsylvania to investors in the Eastern District of Pennsylvania.

### F.    Counts 21 and 24 – Securities Fraud and Wire Fraud Involving Company B and Pooled Investments through BBB Investments LLC

These securities fraud and wire fraud counts are based on Verne's scheme to defraud investors through a series of materially false representations in connection with the purchase and sale and securities of Company B and pooled investments through BBB Investments LLC. In or before about July 2017, Verne became aware of an investment opportunity in Company B, a company that supplied boxed alcoholic beverages.

Despite his claims to the contrary, Verne did not in fact have enough money to make a substantial investment in Company B. In order to raise investment capital, Verne

18

solicited friends, family members, and associates to contribute to a pool to be used to invest in Company B. That pool was called BBB Investments LLC ("BBB-I investment pool"), and members of the pool obtained an ownership interest in the investment in Company B.

Verne collected a total of about $2.3 million from investors who wished to participate in his pooled investment. For example, Verne solicited and received a $200,000 investment from Investor KZ in December 2019. On December 2, 2019, in furtherance of the fraud scheme, Verne transmitted or caused to be transmitted the following interstate wire communication: a wire transfer of approximately $90,000 of Investor KZ's funds by Verne in the Eastern District of Pennsylvania through a bank server in Canada.

Of the $2.3 million raised from investors to purchase Company B units, Verne used only about $1.9 million to purchase units in Company B. He diverted the rest to his own personal purposes and never repaid the members BBB-I investment pool.

Verne again used Investor A to further his fraudulent scheme. On or about March 14, 2020, Verne agreed to transfer to Investor A units of Company B in return for Investor A's forgiveness of about $350,000 of the outstanding personal debt that Verne owed to Investor A. On or about April 1, 2020, Verne agreed to transfer to Investor A additional units in return for Investor A's payment of about $200,000 in debts that Verne personally owed to third persons and a payment of about $23,828 to Verne. Investor A agreed to accept these units in lieu of cash based on Verne's express representation that the units to be transferred belonged to Verne and that those units were Verne's to

transfer. In fact, Verne did not personally own any units of Company B. Instead, the units that Verne sold to Investor A belonged to the members of the BBB-I investment pool. Although Verne disposed of Company B units belonging to members of the BBB-I investment pool, he did not distribute proceeds of these sales to the members, and instead, Verne diverted the funds for his own personal purposes.

On or about January 5, 2021, at about 8:39 a.m., in order to delay and prevent discovery by law enforcement of his own misconduct, Verne sent an email to Investor KZ, in which Verne claimed that his sale of Company B units to Investor A was inadvertent.

Furthermore, in the parties' plea agreement, the defendant stipulated to the following facts:

On or about September 12, 2022, the defendant attended by telephone an in-person meeting between his attorneys and representatives of the government to discuss the expected federal criminal prosecution of the defendant. During this meeting, an FBI Special Agent detailed the government's evidence against the defendant, including the defendant's forgery of Employee l's name and the defendant's theft of the proceeds of the sale of Employee l's stock.

Minutes after the conclusion of the meeting, on September 12, 2022, at 2:44 p.m., the defendant sent Employee 1 a text message that stated, "Just got off the phone with the appropriate people that spoke to u. Interesting what you told them." Employee 1 did not respond to the defendant's text message.

Less than two hours later, on September 12, 2022, at 4:03 p.m., the defendant sent Employee 1 another text message that stated, "If this goes forward – you should expect other natural questions like bachelor party conversations and other conversations you think would be relevant. No prob will make Happen[.]" Employee 1 did not respond to the defendant's text message. Each of the text messages described above were knowingly sent by the defendant to Employee 1 with the intent that Employee 1 receive the messages, and Employee 1 did, in fact, receive the messages.

Later that night, on September 12, 2022, at 10:44 p.m., the defendant sent Employee 1's wife a text message that stated, "Hi. Unfortunately [your husband, Employee 1,] gave some misinformation [to] the authorities on me and therefore you will be brought into the conversation. Just wanted to give you a heads up." Employee 1's wife did not respond to the defendant's text message. The text message was knowingly sent by the defendant to Employee 1's wife with the intent that Employee 1's wife receive the message, and Employee 1's wife did, in fact, receive the message.

## II.    **LEGAL STANDARD**

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. See USSG § 1B1.1 (Nov. 1, 2025).[1]

---

[1]    Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the

At the second step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent § 3553(a) factors in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted).

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the § 3553(a) factors.

## III.   SENTENCING CALCULATION

### A.   Statutory Maximum Sentence

The Court may impose the following statutory maximum sentences: Counts 1, 11, and 21 (securities fraud), 20 years' imprisonment, 3 years of supervised release, a $5 million fine, and a $100 special assessment for each count; Counts 2, 5, 9, 12, 13, 16, 17, 20, and 24 (wire fraud), 20 years' imprisonment, 3 years of supervised release, a $250,000 fine, and a $100 special assessment for each count; and Count 8 (aggravated identity theft), a mandatory minimum 2 years' imprisonment, to run consecutively to any other term of imprisonment, 1 year of supervised release, a $250,000 fine, and a $100 special assessment.

---

Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

Total Maximum and Mandatory Minimum Sentence is: 242 years' imprisonment, a mandatory minimum 2 years' imprisonment, to run consecutively to any other term of imprisonment, 3 years of supervised release, a $17,500,000 fine, and a $1,300 special assessment.

## B. **Sentencing Guidelines Calculation**

The presentence report correctly calculates the defendant's Sentencing Guideline range at 102 to 121 months in prison, which includes a range of 78 months to 97 months in prison, plus a mandatory, consecutive 2 years in prison on the aggravated identity theft count. PSR ¶ 117.

The securities fraud and wire fraud counts are controlled by USSG § 2B1.1, the counts group under the grouping rules, USSG § 3D1.1-3, and the base offense level is 7 under USSG § 2B1.1(a)(1). The amount of loss was more than was more than $9,500,000 but not more than $25,000,000, and therefore, 20 levels are added, pursuant to USSG § 2B1.1(b)(1)(K). The offense level is increased by 2 levels because the offense involved 10 or more victims under USSG § 2B1.1(b)(2)(A), and increased by 2 more levels because the offense involved sophisticated means under USSG § 2B1.1(b)(10). PSR ¶¶ 60-63.

As described in more detail below, the defendant obstructed and impeded justice, and attempted to obstruct or impede justice, pursuant to USSG § 3C1.1, increasing his offense level by 2 levels, because the defendant retaliated against Employee 1 for providing information to law enforcement and then threatened and attempted to threaten

Employee 1 and his wife to influence Employee 1's testimony. PSR ¶ 66. The defendant objects to this enhancement.

The offense level is reduced by 3 levels for timely acceptance of responsibility, pursuant to USSG § 3E1.1(a) and (b); and another 2 levels because the defendant is a "zero-point" offender, pursuant to USSG § 4C1.1. PSR ¶¶ 68-70. With a total offense level of 28 and a criminal history category I, the defendant's range is 78 months to 97 months in prison, plus a mandatory, consecutive 2 years in prison on the aggravated identity theft count, leading to months to total Sentencing Guidelines range of 102 months to 121 months in prison. PSR ¶ 117.

## IV.    DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT

The defendant raises several objections to the presentence report. Some lack merit, and, therefore, should be overruled; others are not material to the sentencing, and a ruling is unnecessary, *see* Fed. R. Crim. P. 32(i)(3)(B). The government addresses each objection in turn.

### A.    No Rulings Necessary on FlockU or Any Specific Period of Ownable's Financial Viability

The defendant alleges that FlockU was not itself one of the many fraudulent investment schemes he operated. Def.'s Objection No. 1; PSR ¶ 13 n.4. The Court need not resolve this question because it is not material to sentencing. *See* Fed. R. Crim. P. 32(i)(3)(B). Indeed, the securities fraud and wire fraud counts at issue here – Counts 1 and 2 – are based on the defendant's scheme to defraud Investor A and others through a series of materially false representations from about 2018 through October 2020 in

connection with Ownable LLC and Ownable Capital Partners I LLC, not FlockU. The FlockU business predates Ownable, and the government does not allege that FlockU was a fraudulent business or scam.

Similarly, the defendant alleges that there was a period of time that Ownable was a financially viable business, and therefore, some early representations made to the advisory board about its financial health were accurate. Def.'s Objection No. 1; PSR ¶ 19 n.7. Again, the Court need not resolve this because the specific timing of the defendant's misrepresentations to the board here are not material to sentencing. The defendant admits that at some point he concealed Ownable's financial deterioration to the board. PSR ¶ 19 n.7. Further, his materially false representations in connection with Ownable involved more than just lying to the board; the defendant also lied to investors about the financial viability of Ownable, and how he was using their investments. Despite his representations that company funds would be used solely for legitimate business purposes, the defendant repeatedly used funds that had been raised for business purposes, and funds belonging to Ownable, for his own personal purposes. PSR ¶¶ 20-22. Therefore, because resolution of these questions—about FlockU and any specific period of Ownable's financial viability—would not affect sentencing, no rulings on these objections are necessary.

### B.     The Parties Agree to a Guideline Loss Range; No Additional Findings Are Necessary

The parties agree that the defendant is responsible for a loss amount of more than $9,500,000 but not more than $25,000,000, and therefore, 20 levels are added, pursuant to USSG § 2B1.1(b)(1)(K). No further factual finding as to the precise loss amount is

necessary for purposes of sentencing. Although the parties dispute the exact dollar figure, *see* Def.'s Objection No. 2, there is no dispute regarding the loss range under USSG § 2B1.1, and thus, the offense level and Sentencing Guidelines remain unchanged regardless of the precise calculation within that loss range. Because resolution of the specific amount would not affect the Court's guideline determination, no additional findings are necessary. *See* Fed. R. Crim. P. 32(i)(3)(b).

### C.    The Defendant Obstructed Justice

The defendant has made a general objection to the two-level enhancement under USSG § 3C1.1 for obstruction of justice. Def.'s Objection No. 3.[2] His objection is without merit and at odds with the stipulated facts regarding the defendant's conduct. The evidence demonstrates that the defendant retaliated against Employee 1 for providing information to law enforcement, and the defendant then threatened and attempted to threaten Employee 1 and his wife to influence Employee 1's testimony. Section 3C1.1 applies where a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense." The commentary makes clear that the conduct at issue here falls squarely within its scope.

Application Note 4(A) specifically identifies as covered conduct: "threatening, intimidating, or otherwise unlawfully influencing . . . a witness . . . , directly or indirectly, or attempting to do so." That is precisely what occurred here. On September 12, 2022—

---

[2]    The government will plan to respond more fully once the defendant articulates any legal authority for his objection.

immediately after meeting with government counsel and the Federal Bureau of Investigation (the "FBI") and learning the scope of the evidence against him—the defendant contacted Employee 1, a victim of his aggravated identity theft and a potential government witness. The timing was no coincidence. Armed with knowledge of the investigation, the defendant initiated contact and referenced Employee 1's communications with authorities, stating that he had "just got off the phone" with the government and found it "interesting what you told them." When Employee 1 did not respond, the defendant escalated. He warned: "If this goes forward – you should expect other natural questions like bachelor party conversations and other conversations you think would be relevant." That message was not a request for clarification. It was an unmistakable signal that the defendant was prepared to expose—or fabricate— embarrassing personal information if Employee 1 continued cooperating.

The defendant then extended the pressure by contacting Employee 1's wife and telling her that her husband had given "misinformation" to authorities and that she would be "brought into the conversation." That communication was calculated to heighten the coercive effect. By invoking private "bachelor party conversations" and by drawing Employee 1's spouse into the matter, the defendant sought to intimidate and to create personal and familial consequences for cooperation.

The fact that the defendant first texted Employee 1 just minutes after the FBI meeting ended is further, strong evidence that the defendant's threat to expose embarrassing information about Employee 1 was in response to, and intended to influence, Employee 1's cooperation with the FBI. *See United States v. Camick*, 796 F.3d

1206, 1221 (10th Cir. 2015) (in an obstruction of justice case, noting "that timing can be circumstantial evidence of retaliatory intent") (internal quotes and citations omitted).

Here, a threat to reveal false, embarrassing information to influence a witness, or retaliate against a victim, constitutes "obstruction" under USSG § 3C1.1. Nothing in the guidelines or related obstruction of justice statutes limit the types of threats to bodily harm, and the guidelines and statutes are written broadly to cover all types of intended harm and retaliation against victims and witnesses. *See* USSG § 3C1.1, App. Note 4(A); Application Note 4(K) (covering "threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct"); Application Note 4(I) (covering "other conduct prohibited by obstruction of justice provisions under title 18, United States Code"); 18 U.S.C. § 1513(e) ("Whoever knowingly, with the intent to retaliate, takes any action harmful to any person . . . ."); 18 U.S.C. § 1512(b)(1) ("Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person . . . ."). There are examples from cases throughout the country when, as here, defendants were convicted based on threats of emotional harm to federal witnesses, where the threat was intended to prevent them from, or retaliate against them for, cooperating with law enforcement. *See, e.g.*, *Ventry v. United States*, 2011 WL 2471390, at *1 (W.D.N.Y. 2011) (defendant convicted under section 1512(b)(1) for sending an email telling witness that if she continued to cooperate with authorities, "my lawyer will have to try and destroy your reputation and I will have to tell him everything [including private embarrassing information about you]") (redacted in original to omit the specific embarrassing information the defendant threatened to

disclose); *United States v. Jefferson*, 751 F.3d 314, 321 (5th Cir. 2014), 2011 WL 13061046 (N.D. Miss. 2011) (superseding indictment) (defendant convicted under section 1513(e) based on "professionally ostraciz[ing]" the witness, "maligning her character," and "denying [witness] access to staff meetings [and] portions of the building," among other harms); *United States v. Bird*, 76 F.4th 758, 761 (8th Cir. 2023) (defendant convicted under section 1512(b)(1) based on jail calls where the victim's grandmother felt "pressured" by the defendant's repeated requests to have the victim recant her allegation and his description of his negative experiences in jail); *Camick*, 796 F.3d 1206, 1221-23 (10th Cir. 2015) (defendant convicted under section 1513(e) based on his filing of a frivolous lawsuit immediately after discovering his former girlfriend cooperated with law enforcement).

The parties do not dispute the authenticity or content of the text messages sent by the defendant to Employee 1 and his wife. The only question is whether they constitute obstruction. Under the plain language of obstruction guidelines, they do. The enhancement does not require a successful effort to derail testimony; an attempt to threaten or unlawfully influence a witness is sufficient. Nor does it require an explicit statement such as "do not testify." As described above, courts routinely recognize that veiled threats of harm and implicit pressure constitute obstruction when they are designed to dissuade cooperation, influence testimony, or retaliate against a victim-witness. That is exactly what the defendant attempted here.

This conduct was deliberate, retaliatory, and directly tied to the investigation. It occurred after the defendant learned what the government knew. It targeted a victim-

witness. And it invoked personal and reputational harm as leverage. Under these circumstances, the presentence report correctly concluded that the two-level obstruction enhancement applies, and the total offense level and Sentencing Guideline range are properly calculated.

## V.    GOVERNMENT'S RECOMMENDATIONS CONCERNING SENTENCING

### A.    Sentencing Factors

A thorough consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that a significant sentence of imprisonment is appropriate in this case. The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range.'" *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (*quoting Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences. *Peugh*, 133 S. Ct. at 2084. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.*

In addition, the Court must also consider all of the sentencing considerations set forth in § 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed

to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

## B.     **Application**

The relevant § 3553(a) factors will be discussed in turn.

### 1.     **The Nature and Circumstances of the Offense**

This was a serious offense involving securities fraud, wire fraud, aggravated identity theft, and obstruction, resulting in millions of dollars of losses to dozens of victims. The defendant concocted an array of fraud schemes over multiple years, betraying the trust of investors, prospective investors, employees, business partners, and friends. He forged documents. For example, he brazenly provided an investor with a forged Goldman Sachs statement falsely representing that the defendant's family investment holdings exceeded $50 million, when, in fact, the defendant did not even have an investment account at Goldman Sachs in his own name or in his family's names, much less an account with a market value of more than $50 million. The defendant lied numerous times to investors and to those in his companies. Moreover, he then used the

funds that he obtained through fraud to enrich himself and live a life of luxury on the victims' dime. In order to delay and prevent discovery of his own misconduct, the defendant later sent his victims forged bank and FedEx confirmations that falsely purported to confirm the delivery of funds to investors to whom he had promised repayment. Then, when the defendant learned that he was under investigation, instead of immediately accepting responsibility for his crimes, he chose to try to obstruct justice, threatening a former employee and his wife who had cooperated with authorities. As the defendant admitted in emails to his investors, he "chose lies and ego over transparency."

The victims lost not only money following the defendant's betrayal, but also a sense of security and trust in their dealings with others. As one victim put it:

> We lost money we could not afford to lose. And while financial loss is one thing, losing it to deception—to theft —is another entirely. It's a different kind of pain when you realize you were manipulated by someone you called a friend. The betrayal is deeply personal. It shakes your sense of judgment, trust, and community.

PSR ¶ 48. Victim after victim recounted how the defendant used friendship and community to ensnare his victims and continue victimizing them: "While losing significant monies, the toll of [the defendant's] actions impacted my emotional wellbeing. He used my kindness, compassion and concern for his children and wife to prolong this charade." The Court's sentence here must hold the defendant accountable not only for the millions of dollars in losses and financial harm, but also for this violation of trust. PSR ¶ 44.

## 2. The History and Characteristics of the Defendant

The defendant is a 49 year-old male living in Florida. He grew up in a "very nice area" in the Philadelphia suburbs surrounded by a loving family. He was married (later divorced) with two daughters, living in a million-dollar home in Gladwyne. The defendant held himself out as a wealthy and successful businessman, entrepreneur, and investor, but much of his money was obtained through fraud. Despite years having passed since the commission of these fraud crimes, the defendant still does not appear to appreciate the full breadth of his fraud and consequences of his conduct, which makes him likely to re-offend. This is evident from the defendant's statements in his medical report, where when asked why he had engaged in the offenses, he commented, "I was just trying to save the company...." Forensic Mental Health Report at 23. Although the defendant has no criminal history, he committed 13 separate crimes over three years in this case, lining his own pockets in the process, tried to prevent discovery of his crimes through more fraud and forgery, and then attempted to obstruct justice. This continued criminality demonstrates that his prospects for the future are bleak.

## 3. The Need for Sentence Imposed to Reflect Seriousness of the Offense, Promote Respect for Law, and Provide Just Punishment

There is a strong need to impose a sentence that reflects the seriousness of these offenses, promotes respect for the law, and provide just punishment. The defendant's conduct caused significant financial and emotional harm to many victims. The defendant is not an individual who made a singular bad decision; his criminal conduct stretched for

years, across multiple businesses and fraud schemes, and impacted dozens of people. The sentence here should punish the defendant accordingly.

### 4. The Need for Adequate Deterrence and Protection of Public

The need for adequate deterrence of this type of white-collar crime—large-scale fraud and identity theft—is great. The best way to deter this defendant and others is to send him to prison to serve a guideline sentence. Short of such a lengthy sentence, the defendant's path to private jets, fancy properties, and country clubs might appear an attractive, quick route to undeserved luxury. If the defendant were sentenced below the guideline range, the defendant, and others similarly situated, might view such a sentence simply as the small cost of doing business. Only a sentence of significant imprisonment will send a message that this type of repeated and substantial fraud will not be tolerated. Furthermore, the recommended sentence protects the public from further crimes by the defendant, for at least as long as he remains in prison.

### 5. The Need to Provide the Defendant with Training, Medical Care, or Correctional Treatment

There is no demonstrated need to adjust the sentence in order to provide the defendant with needed educational or vocational training, medical care, or additional treatment that cannot be adequately addressed by the Bureau of Prisons during incarceration. Indeed, the combination of incarceration and supervised release provides the best means of assuring that the defendant's needs are met.

### 6. The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants

While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the guidelines, while carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. On balance, the government believes that the defendant's criminal conduct is appropriately captured by a sentence within the recommended Sentencing Guidelines range.

### 7. Restitution

Restitution is a critical component of sentencing. The defendant has requested that the Court set a date for final determination of the victims' losses within 90 days after sentencing, pursuant to 18 U.S.C. § 3664(d)(5). That statute provides that when victims' losses are not ascertainable 10 days prior to sentencing, "the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." Neither the government nor probation object to this request. The parties are continuing to analyze financial records, reconcile transactional data, and obtain updated information and supporting documentation from victims. That process is necessary to ensure that any restitution order is accurate, comprehensive, and fully supported by the evidentiary

record. Pursuant to the Court's order on February 25, 2025, the government will continue to confer with defense counsel and will be prepared to address this request at sentencing.

### C. **Supervised Release**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a term of supervised release of 3 years is warranted. As explained above, the defendant defrauded dozens of victims out of millions and millions of

dollars through a sprawling series of fraud schemes over many years. He used the stolen funds to enjoy a luxurious lifestyle he did not earn. The defendant compounded these many frauds by then attempting to cover up the schemes through forged documents and fabricated stories, and when all else failed, he tried to obstruct justice by tampering with a victim-witness of these crimes. Close supervision following release from imprisonment is warranted to aid his reentry to society and to protect the public. A term of supervised release in this case advances the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), assure that the defendant continues to pursue education and vocational efforts that promote rehabilitation, § 3553(a)(2)(D), and pays restitution to victims, § 3553(a)(7).

This assessment also supports imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3, as well as the special conditions listed in Appendix A of the presentence report.

## VI.   CONCLUSION

The sentencing guidelines present "the lodestone of sentencing," *Peugh*, 133 S. Ct. at 2084, and that guide is once again persuasive in this case. For these reasons and any that may be presented at the defendant's sentencing hearing, the government believes that

only a significant Sentencing Guidelines sentence—one that fully accounts for the scope and severity of the defendant's criminal conduct—is appropriate in this case.

Respectfully submitted,

DAVID METCALF
United States Attorney


JEROME M. MAIATICO
PAUL G. SHAPIRO
Assistant United States Attorneys

# CERTIFICATE OF SERVICE

I certify that a copy of this sentencing memorandum was served by email on defense counsel of record.

_____
JEROME M. MAIATICO
Assistant United States Attorney

Dated: February 25, 2026