RECEIVED

MAY 1 9 2026

*PAE-AO 243 (Rev. 05/2018)*                                        *Verne, No. 2:24-cr-00270-JFM*

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

# MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court  District: EASTERN DISTRICT OF PENNSYLVANIA | |
|---|---|
| **Name (under which you were convicted):** Josh S. Verne | **Docket or Case No.:** 2:24-cr-00270-JFM |
| **Place of Confinement:** Not currently in custody. On bond pending self-surrender on June 11, 2026. Designated facility upon surrender: Miami Satellite Camp, 15801 SW 137th Ave, Miami, FL 33177. | **Prisoner No.:** 28382-511 (Bureau of Prisons Register Number) |

| UNITED STATES OF AMERICA v. JOSH S. VERNE, *Movant.* | Criminal No. 2:24-cr-00270-JFM *(Honorable John F. Murphy)* |
|---|---|

## MOTION

**1. (a) Name and location of court which entered the judgment of conviction you are challenging:**

United States District Court for the Eastern District of Pennsylvania, James A. Byrne U.S. Courthouse, 601 Market Street, Philadelphia, PA 19106.

**(b) Criminal docket or case number (if you know):** 2:24-cr-00270-JFM (Honorable John F. Murphy).

**2. (a) Date of the judgment of conviction (if you know):** March 4, 2026 (judgment entered the same date as sentencing).

**(b) Date of sentencing:** March 4, 2026.

**3. Length of sentence:**

111 months total imprisonment, comprised of 87 months on each of Counts 1, 2, 5, 9, 11, 12, 13, 16, 17, 20, 21, and 24 (to run concurrently with one another), and 24 months on Count 8 to run consecutively to all other terms; followed by 3 years of supervised release; restitution to be determined; special assessment of $1,300.

**4. Nature of crime (all counts):**

Three counts of securities fraud (Counts 1, 11, and 21), in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; nine counts of wire fraud (Counts 2, 5, 9, 12, 13, 16, 17, 20, and 24), in violation of 18 U.S.C. § 1343; and one count of aggravated identity theft (Count 8), in violation of 18 U.S.C. § 1028A(a)(1), (c)(5).

**5. (a) What was your plea? (Check one)**

(1) Not guilty ☐    (2) Guilty ☒    (3) Nolo contendere (no contest) ☐

**(b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?**

Movant entered a guilty plea on March 3, 2025, to all thirteen counts identified in the written plea agreement: Counts 1, 2, 5, 8, 9, 11, 12, 13, 16, 17, 20, 21, and 24 of the indictment. Counts 3, 4, 6, 7, 10, 14, 15, 18, 19, 22, 23, 25, 26, 27, and 28 were dismissed by the government at sentencing pursuant to paragraph 2(a) of the plea agreement.

**6. If you went to trial, what kind of trial did you have? (Check one)** Jury ☐    Judge only ☐
*Not applicable - Movant pleaded guilty pursuant to a written plea agreement; no trial was held.*

**7. Did you testify at a pretrial hearing, trial, or post-trial hearing?** Yes ☐    No ☒

**8. Did you appeal from the judgment of conviction?** Yes ☐    No ☒

**9. If you did appeal, answer the following:**

Not applicable. No direct appeal was filed. The plea agreement contains a broad appellate waiver at paragraph 15, with limited exceptions enumerated at paragraph 15(b). Subparagraph 15(b)(iv) preserves Movant's right to assert ineffective assistance of counsel - the basis of this motion. Movant pursues that preserved claim through this collateral proceeding under 28 U.S.C. § 2255, not through direct appeal.

**10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?** Yes ☐    No ☒

**11. If your answer to Question 10 was "Yes," give the following information:** *Not applicable.*

**12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.**

Movant asserts fifteen grounds for relief, all arising under the Sixth Amendment to the United States Constitution. All fifteen grounds allege ineffective assistance of counsel rendered by Movant's appointed sentencing counsel, Angela Levy, Esq. and Michael B. McCrossen, Esq., of the Federal Community Defender Office for the Eastern District of Pennsylvania. The substantive answer for each ground - including (a) supporting facts, (b) direct appeal status, and (c) post-conviction proceedings status - is set forth in the corresponding Continuation Sheet attached to this Motion. Each Continuation Sheet provides the full substantive answer required by Local Civil Rule 9.4(B) and the form's instructions; no answer is incorporated by reference to a separate memorandum.

**GROUND ONE: Ineffective Assistance of Counsel - Failure to Challenge Michael Schulson's Victim Impact Letter Despite Possessing a Signed Buy-Back Agreement, Mutual Release, and Bank Records Proving Full Repayment.**

*See Continuation Sheet for Ground One (substantive answer including (a) supporting facts, (b) direct appeal, and (c) post-conviction proceedings).*

2

**GROUND TWO: Ineffective Assistance of Counsel - Failure to Challenge Eve Rosen's Unsubstantiated Threat Allegation Despite a Specific Written Instruction Passed to Counsel During Her Testimony.**

*See Continuation Sheet for Ground Two (substantive answer including (a) supporting facts, (b) direct appeal, and (c) post-conviction proceedings).*

**GROUND THREE: Ineffective Assistance of Counsel - Failure to Rebut Steve Rosenberg's Letter Despite Documented Evidence Directly Contradicting His Characterizations.**

*See Continuation Sheet for Ground Three (substantive answer including (a) supporting facts, (b) direct appeal, and (c) post-conviction proceedings).*

**GROUND FOUR: Ineffective Assistance of Counsel - Violation of Movant's Express Written Pre-Sentencing Instructions Regarding Sensitive Medical Information; Failure to Use the Cunliffe Forensic Report's Mitigating Conclusions.**

*See Continuation Sheet for Ground Four (substantive answer including (a) supporting facts, (b) direct appeal, and (c) post-conviction proceedings).*

*ADDITIONAL GROUNDS FIVE THROUGH FIFTEEN: See Continuation Sheets for Grounds Five through Fifteen attached, each providing a full substantive answer in the same format prescribed by Question 12 of this Form.*

**13. Is there any ground in this motion that you have not previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:**

All fifteen grounds set forth in this Motion are presented to a federal court for the first time in this proceeding. The factual basis for each ground arises from defense counsel's performance at the March 4, 2026 sentencing hearing and the documented attorney-client communications surrounding that hearing - facts that, as a matter of law, cannot be developed on direct appeal but are properly raised on collateral review. See Massaro v. United States, 538 U.S. 500, 504-05 (2003).

**14. Do you have any motion, petition, or appeal now pending (filed and not decided yet) in any court for the judgment you are challenging?** Yes ☐   No ☒

Movant has no other motion, petition, or appeal pending. Restitution was determined at a post-sentencing proceeding on May 12, 2026, within the 90-day window under 18 U.S.C. § 3664(d)(5); that proceeding is part of the same criminal case and is not a separate motion, petition, or appeal challenging the judgment.

**15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:**

**(a) At the preliminary hearing:** Not applicable. The case was initiated by indictment returned July 25, 2024; no preliminary hearing was held.

**(b) At the arraignment and plea:** Michael B. McCrossen, Esq. and Angela Levy, Esq., Federal Community Defender Office, 601 Walnut Street, Suite 540, Philadelphia, PA 19106.

**(c) At the trial:** Not applicable; no trial was held. Movant entered a guilty plea.

**(d) At sentencing:** Michael B. McCrossen, Esq. and Angela Levy, Esq., Federal Community Defender Office, 601 Walnut Street, Suite 540, Philadelphia, PA 19106. The performance of these attorneys is the subject of this Motion.

**(e) On appeal:** Not applicable. No direct appeal was filed.

**(f) In any post-conviction proceeding:** Movant is proceeding pro se in this § 2255 proceeding. Movant has requested in the Relief portion of this Motion that the Court appoint conflict-free counsel from outside the Federal Community Defender Office for the Eastern District of Pennsylvania, drawn from the CJA panel, to represent Movant at all subsequent stages of this proceeding, including any reply, evidentiary hearing, resentencing, or appeal.

**(g) On appeal from any ruling against you in a post-conviction proceeding:** Not applicable; no ruling has been entered.

**16. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?** Yes ☐   No ☒

**17. TIMELINESS OF MOTION:** *If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

This Motion is timely under 28 U.S.C. § 2255(f)(1). Judgment of conviction was entered on March 4, 2026. No notice of appeal was filed. Under Federal Rule of Appellate Procedure 4(b)(1)(A)(i), Movant had 14 days from the entry of judgment to file a notice of appeal. That period expired on March 18, 2026, on which date the judgment became final for purposes of § 2255(f)(1). The one-year limitations period therefore runs through March 18, 2027. This Motion is filed well within that period and prior to Movant's self-surrender date of June 11, 2026.

**Therefore, movant asks that the Court grant the following relief:**

Movant respectfully requests that this Court: (1) vacate the sentence imposed on March 4, 2026; (2) order a new sentencing hearing at which Movant is represented by conflict-free counsel not previously involved in this case, appointed at no cost to Movant consistent with his qualification for appointed representation; (3) in the alternative, grant an evidentiary hearing at which Movant may present the documentary evidence described herein and in the accompanying Memorandum, including Exhibits A through P; (4) appoint conflict-free counsel drawn from the CJA panel or private appointed counsel - and specifically not from the Federal Community Defender Office for the Eastern District of Pennsylvania - to represent Movant at all subsequent stages of these proceedings, including any reply to the government's response under Rule 5 of the Rules Governing § 2255 Proceedings, any evidentiary hearing, any resentencing, and any appeal; (5) appoint such counsel as early as practicable, including for the purpose of replying to the government's response, given Movant's imminent self-surrender on June 11, 2026 and the practical limitations on pro se litigation from within Bureau of Prisons custody; and (6) grant such other and further relief as this Court deems just and proper, or any other relief to which movant may be entitled.

---

*Signature of Attorney (if any) - Not applicable; Movant is proceeding pro se.*

4

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on

_____.

*(Not applicable. Movant is not currently in custody. The federal prisoner-mailbox rule does not apply. Movant's filing date is the date the Clerk receives this Motion.)*

Executed (signed) on _____5/13/26_____

(date)

_____

Signature of Movant

Josh S. Verne, Pro Se Movant

525 NE 7th Street, Unit 1-912

Fort Lauderdale, FL 33304

*[Telephone number, if Movant elects to provide one]*

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion:

*Not applicable. Movant is signing this Motion personally.*

**CONTINUATION SHEETS**
(Substantive Answers to Question 12)

**GROUND ONE: Ineffective Assistance of Counsel - Failure to Challenge Michael Schulson's Victim Impact Letter Despite Possessing a Signed Buy-Back Agreement, Mutual Release, and Bank Records Proving Full Repayment.**

**(a) Supporting facts** *(Do not argue or cite law. Just state the specific facts that support your claim.)*:

On March 4, 2026, this Court sentenced Movant to 111 months of imprisonment. At sentencing, the Court described the victim impact letter submitted by Michael Schulson as "particularly significant" and cited Schulson's characterization of Movant as "a danger to the public" as part of the basis for its sentencing rationale.

Movant's appointed counsel, Angela Levy and Michael McCrossen of the Federal Community Defender Office, possessed a fully executed Purchase Agreement dated February 28, 2020, by which Schulson sold his interests in Ownable LLC and Ownable Capital Partners I LLC back for $426,581. Counsel also possessed bank records confirming each corresponding payment, and an outside-counsel billing record from the law firm Baer Crossey McDemus LLC dated February 28, 2020 (5.8 hours billed for "repurchase of various interests held by Schulson in ownable and OCP") independently confirming the buyback was drafted and executed on that date.

On September 11, 2025 - five months before sentencing - Movant transmitted the executed Purchase Agreement to both Levy and McCrossen by email and documented in writing that the buyback had been extracted from him by Schulson under threat: Schulson had threatened to appear at Movant's [REDACTED — minor children] school and publicly shame them in front of their classmates. [REDACTED — ages of minor children].

Section 4(c) of the Purchase Agreement contained an unconditional mutual release of all claims. Section 4(d) contained a mutual non-disparagement clause. Schulson's victim impact letter violated both provisions. Counsel possessed the executed agreement, the release, the non-disparagement clause, the bank records, and the documentation of the school threat.

Counsel placed none of this evidence before the Court at sentencing. The agreement was not introduced. The release was not raised. The non-disparagement clause was not raised. The bank records were not introduced. The documented threat against Movant's minor children was not disclosed to the Court. The same Schulson buyback agreement was partially credited in the post-sentencing restitution proceeding — limited to amounts already reflected on the government's loss-table worksheet, without counsel placing the full agreement, release, or non-disparagement clause before this Court - establishing that counsel knew the agreement existed and understood its legal significance.

The Court denied any downward variance and imposed a sentence of 111 months, citing Schulson's letter as a basis for that decision.

**(b) Direct Appeal of Ground ONE:**

**(1) If you appealed from the judgment of conviction, did you raise this issue?** No direct appeal was filed; this issue was not raised on direct appeal.

**(2) If you did not raise this issue in your direct appeal, explain why:** No direct appeal was filed. The plea agreement contains a broad appeal waiver at paragraph 15. The same agreement preserves ineffective-assistance-of-counsel claims at paragraph 15(b)(iv). Movant pursues this ineffective-assistance claim through the preserved § 2255 collateral review process rather than direct appeal.

**(c) Post-Conviction Proceedings:**

**(1) Did you raise this issue in any post-conviction motion, petition, or application?** No. This § 2255 motion is the first post-conviction proceeding filed.

**(2) If your answer to Question (c)(1) is "Yes," state:** Not applicable.

**(3) Did you receive a hearing on your motion, petition, or application?** Not applicable; no prior post-conviction motion has been filed.

**(4) Did you appeal from the denial of your motion, petition, or application?** Not applicable.

**(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?** Not applicable.

**(6) If your answer to Question (c)(4) is "Yes," state:** Not applicable.

**(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:** Not applicable; this is Movant's first post-conviction motion. There has been no denial from which to appeal.

**GROUND TWO: Ineffective Assistance of Counsel - Failure to Challenge Eve Rosen's Unsubstantiated Threat Allegation Despite a Specific Written Instruction Passed to Counsel During Her Testimony.**

**(a) Supporting facts** *(Do not argue or cite law. Just** state the specific facts that support your claim.):*

At the sentencing hearing on March 4, 2026, Eve Rosen, a licensed Pennsylvania attorney who helped organize the victim response in this case, testified live. The Court later identified Rosen's testimony as one of the factors that "really jumped out" at sentencing.

During her testimony, Rosen alleged for the first time that Movant had personally threatened her after she went to law enforcement. The allegation was uncorroborated, with no documentary evidence offered. The allegation appeared for the first time more than five years after the events Rosen described. Rosen had been interviewed by the FBI on November 2, 2020, in her first contact with the agent investigating this case. The FBI 302 from that November 2020 interview - in counsel's possession before sentencing - contains no mention of any physical threat from Movant. Rosen, as a licensed attorney, was familiar with the legal mechanisms available to seek personal protection from threatening conduct (restraining orders, protective orders); to Movant's knowledge, she sought no such protection at any time, and Movant was never contacted by any local, state, or federal authority regarding any such alleged threat.

While Rosen was on the witness stand making her allegation, Movant - using a notepad and pen Levy had handed him at the outset of the hearing with instructions to slip her a note if he needed to communicate during the proceeding - wrote a note specifically requesting that

7

counsel challenge and rebut what Rosen was saying. Movant slipped the note to Levy as instructed. Counsel asked no questions. Counsel did not cross-examine Rosen. Counsel did not raise the absence of any threat allegation in Rosen's prior FBI interview. Counsel did not place Rosen's professional background or her failure to take any protective action before the Court.

The Court relied on Rosen's testimony as a factor in imposing sentence.

**(b) Direct Appeal of Ground TWO:**

**(1) If you appealed from the judgment of conviction, did you raise this issue?** No direct appeal was filed; this issue was not raised on direct appeal.

**(2) If you did not raise this issue in your direct appeal, explain why:** No direct appeal was filed. The plea agreement contains a broad appeal waiver at paragraph 15. The same agreement preserves ineffective-assistance-of-counsel claims at paragraph 15(b)(iv). Movant pursues this ineffective-assistance claim through the preserved § 2255 collateral review process rather than direct appeal.

**(c) Post-Conviction Proceedings:**

**(1) Did you raise this issue in any post-conviction motion, petition, or application?** No. This § 2255 motion is the first post-conviction proceeding filed.

**(2) If your answer to Question (c)(1) is "Yes," state:** Not applicable.

**(3) Did you receive a hearing on your motion, petition, or application?** Not applicable; no prior post-conviction motion has been filed.

**(4) Did you appeal from the denial of your motion, petition, or application?** Not applicable.

**(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?** Not applicable.

**(6) If your answer to Question (c)(4) is "Yes," state:** Not applicable.

**(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:** Not applicable; this is Movant's first post-conviction motion. There has been no denial from which to appeal.

**GROUND THREE: Ineffective Assistance of Counsel - Failure to Rebut Steve Rosenberg's Letter Despite Documented Evidence Directly Contradicting His Characterizations.**

**(a) Supporting facts** *(Do not argue or cite law. Just state the specific facts that support your claim.):*

At sentencing, Steve Rosenberg's victim impact letter was presented to the Court. The Court identified Rosenberg's characterizations as a key sentencing factor, stating "Same goes for Mr. Rosenberg's letter. I mean, trust was everything for him." Rosenberg's letter framed Movant's decade of charitable activity - Israel trips, Shabbat dinners, community leadership - as a calculated performance designed to defraud investors and a vehicle for exploitation of Jewish-community ties.

Counsel possessed three specific items of documentary rebuttal evidence and used none of them.

First, the investor base across Movant's entities was not exclusively Jewish. Movant had numerous non-Jewish investors, directly contradicting the characterization that Jewish-community ties were deliberately cultivated as an instrument of fraud.

Second, Movant's involvement in the Jewish community - including hosting of Shabbat dinners and faith-community gatherings - substantially predated the formation of Ownable LLC by close to a decade. Documentary records of that prior community involvement were in counsel's possession and contradict the narrative that the activity was a vehicle for investor solicitation.

Third, Rosenberg himself personally organized and invited Movant on two trips to Israel during the relevant period, and Movant assisted in organizing, leading, and raising funds on the second of those trips. The conduct Rosenberg's letter framed as exploitation was charitable community work in which Rosenberg himself was an active organizer. The Israel-trip organizer role appeared in the sentencing record itself.

Movant provided counsel with written notice of these rebuttals before sentencing, including in the February 23, 2026 pre-sentencing letter and prior email exchanges, with a specific request that the Israel-trip and timeline points be raised at the hearing. Counsel raised none of the three. The Court relied on Rosenberg's letter as the second pillar of its trust framework in imposing sentence.

## (b) Direct Appeal of Ground THREE:

**(1) If you appealed from the judgment of conviction, did you raise this issue?** No direct appeal was filed; this issue was not raised on direct appeal.

**(2) If you did not raise this issue in your direct appeal, explain why:** No direct appeal was filed. The plea agreement contains a broad appeal waiver at paragraph 15. The same agreement preserves ineffective-assistance-of-counsel claims at paragraph 15(b)(iv). Movant pursues this ineffective-assistance claim through the preserved § 2255 collateral review process rather than direct appeal.

## (c) Post-Conviction Proceedings:

**(1) Did you raise this issue in any post-conviction motion, petition, or application?** No. This § 2255 motion is the first post-conviction proceeding filed.

**(2) If your answer to Question (c)(1) is "Yes," state:** Not applicable.

**(3) Did you receive a hearing on your motion, petition, or application?** Not applicable; no prior post-conviction motion has been filed.

**(4) Did you appeal from the denial of your motion, petition, or application?** Not applicable.

**(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?** Not applicable.

**(6) If your answer to Question (c)(4) is "Yes," state:** Not applicable.

**(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:** Not applicable; this is Movant's first post-conviction motion. There has been no denial from which to appeal.

9

**GROUND FOUR: Ineffective Assistance of Counsel - Violation of Movant's Express Written Pre-Sentencing Instructions Regarding Sensitive Medical Information; Failure to Use the Cunliffe Forensic Report's Mitigating Conclusions.**

**(a) Supporting facts** *(Do not argue or cite law. Just state the specific facts that support your claim.):*

Defense counsel retained forensic psychologist Dr. Ted B. Cunliffe to evaluate Movant. Dr. Cunliffe spent fourteen hours evaluating Movant using [REDACTED — number and type of clinical instruments — see sealed version]. Dr. Cunliffe's August 25, 2025 report concluded that Movant scored in the [REDACTED — specific clinical risk profile finding — see sealed version] on [REDACTED — specific clinical measures — see sealed version]; that there was [REDACTED — specific clinical findings — see sealed version]; and that Movant's conduct was a product of [REDACTED — specific clinical conclusion — see sealed version]. Dr. Cunliffe prescribed a specific evidence-based treatment pathway: [REDACTED — specific treatment modality — see sealed version].

Counsel filed Dr. Cunliffe's full report under seal as Exhibit A to the defense sentencing memorandum, consistent with Movant's instructions.

Before sentencing, Movant gave counsel express written instructions stating that the diagnostic labels in the report (the names of his diagnosed disorders) were not to be read aloud in open court, and that any reference to those labels at the public hearing was to be limited to general descriptive language without naming the disorders.

At the sentencing hearing on March 4, 2026, counsel Angela Levy read the diagnostic labels from the Cunliffe report aloud in open court, on the public record, in direct contravention of Movant's written instruction. Counsel then stated to the Court: "I'm not going to go into a tremendous amount of detail from Dr. Cunliffe's report, because I know that you read, it's Exhibit A which we attached and filed under seal."

Counsel's argument addressed historical misdiagnoses and [REDACTED — sensitive family content — see sealed version]. Counsel did not present, explain, or argue the [REDACTED — specific clinical findings — see sealed version]; the [REDACTED — specific clinical findings on risk profile — see sealed version]; or the specific [REDACTED — treatment modality — see sealed version] treatment pathway Dr. Cunliffe prescribed. The Court subsequently stated: "there's nothing in this record that makes me think that Mr. Verne would have stopped doing what he was doing, or this kind of behavior for any reason other than he was forced to." The Court then denied any downward variance and imposed sentence.

**(b) Direct Appeal of Ground FOUR:**

**(1) If you appealed from the judgment of conviction, did you raise this issue?** No direct appeal was filed; this issue was not raised on direct appeal.

**(2) If you did not raise this issue in your direct appeal, explain why:** No direct appeal was filed. The plea agreement contains a broad appeal waiver at paragraph 15. The same agreement preserves ineffective-assistance-of-counsel claims at paragraph 15(b)(iv). Movant pursues this ineffective-assistance claim through the preserved § 2255 collateral review process rather than direct appeal.

**(c) Post-Conviction Proceedings:**

**(1) Did you raise this issue in any post-conviction motion, petition, or application?** No. This § 2255 motion is the first post-conviction proceeding filed.

**(2) If your answer to Question (c)(1) is "Yes," state:** Not applicable.

**(3) Did you receive a hearing on your motion, petition, or application?** Not applicable; no prior post-conviction motion has been filed.

**(4) Did you appeal from the denial of your motion, petition, or application?** Not applicable.

**(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?** Not applicable.

**(6) If your answer to Question (c)(4) is "Yes," state:** Not applicable.

**(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:** Not applicable; this is Movant's first post-conviction motion. There has been no denial from which to appeal.

**GROUND FIVE: Ineffective Assistance of Counsel - Failure to Investigate and Raise the Hockfield Structural Conflict of Interest.**

**(a) Supporting facts** *(Do not argue or cite law. Just state the specific facts that support your claim.):*

Barry Hockfield is an attorney who served as Movant's personal and business attorney across documented engagements spanning January 2015 through February 2021. He is also Movant's former father-in-law.

Four documentary engagements establish the prior attorney-client relationship: (1) On January 2, 2015, Movant forwarded a non-compete agreement from the WorkPays/APA business transaction to Hockfield for legal review. (2) On April 20, 2017, Movant wrote to Independence Blue Cross stating in writing: "I give complete authorization for you and whoever else from IBC/IBX to discuss all matters regarding me, Josh Verne, with my attorney Barry J. Hockfield (CC'd)." Hockfield was copied at his personal email account. (3) On April 21, 2020, Hockfield's personal email was on the Ownable investor meeting distribution list, providing access to investor communications. Hockfield was not himself an investor in Ownable. (4) On February 3, 2021, attorney Neal Jacobs sent a joint email to Movant and Hockfield regarding a lawsuit in which Movant and his then-wife were co-defendants, addressing settlement strategy, subpoenas, and Fifth Amendment considerations.

On or about July 6, 2021, AUSA Paul Shapiro - the prosecutor in this case - sent three separate proffer letters to Barry Hockfield, Esquire. The first concerned Sherri Hockfield, the company's former Chief Financial Officer, key government financial witness in this case, and Movant's former sister-in-law. The second and third concerned Josh Block and Gayle Block, family members on the government's victim and witness list. All three proffer letters are in the discovery file.

These three proffer letters establish that Barry Hockfield was simultaneously orchestrating the formal cooperation of multiple government witnesses drawn from Movant's own family and professional network with the same prosecutor, AUSA Shapiro, who was prosecuting Movant.

11

Before sentencing, Hockfield appeared on a podcast and made specific predictions about Movant's sentencing outcome. Counsel Angela Levy listened to the podcast and confirmed awareness of Hockfield's specific statements.

Counsel had documented notice of Hockfield's prior representation through Movant's pre-sentencing communications. Counsel did not investigate the conflict, did not file any motion regarding the conflict, did not seek discovery on Hockfield's witness communications, and did not raise the conflict with the Court at sentencing. No written conflict waiver from Movant exists in the record.

**(b) Direct Appeal of Ground FIVE:**

**(1) If you appealed from the judgment of conviction, did you raise this issue?** No direct appeal was filed; this issue was not raised on direct appeal.

**(2) If you did not raise this issue in your direct appeal, explain why:** No direct appeal was filed. The plea agreement contains a broad appeal waiver at paragraph 15. The same agreement preserves ineffective-assistance-of-counsel claims at paragraph 15(b)(iv). Movant pursues this ineffective-assistance claim through the preserved § 2255 collateral review process rather than direct appeal.

**(c) Post-Conviction Proceedings:**

**(1) Did you raise this issue in any post-conviction motion, petition, or application?** No. This § 2255 motion is the first post-conviction proceeding filed.

**(2) If your answer to Question (c)(1) is "Yes," state:** Not applicable.

**(3) Did you receive a hearing on your motion, petition, or application?** Not applicable; no prior post-conviction motion has been filed.

**(4) Did you appeal from the denial of your motion, petition, or application?** Not applicable.

**(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?** Not applicable.

**(6) If your answer to Question (c)(4) is "Yes," state:** Not applicable.

**(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:** Not applicable; this is Movant's first post-conviction motion. There has been no denial from which to appeal.

**GROUND SIX: Ineffective Assistance of Counsel - Failure to Research and Raise Pending Sentencing Guideline Amendments and the § 3553(a)(6) Disparity Argument.**

**(a) Supporting facts** *(Do not argue or cite law. Just state the specific facts that support your claim.):*

Before sentencing, counsel Angela Levy identified to Movant that the United States Sentencing Commission had pending amendments to USSG § 2B1.1 affecting loss amount thresholds and victim count tiers. Levy discussed these pending amendments with Movant as a basis for mitigation.

The Sentencing Commission published proposed amendments in December 2025 and January 2026. The amendments restructure the loss table from 16 tiers to 8 broader tiers and

12

adjust monetary thresholds for inflation. The same amendment package narrows the "sophisticated means" enhancement under USSG § 2B1.1(b)(10)(C) and adds a new reduction for defendants who demonstrate significant pre-sentencing rehabilitative efforts. The Commission voted to adopt the amendments on April 16, 2026, with an effective date of November 1, 2026.

Movant was sentenced on March 4, 2026, under the prior loss table, the prior sophisticated-means standard, and without the pre-sentencing-rehabilitation reduction. Defendants sentenced after November 1, 2026, with similar conduct will be evaluated under the revised standards. This creates a fixed sentencing disparity directly addressed by 18 U.S.C. § 3553(a)(6).

Counsel did not brief any of the three pending amendments. Counsel did not raise the § 3553(a)(6) disparity argument they supported. Counsel said nothing about the amendments at the sentencing hearing.

Movant's pre-sentencing rehabilitation - one of the categories the new amendment addresses - is established by four independent government-produced documents: Eve Rosen's November 2020 FBI interview noting Movant was "currently in rehab"; Charles Kurtzman's June 2021 FBI interview stating Movant "advised that he was seeking rehabilitation for substance abuse"; David Magerman's July 2021 FBI interview stating Movant told him directly in summer 2020 that "he was going to rehab, and would turn himself around"; and Movant's own October 2020 email to investors stating he was "entering into an inpatient facility to work on his health and mental wellness."

**(b) Direct Appeal of Ground SIX:**

**(1) If you appealed from the judgment of conviction, did you raise this issue?** No direct appeal was filed; this issue was not raised on direct appeal.

**(2) If you did not raise this issue in your direct appeal, explain why:** No direct appeal was filed. The plea agreement contains a broad appeal waiver at paragraph 15. The same agreement preserves ineffective-assistance-of-counsel claims at paragraph 15(b)(iv). Movant pursues this ineffective-assistance claim through the preserved § 2255 collateral review process rather than direct appeal.

**(c) Post-Conviction Proceedings:**

**(1) Did you raise this issue in any post-conviction motion, petition, or application?** No. This § 2255 motion is the first post-conviction proceeding filed.

**(2) If your answer to Question (c)(1) is "Yes," state:** Not applicable.

**(3) Did you receive a hearing on your motion, petition, or application?** Not applicable; no prior post-conviction motion has been filed.

**(4) Did you appeal from the denial of your motion, petition, or application?** Not applicable.

**(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?** Not applicable.

**(6) If your answer to Question (c)(4) is "Yes," state:** Not applicable.

13

**(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:** Not applicable; this is Movant's first post-conviction motion. There has been no denial from which to appeal.

**GROUND SEVEN: Ineffective Assistance of Counsel - Failure to Explain the Absence of Character Witnesses and Failure to Raise Documented Government Overreach Under § 3553(a)(1).**

**(a) Supporting facts** *(Do not argue or cite law. Just state the specific facts that support your claim.):*

At sentencing, the government cited the absence of character witnesses for Movant as evidence that Movant had no genuine community support. Counsel offered no explanation for the absence.

The actual reason was documented and known to counsel. The government had placed close to one hundred individuals on the victim and witness list. That list included individuals Movant had never been alleged to have defrauded, and at least one individual Movant had an active legitimate consulting relationship with - Krishna Gopinathan. Once placed on the witness list, those individuals were prohibited from any contact with Movant, severing professional and personal relationships.

On February 23, 2026 - nine days before sentencing - Movant emailed counsel in writing: "I DO THINK YOU SHOULD BRING THIS UP AT THE HEARING AS TO WHY I DIDN'T WANT TO CALL ANYONE - THIS GOES ALONG WITH THEIR OVERREACH AT EVERY LEVEL." Movant identified four specific factual bases for the argument: investors on the government's witness list had contacted his employer (Juice Financial) and caused him to lose his job before the SEC investigation was public; the government added Gopinathan to the list without first contacting him, severing an active consulting income source; Movant reasonably feared retaliation against any character witness who appeared; and the government accepted Schulson's victim impact letter despite Schulson's signed non-disparagement obligation.

Movant separately identified to counsel a sitting elected official who had expressed openness to writing a character letter and asked whether other public officials were also writing. Movant provided counsel with the official's direct cell phone number and specifically asked counsel to call to solicit the letter. On November 10, 2025, Movant followed up in writing asking whether contact had been made.

Counsel did not contact the elected official. Counsel did not raise the witness-list-overreach argument at sentencing. Counsel did not present any of the four documented factual bases. Counsel did not raise the government's pre-indictment posture, including AUSA Shapiro's December 19, 2022 email to defense counsel demanding a confession-level admission by 1:00 PM under threat of cancellation - documentation in counsel's possession before sentencing.

**(b) Direct Appeal of Ground SEVEN:**

**(1) If you appealed from the judgment of conviction, did you raise this issue?** No direct appeal was filed; this issue was not raised on direct appeal.

14

**(2) If you did not raise this issue in your direct appeal, explain why:** No direct appeal was filed. The plea agreement contains a broad appeal waiver at paragraph 15. The same agreement preserves ineffective-assistance-of-counsel claims at paragraph 15(b)(iv). Movant pursues this ineffective-assistance claim through the preserved § 2255 collateral review process rather than direct appeal.

### (c) Post-Conviction Proceedings:

**(1) Did you raise this issue in any post-conviction motion, petition, or application?** No. This § 2255 motion is the first post-conviction proceeding filed.

**(2) If your answer to Question (c)(1) is "Yes," state:** Not applicable.

**(3) Did you receive a hearing on your motion, petition, or application?** Not applicable; no prior post-conviction motion has been filed.

**(4) Did you appeal from the denial of your motion, petition, or application?** Not applicable.

**(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?** Not applicable.

**(6) If your answer to Question (c)(4) is "Yes," state:** Not applicable.

**(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:** Not applicable; this is Movant's first post-conviction motion. There has been no denial from which to appeal.

**GROUND EIGHT: Ineffective Assistance of Counsel - Failure to Challenge the Government's Contradictory Timeline and to Present Evidence of Legitimate Business Value.**

**(a) Supporting facts** (*Do not argue or cite law. Just state the specific facts that support your claim.*):

The government's sentencing presentation characterized the fraud as continuous from 2015 through 2020 - a five-year fraudulent enterprise. The government's own prior position at the change-of-plea hearing acknowledged that conduct predating 2018 was not part of the fraudulent scheme. Movant operated FlockU LLC from 2015 through 2018 and the government acknowledged at change of plea that FlockU was not a fraudulent enterprise. Counsel did not challenge the government's five-year framing or draw the Court's attention to the inconsistency between the government's two positions.

Counsel possessed documentary rebuttal evidence concerning Movant's prior legitimate business history and did not introduce any of it. Movant operated the family furniture business as President from 1998 through 2011. Movant founded WorkPays (later Global Analytics) and sold it in a transaction that included substantial stock consideration in addition to cash; the government's references at sentencing characterized the WorkPays transaction by reference only to the cash component, omitting the stock consideration. The Asset Purchase Agreement documenting both components was in counsel's possession.

Movant separately forwarded counsel a news article reporting the Beatbox Beverages acquisition at a reported $490 million - a substantial outcome for the investors Movant had

brought into BBB-I, the vehicle through which the investments were made - with a specific written request that the article be raised at sentencing. It was not raised.

Counsel separately possessed the Blue Elephant Capital Management forward purchase agreement, by which a sophisticated institutional lender conducted due diligence on Ownable, deployed capital, and recovered profit on each rental contract it purchased. Movant requested in writing that this be raised at sentencing. It was not raised.

**(b) Direct Appeal of Ground EIGHT:**

**(1) If you appealed from the judgment of conviction, did you raise this issue?** No direct appeal was filed; this issue was not raised on direct appeal.

**(2) If you did not raise this issue in your direct appeal, explain why:** No direct appeal was filed. The plea agreement contains a broad appeal waiver at paragraph 15. The same agreement preserves ineffective-assistance-of-counsel claims at paragraph 15(b)(iv). Movant pursues this ineffective-assistance claim through the preserved § 2255 collateral review process rather than direct appeal.

**(c) Post-Conviction Proceedings:**

**(1) Did you raise this issue in any post-conviction motion, petition, or application?** No. This § 2255 motion is the first post-conviction proceeding filed.

**(2) If your answer to Question (c)(1) is "Yes," state:** Not applicable.

**(3) Did you receive a hearing on your motion, petition, or application?** Not applicable; no prior post-conviction motion has been filed.

**(4) Did you appeal from the denial of your motion, petition, or application?** Not applicable.

**(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?** Not applicable.

**(6) If your answer to Question (c)(4) is "Yes," state:** Not applicable.

**(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:** Not applicable; this is Movant's first post-conviction motion. There has been no denial from which to appeal.

**GROUND NINE: Ineffective Assistance of Counsel - Failure to Counter the Government's Misrepresentation of a Loving and Supportive Family.**

**(a) Supporting facts** *(Do not argue or cite law. Just state the specific facts that support your claim.):*

At sentencing, the government told the Court: "He was raised with privilege. He was raised with opportunity. He was raised with support, a two parent home, a comfortable upbringing." The government compared Movant to defendants who had endured serious adversity. The Court adopted this framing in its sentencing analysis.

Counsel possessed four documented facts contradicting the government's framing. None were placed before the Court.

First, [REDACTED — sensitive family history — see sealed version]. The estrangement lasted years and resumed only after Movant's professional and financial standing recovered. This pattern of conditional engagement predated this case.

Second, before any criminal charge was filed, [REDACTED — sensitive family history — see sealed version]. Both had been in contact with FBI investigators before this refusal.

Third, when counsel reached out to Movant's mother before sentencing to ask her to write a character letter on Movant's behalf, she declined. The same parent approached Movant repeatedly in the moments before he entered the courtroom on the day of sentencing, but did not write any letter on his behalf or speak on his behalf at sentencing. Counsel did not disclose this to the Court.

Fourth, the sealed Cunliffe report - in counsel's possession before sentencing - [REDACTED — sensitive family history — see sealed version]. The report documented that the family "attempted to create the impression that they were a close and perfect family - it was not real," and that within the home "discussing one's problems was not encouraged and was frequently not allowed." These clinical findings were available to counsel in actionable form. None were presented to the Court.

**(b) Direct Appeal of Ground NINE:**

**(1) If you appealed from the judgment of conviction, did you raise this issue?** No direct appeal was filed; this issue was not raised on direct appeal.

**(2) If you did not raise this issue in your direct appeal, explain why:** No direct appeal was filed. The plea agreement contains a broad appeal waiver at paragraph 15. The same agreement preserves ineffective-assistance-of-counsel claims at paragraph 15(b)(iv). Movant pursues this ineffective-assistance claim through the preserved § 2255 collateral review process rather than direct appeal.

**(c) Post-Conviction Proceedings:**

**(1) Did you raise this issue in any post-conviction motion, petition, or application?** No. This § 2255 motion is the first post-conviction proceeding filed.

**(2) If your answer to Question (c)(1) is "Yes," state:** Not applicable.

**(3) Did you receive a hearing on your motion, petition, or application?** Not applicable; no prior post-conviction motion has been filed.

**(4) Did you appeal from the denial of your motion, petition, or application?** Not applicable.

**(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?** Not applicable.

**(6) If your answer to Question (c)(4) is "Yes," state:** Not applicable.

**(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:** Not applicable; this is Movant's first post-conviction motion. There has been no denial from which to appeal.

**GROUND TEN: Ineffective Assistance of Counsel - Failure to Adequately Challenge the Two-Level Obstruction Enhancement (Direct, Calculable Impact on Guideline Range).**

17

**(a) Supporting facts** *(Do not argue or cite law. Just state the specific facts that support your claim.):*

The Court overruled the defense objection to the two-level obstruction enhancement under USSG § 3C1.1, increasing the advisory guideline range from 87-102 months to 102-121 months total.

The enhancement arose from three text messages Movant sent to Jon Dorfman and to Dorfman's wife on September 12, 2022. The texts were sent within hours of Movant's first learning that Dorfman, his closest friend of approximately 35 years (since third grade), had been cooperating against him with the government. Movant sent no further communication to Dorfman or his wife about this matter at any point thereafter.

Seven specific factual bases for challenging the enhancement were available, documented, and in counsel's possession before sentencing:

(i) Dorfman was the named victim of Count 8, the aggravated identity theft count carrying a mandatory consecutive 24 months. Dorfman therefore had a direct legal stake in Movant's sentencing.

(ii) Dorfman was Movant's lifelong friend whose knowledge of Movant's impulsive communication style is documented in Dr. Cunliffe's forensic report.

(iii) The four-year period of complete silence following the three texts is inconsistent with a sustained intent to obstruct.

(iv) Dorfman's own attorney, when the texts were first reported, stated to the government that the texts "on their face are not direct threats." Counsel possessed this written characterization.

(v) The actual content of the September 12, 2022 message references a "bachelor party" conversation. When the FBI interviewed Dorfman, he told agents he "does not know what VERNE meant when he referenced the bachelor party" and confirmed "there was nothing that happened at any party that could be used to coerce DORFMAN." The 302 was in counsel's possession.

(vi) Dorfman did not attend the sentencing hearing.

(vii) This same Court had previously ruled in Movant's favor on the government's earlier motion to maintain GPS monitoring based on the same text messages as alleged evidence of threatening conduct.

During McCrossen's argument on the obstruction enhancement, Movant - again using the notepad Levy had given him for that purpose - passed a written note to Levy specifically requesting that counsel ensure McCrossen raise the fact that there had been no further contact with the relevant witnesses after September 12, 2022. Levy ignored the note. The seven factual bases were not developed in counsel's argument. The Court overruled the objection. The enhancement added 15 to 19 months to the advisory range.

**(b) Direct Appeal of Ground TEN:**

**(1) If you appealed from the judgment of conviction, did you raise this issue?** No direct appeal was filed; this issue was not raised on direct appeal.

**(2) If you did not raise this issue in your direct appeal, explain why:** No direct appeal was filed. The plea agreement contains a broad appeal waiver at paragraph 15. The same

18

agreement preserves ineffective-assistance-of-counsel claims at paragraph 15(b)(iv). Movant pursues this ineffective-assistance claim through the preserved § 2255 collateral review process rather than direct appeal.

**(c) Post-Conviction Proceedings:**

**(1) Did you raise this issue in any post-conviction motion, petition, or application?** No. This § 2255 motion is the first post-conviction proceeding filed.

**(2) If your answer to Question (c)(1) is "Yes," state:** Not applicable.

**(3) Did you receive a hearing on your motion, petition, or application?** Not applicable; no prior post-conviction motion has been filed.

**(4) Did you appeal from the denial of your motion, petition, or application?** Not applicable.

**(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?** Not applicable.

**(6) If your answer to Question (c)(4) is "Yes," state:** Not applicable.

**(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:** Not applicable; this is Movant's first post-conviction motion. There has been no denial from which to appeal.

**GROUND ELEVEN: Ineffective Assistance of Counsel - Failure to Present the Blue Elephant Forward Purchase Agreement Confirming Institutional Validation of Ownable's Assets and Business Model.**

**(a) Supporting facts** *(Do not argue or cite law. Just state the specific facts that support your claim.):*

Blue Elephant Capital Management is a sophisticated institutional lender. Before the conduct in this case occurred, Blue Elephant conducted months of arm's-length due diligence on Ownable LLC, executed a forward purchase agreement, deployed capital, and recovered profit on each individual rental contract it purchased.

The Blue Elephant forward purchase agreement, the supporting due-diligence record, and the documentation of capital deployment and profitable recovery on each rental contract were in defense counsel's possession before sentencing.

Before sentencing, Movant directed counsel in writing to raise the Blue Elephant relationship at sentencing as direct evidence that Ownable's underlying assets and business model had institutional validation, contrary to the government's characterization that the enterprise was a sham from inception.

Counsel did not present the Blue Elephant agreement at sentencing. Counsel did not raise the institutional due-diligence record. Counsel did not advise the Court that an arm's-length sophisticated institutional lender had recovered profit on each contract it purchased.

**(b) Direct Appeal of Ground ELEVEN:**

**(1) If you appealed from the judgment of conviction, did you raise this issue?** No direct appeal was filed; this issue was not raised on direct appeal.

**(2) If you did not raise this issue in your direct appeal, explain why:** No direct appeal was filed. The plea agreement contains a broad appeal waiver at paragraph 15. The same agreement preserves ineffective-assistance-of-counsel claims at paragraph 15(b)(iv). Movant pursues this ineffective-assistance claim through the preserved § 2255 collateral review process rather than direct appeal.

**(c) Post-Conviction Proceedings:**

**(1) Did you raise this issue in any post-conviction motion, petition, or application?** No. This § 2255 motion is the first post-conviction proceeding filed.

**(2) If your answer to Question (c)(1) is "Yes," state:** Not applicable.

**(3) Did you receive a hearing on your motion, petition, or application?** Not applicable; no prior post-conviction motion has been filed.

**(4) Did you appeal from the denial of your motion, petition, or application?** Not applicable.

**(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?** Not applicable.

**(6) If your answer to Question (c)(4) is "Yes," state:** Not applicable.

**(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:** Not applicable; this is Movant's first post-conviction motion. There has been no denial from which to appeal.

**GROUND TWELVE: Ineffective Assistance of Counsel - Failure to Investigate or Raise Brady/Giglio Questions Concerning the Former CFO Whose Records the Government Relied Upon.**

**(a) Supporting facts** *(Do not argue or cite law. Just state the specific facts that support your claim.):*

Sherri Hockfield is the former Chief Financial Officer of Ownable LLC and Movant's former sister-in-law. The government relied substantially on financial records and statements provided by Sherri Hockfield as a key cooperating witness.

Sherri Hockfield was represented during her cooperation with the government by Barry Hockfield - the same attorney who had served as Movant's personal and business attorney across documented engagements from 2015 through February 2021. AUSA Paul Shapiro's July 6, 2021 proffer letter to Barry Hockfield concerning Sherri Hockfield is in the discovery file.

The dual-representation issue raised potential Brady/Giglio questions concerning the reliability and independence of Sherri Hockfield's cooperation, the scope of any privileged communications shared between the witness's attorney and Movant during his prior representation by that same attorney, and the potential for selective production of financial records.

Counsel did not move for any Brady/Giglio inquiry directed at Sherri Hockfield's cooperation. Counsel did not move for discovery concerning communications between Barry Hockfield and the witness or between Barry Hockfield and the prosecution team. Counsel did

20

not raise these questions with the Court at sentencing despite documentary notice in the discovery file.

**(b) Direct Appeal of Ground TWELVE:**

**(1) If you appealed from the judgment of conviction, did you raise this issue?** No direct appeal was filed; this issue was not raised on direct appeal.

**(2) If you did not raise this issue in your direct appeal, explain why:** No direct appeal was filed. The plea agreement contains a broad appeal waiver at paragraph 15. The same agreement preserves ineffective-assistance-of-counsel claims at paragraph 15(b)(iv). Movant pursues this ineffective-assistance claim through the preserved § 2255 collateral review process rather than direct appeal.

**(c) Post-Conviction Proceedings:**

**(1) Did you raise this issue in any post-conviction motion, petition, or application?** No. This § 2255 motion is the first post-conviction proceeding filed.

**(2) If your answer to Question (c)(1) is "Yes," state:** Not applicable.

**(3) Did you receive a hearing on your motion, petition, or application?** Not applicable; no prior post-conviction motion has been filed.

**(4) Did you appeal from the denial of your motion, petition, or application?** Not applicable.

**(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?** Not applicable.

**(6) If your answer to Question (c)(4) is "Yes," state:** Not applicable.

**(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:** Not applicable; this is Movant's first post-conviction motion. There has been no denial from which to appeal.

**GROUND THIRTEEN: Ineffective Assistance of Counsel - The Deficient Performance Was Part of a Documented Ongoing Pattern.**

**(a) Supporting facts** *(Do not argue or cite law. Just state the specific facts that support your claim.):*

Documentary records establish a pattern of deficient performance extending across the representation, not isolated to the sentencing hearing.

On October 5, 2024, Movant sent a letter to Lisa Evans Lewis, Chief Federal Defender for the Eastern District of Pennsylvania, raising specific performance concerns about counsel.

On November 12, 2025, Movant sent counsel an email memorializing that submitted materials had not been reviewed. During a phone call that same date, counsel ended the call by hanging up. Movant immediately documented the incident in writing: "You hung up because I guess you did not like my tone - well my apologies. I am facing jail time, and I am being told that documents were not looked at that I sent."

On December 26, 2024, Movant sent a documented written communication to counsel.

21

Box file-sharing platform records establish that counsel were not granted access to the Discovery folder until November 13, 2024 - more than three months after Movant's August 2024 arrest. Both attorneys had only previewer-level (read-only) access until May 15, 2025. The last documented activity in the Discovery folder by either attorney is dated August 28, 2025 - more than six months before the March 4, 2026 sentencing.

Brian Landun, a Board of Advisors member and equity stakeholder, executed a proffer letter dated July 5, 2024. No corresponding FBI 302 interview report has been located in the discovery file - a discrepancy a competent attorney conducting pre-sentencing investigation would have raised. Counsel did not.

Between January 7, 2025 and February 25, 2026, counsel left twelve emails from Movant unanswered over a seven-week period during the sentencing-preparation phase.

On February 17, 2026, Levy emailed Movant: "we do not contemplate a fulsome loss hearing with presentation of expert evidence" - the only written communication from counsel addressing any limitation on the sentencing presentation, and one limited specifically and narrowly to loss methodology.

On the evening of February 25, 2026, Movant emailed Levy: "Is the strategy to hammer all of that out live in front of the judge at the hearing?" Levy did not respond.

On March 6, 2026 - two days after sentencing - Levy emailed Movant advising that any § 2255 challenge was prohibited by the plea agreement and recommending that Movant pursue a pardon instead. The email quoted paragraph 15 of the plea agreement in full while omitting subparagraph 15(b)(iv) - the express ineffective-assistance carve-out that Levy herself had signed. The plea agreement, signed January 31, 2025, contains the express IAC carve-out at paragraph 15(b)(iv) preserving exactly the right asserted in this motion.

**(b) Direct Appeal of Ground THIRTEEN:**

**(1) If you appealed from the judgment of conviction, did you raise this issue?** No direct appeal was filed; this issue was not raised on direct appeal.

**(2) If you did not raise this issue in your direct appeal, explain why:** No direct appeal was filed. The plea agreement contains a broad appeal waiver at paragraph 15. The same agreement preserves ineffective-assistance-of-counsel claims at paragraph 15(b)(iv). Movant pursues this ineffective-assistance claim through the preserved § 2255 collateral review process rather than direct appeal.

**(c) Post-Conviction Proceedings:**

**(1) Did you raise this issue in any post-conviction motion, petition, or application?** No. This § 2255 motion is the first post-conviction proceeding filed.

**(2) If your answer to Question (c)(1) is "Yes," state:** Not applicable.

**(3) Did you receive a hearing on your motion, petition, or application?** Not applicable; no prior post-conviction motion has been filed.

**(4) Did you appeal from the denial of your motion, petition, or application?** Not applicable.

**(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?** Not applicable.

**(6) If your answer to Question (c)(4) is "Yes," state:** Not applicable.

**(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:** Not applicable; this is Movant's first post-conviction motion. There has been no denial from which to appeal.

**GROUND FOURTEEN: Ineffective Assistance of Counsel - Failure to Request a Judicial RDAP Recommendation Despite Counsel's Written Confirmation Three Days Before Sentencing That It Was Available.**

**(a) Supporting facts** *(Do not argue or cite law. Just state the specific facts that support your claim.):*

Dr. Ted B. Cunliffe's August 25, 2025 evaluation of Movant diagnosed Movant with [REDACTED — specific clinical diagnoses — see sealed version]. That diagnosis was on the record at sentencing.

Movant's convictions are nonviolent offenses. Under 18 U.S.C. § 3621(e)(2)(B), inmates with nonviolent offenses who successfully complete the Bureau of Prisons Residential Drug Abuse Program (RDAP) are eligible for up to twelve months of sentence reduction. A pre-sentence judicial recommendation that the defendant be screened for RDAP is a standard mechanism for facilitating this reduction.

On March 1, 2026 - three days before sentencing - Movant emailed both Levy and McCrossen specifically asking about RDAP, framing his question as whether RDAP was "part of the paperwork and application you guys put in place after sentencing."

On March 2, 2026, McCrossen responded in writing: "No - we can ask the judge to recommend you be screened for RDAP but the decision ultimately rests with the BOP." McCrossen's response confirmed in writing two days before sentencing that requesting a pre-sentence judicial RDAP recommendation was within counsel's power and was the appropriate procedural step.

At the sentencing hearing on March 4, 2026, counsel did not request a judicial RDAP recommendation as part of the mitigation argument or at any other point before the Court announced sentence. After the 111-month sentence was announced, McCrossen raised RDAP only as a facility designation preference.

**(b) Direct Appeal of Ground FOURTEEN:**

**(1) If you appealed from the judgment of conviction, did you raise this issue?** No direct appeal was filed; this issue was not raised on direct appeal.

**(2) If you did not raise this issue in your direct appeal, explain why:** No direct appeal was filed. The plea agreement contains a broad appeal waiver at paragraph 15. The same agreement preserves ineffective-assistance-of-counsel claims at paragraph 15(b)(iv). Movant pursues this ineffective-assistance claim through the preserved § 2255 collateral review process rather than direct appeal.

**(c) Post-Conviction Proceedings:**

**(1) Did you raise this issue in any post-conviction motion, petition, or application?** No. This § 2255 motion is the first post-conviction proceeding filed.

23

**(2) If your answer to Question (c)(1) is "Yes," state:** Not applicable.

**(3) Did you receive a hearing on your motion, petition, or application?** Not applicable; no prior post-conviction motion has been filed.

**(4) Did you appeal from the denial of your motion, petition, or application?** Not applicable.

**(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?** Not applicable.

**(6) If your answer to Question (c)(4) is "Yes," state:** Not applicable.

**(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:** Not applicable; this is Movant's first post-conviction motion. There has been no denial from which to appeal.

## GROUND FIFTEEN: Cumulative Effect of Counsel's Multiple Deficiencies - Independent Ground for Relief.

**(a) Supporting facts** *(Do not argue or cite law. Just state the specific facts that support your claim.):*

The cumulative effect of the deficiencies set forth in Grounds One through Fourteen constitutes an independent basis for relief.

Counsel possessed: a signed repayment agreement, mutual release, non-disparagement clause, and bank records refuting the victim impact the Court called "particularly significant" (Ground One). The November 2020 FBI 302 contradicting Eve Rosen's testimony, with Movant's contemporaneous written note passed at the hearing (Ground Two). The Israel trip records refuting Steve Rosenberg's faith-community-exploitation narrative (Ground Three). A comprehensive forensic psychological evaluation including [REDACTED — specific clinical findings — see sealed version] directly addressing the "would have stopped" question the Court identified as dispositive (Ground Four). Documentary proof of a structural conflict involving prior counsel and three cooperating government witnesses through proffer letters from the prosecutor in this case (Ground Five). Three pending Sentencing Commission amendments - one of which counsel had herself flagged - supporting a § 3553(a)(6) disparity argument (Ground Six). Documented witness-list overreach severing legitimate income, plus a sitting elected official willing to write a character letter (Ground Seven). The full record of Movant's prior legitimate business successes and the government's contradictory timeline (Ground Eight). Documentary evidence demolishing the government's loving-family narrative (Ground Nine). Seven specific bases to challenge the obstruction enhancement, including the Court's own prior ruling on the same texts (Ground Ten). The Blue Elephant institutional due-diligence record (Ground Eleven). Brady/Giglio questions concerning a key cooperating witness's representation by Movant's prior counsel (Ground Twelve). A documented sixteen-month pattern of non-review, twelve unanswered emails over seven weeks, ignored written instructions, and discovery folders accessed only at preview level until May 2025 (Ground Thirteen). And a written confirmation that a judicial RDAP recommendation was available, never made (Ground Fourteen).

None of the foregoing was placed before the Court at sentencing. The Court imposed a 111-month sentence on the record before it. The record before it was not the full record.

24

**(b) Direct Appeal of Ground FIFTEEN:**

**(1) If you appealed from the judgment of conviction, did you raise this issue?** No direct appeal was filed; this issue was not raised on direct appeal.

**(2) If you did not raise this issue in your direct appeal, explain why:** No direct appeal was filed. The plea agreement contains a broad appeal waiver at paragraph 15. The same agreement preserves ineffective-assistance-of-counsel claims at paragraph 15(b)(iv). Movant pursues this ineffective-assistance claim through the preserved § 2255 collateral review process rather than direct appeal.

**(c) Post-Conviction Proceedings:**

**(1) Did you raise this issue in any post-conviction motion, petition, or application?** No. This § 2255 motion is the first post-conviction proceeding filed.

**(2) If your answer to Question (c)(1) is "Yes," state:** Not applicable.

**(3) Did you receive a hearing on your motion, petition, or application?** Not applicable; no prior post-conviction motion has been filed.

**(4) Did you appeal from the denial of your motion, petition, or application?** Not applicable.

**(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?** Not applicable.

**(6) If your answer to Question (c)(4) is "Yes," state:** Not applicable.

**(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:** Not applicable; this is Movant's first post-conviction motion. There has been no denial from which to appeal.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,

v.

JOSH S. VERNE,

Petitioner.

Criminal No.
2:24-cr-00270-JFM

Hon. John F. Murphy

RECEIVED
MAY 1 9 2026
CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

**MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE
PURSUANT TO 28 U.S.C. § 2255
(PRO SE)**

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT …… 2

II. JURISDICTION AND TIMELINESS …… 9

III. PROCEDURAL AND FACTUAL BACKGROUND …… 9

IV. LEGAL STANDARD …… 11

V. GROUNDS FOR RELIEF …… 12

A. Counsel Failed to Challenge Michael Schulson's Victim Impact Letter …… 12

B. Counsel Failed to Challenge Eve Rosen's Unsubstantiated Threat Allegation …… 16

C. Counsel Failed to Rebut Steve Rosenberg's Letter …… 19

D. Counsel Violated Express Written Pre-Sentencing Instructions Regarding Sensitive Medical Information …… 21

E. Counsel Failed to Investigate and Raise the Hockfield Structural Conflict …… 27

F. Counsel Failed to Research and Raise Pending Sentencing Guideline Changes …… 34

G. Counsel Failed to Explain the Absence of Character Witnesses …… 36

H. Counsel Failed to Challenge the Government's Contradictory Timeline …… 41

I. Counsel Failed to Counter the Government's Misrepresentation of a Loving Family …… 44

J. Counsel Failed to Adequately Challenge the Two-Level Obstruction Enhancement …… 47

K. Counsel Failed to Present the Blue Elephant Forward Purchase Agreement …… 53

L. Counsel Failed to Investigate or Raise Brady/Giglio Questions …… 56

M. The Deficient Performance Was Part of a Documented Ongoing Pattern …… 58

N. Counsel Failed to Request a Judicial RDAP Recommendation …… 64

O. The Cumulative Effect of Counsel's Multiple Deficiencies …… 66

VI. PREJUDICE …… 67

VII. RELIEF REQUESTED                                                72
VIII. DECLARATION UNDER PENALTY OF PERJURY                           73

**TABLE OF AUTHORITIES**

**CASES**

*Berryman v. Morton*, 100 F.3d 1089 (3d Cir. 1996)                   66
*Cuyler v. Sullivan*, 446 U.S. 335 (1980)                            32
*Glover v. United States*, 531 U.S. 198 (2001)         27, 52, 58, 72
*Government of Virgin Islands v. Zepp*, 748 F.2d 125 (3d Cir. 1984)  31
*Massaro v. United States*, 538 U.S. 500 (2003)                   10, 63
*Strickland v. Washington*, 466 U.S. 668 (1984)                 passim
*United States v. Bellille*, 962 F.3d 731 (3d Cir. 2020)            32
*United States v. Mabry*, 536 F.3d 231 (3d Cir. 2008)               11
*United States v. Moscony*, 927 F.2d 742 (3d Cir. 1991)             32
*United States v. Sepling*, 944 F.3d 138 (3d Cir. 2019)             12
*United States v. Shedrick*, 493 F.3d 292 (3d Cir. 2007)          3, 11

**STATUTES AND RULES**

18 U.S.C. § 3553(a)                                             passim
18 U.S.C. § 3621(e)(2)(B)                                           65
28 U.S.C. § 2255                                                passim
Fed. R. Crim. P. 32(d)(3)                                          23
USSG § 2B1.1                                                       34
USSG § 3C1.1                                                       47

## I. PRELIMINARY STATEMENT

Petitioner Josh S. Verne, appearing pro se, respectfully moves this Court pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence of 111 months imposed on March 4, 2026. This motion is limited solely to the sentencing proceeding. Petitioner does not challenge his guilty plea, his conviction, or any other term of his plea agreement. The plea agreement expressly preserves this right at paragraph 15(b)(iv), which permits a challenge based on "a claim that an attorney who represented the defendant during the course of this criminal case

2

provided constitutionally ineffective assistance of counsel." This motion asserts that IAC claim as it applies to the sentencing proceeding only. The Third Circuit allowed IAC claims to survive a broad collateral-attack waiver in United States v. Shedrick, 493 F.3d 292 (3d Cir. 2007) where the agreement contained no express IAC carve-out at all. Here, the agreement contains a direct preservation clause at paragraph 15(b)(iv). Petitioner's jurisdictional foundation is stronger than Shedrick's on the face of the document.

Petitioner enters this motion with a clear acknowledgment: what he did was wrong. The guilty plea was entered knowingly and voluntarily. Many of the investors in this case experienced real financial harm, and that harm is not minimized here. Petitioner does not contest his conviction, does not challenge his plea, and does not seek to relitigate the facts of the offense. He accepts responsibility for his conduct.

What this motion documents is something narrower, more specific, and more troubling than a challenge to the underlying facts. It documents what the sentencing Court was never given the opportunity to consider.

On March 4, 2026, this Court sentenced Josh Verne to 111 months based on a record that was, at every critical point, one-sided. Not because the evidence did not exist. Because the attorneys responsible for presenting it did not present it. The victim the Court cited as "particularly significant" - the one whose letter the Court specifically identified as the basis for its sentencing rationale - had signed a repayment agreement, a mutual release, and a mutual non-disparagement clause before submitting that letter. Counsel had all three documents for five months. A witness whose testimony the Court identified as one of the factors that "really jumped out" at sentencing made a specific, inflammatory allegation of a personal threat - a claim that was objectively implausible, that went to the credibility of one of the witnesses the Court

3

highlighted, and that counsel had specific written tools to challenge. Counsel said nothing. A forensic psychologist retained by the defense spent fourteen hours evaluating Petitioner using [REDACTED — number and type of clinical instruments — see sealed version] - and concluded that the conduct arose from [REDACTED — specific clinical conclusion — see sealed version], and that the specific risk factors the Court cited as the basis for denying any variance were not present. Counsel filed the report under seal, read only the diagnostic labels aloud in violation of Petitioner's express written instructions, and never explained to the Court what those findings actually established. Two levels were added to the guideline range for obstruction - a direct, calculable increase of 15 to 19 months - based on a characterization of three text messages that the alleged victim's own attorney had described as not constituting direct threats, and that this same Court had previously rejected as evidence of threatening conduct in an earlier proceeding involving the same messages. Counsel possessed that characterization and that ruling. Neither was raised.

The sentencing proceeding that resulted was not adversarial in any meaningful sense. It was a proceeding in which the government presented a complete, documented, factually specific case for a guideline sentence, and the defense responded with an unspecific request for a downward variance - stripped of the documentary foundation that would have given it force. The Court did not err. It sentenced on the record before it. The record before it was not the full record.

The failures documented in this motion are not isolated. They span fifteen independent grounds. In every instance, the pattern is the same: counsel possessed specific evidence, received specific written notice directing them to use it, agreed to use it, and presented none of it. Counsel had a signed repayment agreement and mutual release confirming the Court's most-cited victim

had no remaining claim — and a non-disparagement clause he violated by submitting his letter. That man had extracted the repayment by threatening to appear at Petitioner's [REDACTED — minor children] school and publicly shame them in front of their classmates. Counsel had a forensic report establishing through clinical testing that the specific risk factors the Court cited as the basis for denying any variance were not present. Counsel had the alleged victim's own attorney's written characterization of the obstruction texts as non-threatening, and this Court's own prior ruling on those same messages - and used neither. Counsel had a documented prior representation by Petitioner's former attorney who simultaneously orchestrated the cooperation of multiple government witnesses through formal proffer agreements with the same prosecutor - and never raised it. Counsel had a sitting elected official who had expressed openness to writing a character letter and was specifically asked to contact that person - and never did. Counsel confirmed in writing three days before sentencing that a zero-cost statutory mechanism to reduce the effective sentence by up to twelve months was available - and never requested it. In each instance, the evidence existed. The notice existed. The written directive existed. What did not exist was any communication from counsel explaining why none of it was used. That silence is not strategy. It is the record this motion is built on.

This motion is not built on Petitioner's characterizations of what happened. It is built on the Court's own words, counsel's own emails, signed legal agreements, and the sentencing transcript. Every factual claim in this motion is documentable. Every omission is established through correspondence counsel wrote, evidence counsel possessed, and instructions counsel received and ignored. When the Court stated that "there's nothing in this record that makes me think that Mr. Verne would have stopped doing what he was doing for any reason other than he

5

was forced to" - the record the Court was describing was the record counsel left it. The evidence that would have responded to that statement existed. It was in counsel's file. It was never used.

Petitioner files this motion pro se because his appointed counsel, Angela Levy, advised him in writing on March 6, 2026 - two days after sentencing - that "the only way" to challenge anything was through a habeas petition barred by the plea agreement, and suggested he pursue a pardon instead. That advice was legally incorrect. The agreement counsel herself signed contains an explicit carve-out at paragraph 15(b)(iv) preserving exactly the right Petitioner asserts here. Counsel drafted and signed an agreement preserving this right - and then told her own client two days after sentencing that the right did not exist. The fact that Petitioner proceeds without counsel is itself a direct consequence of that deficient post-sentencing advice. On the same date, counsel advised there was "nothing prohibiting" him from speaking to the press if contacted - while failing to mention that his pretrial conditions under section 7(p) specifically prohibited public statements about anyone on the victim and witness list. This pattern of incomplete and inaccurate guidance extended before, during, and after the sentencing hearing itself.

These failures are the work of court-appointed counsel Michael McCrossen and Angela Levy of the Federal Community Defender Office for the Eastern District of Pennsylvania - counsel who received specific documented evidence months, even days, before sentencing, ignored specific written instructions at the hearing itself, and violated Petitioner's express direction regarding sensitive medical information in open court. Their failures, individually and collectively, satisfy both prongs of Strickland v. Washington, 466 U.S. 668 (1984).

The government will argue that the omissions described in this motion were strategic choices entitled to deference. That argument is foreclosed by the documentary record on four independent grounds.

6

First: counsel's own reaction in the post-hearing meeting that afternoon, when Petitioner raised the Schulson letter with her directly and asked why counsel had not brought up the Schulson argument and how the judge had relied on the "a danger to the public" language. Her initial response was that Petitioner was "being selfish by bringing it up afterwards." Only after reviewing Schulson's letter and confirming that it contained the "he will undoubtedly do it again" and "no rehabilitation" language that tracked the Court's stated sentencing rationale did her position change entirely. An attorney who makes a deliberate, informed strategic choice to exclude evidence does not react with dismissal when that evidence turns out to be the foundation of the Court's stated rationale. She defends the choice. Counsel could not, because no such choice had been made.

Second: the November 12, 2025 email - four months before sentencing - in which counsel's own words document that submitted materials "were not looked at." (Exhibit F - Email, Josh Verne to Angela Levy, November 12, 2025.) A pattern of non-review is not strategy. Strategy requires deliberate decision-making. What the record shows is not deliberate decision-making about specific evidence. It is a representation in which submitted materials went unreviewed, specific written directives went unanswered, and the sentencing hearing arrived before the work was done. When Petitioner raised the non-review directly on a November 12, 2025 call, counsel's response was to hang up the phone. Petitioner documented it in writing immediately: "You hung up because I guess you did not like my tone - well my apologies. I am facing jail time, and I am being told that documents were not looked at that I sent." That email is in the record. A representation in which submitted materials go unreviewed and documented frustration is met with a disconnected call is not a representation in which strategic choices about evidence are being made.

7

Third: the February 17, 2026 email in which Levy stated "we do not contemplate a fulsome loss hearing with presentation of expert evidence" (Exhibit J - Email, Angela Levy to Josh Verne, February 17, 2026) was specifically and narrowly about loss methodology - the decision to forgo expert witnesses on the loss calculation only. It said nothing about abandoning the Schulson challenge, the Rosen rebuttal, the obstruction arguments, the family narrative, or any other ground documented in this motion. No subsequent communication disclosed any of those additional omissions. The February 17 email does not establish a strategic framework for the sentencing proceeding. It establishes a single decision about loss calculation methodology. Everything else that was omitted was omitted without disclosure and without Petitioner's consent - especially when there was a documented and many times discussed plan of attack, all of which was abandoned.

Fourth: at 9:54 PM on February 25, 2026 - the evening the defense sentencing memorandum was first sent to him - Petitioner commented that our sentencing memo seems light and asked whether everything would be reviewed and explained live at the hearing. (Exhibit K - Email exchange, Josh Verne and Angela Levy, February 25-26, 2026.) He followed up: "Is the strategy to hammer all of that out live in front of the judge at the hearing?" Levy never responded. At 3:44 AM on February 26, Petitioner withdrew his own question - "Actually, I just remembered that you guys said this was part of the strategy so this way there's not too much information before the hearing. Scratch my question" - not because counsel answered, but because he recalled a prior commitment that the substantive arguments would be presented live. That commitment was never fulfilled. The February 25-26 exchange is not evidence of a client who consented to a limited presentation. It is evidence of a client who was never told the presentation had been abandoned.

## II. JURISDICTION AND TIMELINESS

This Court has jurisdiction under 28 U.S.C. § 2255. Judgment of conviction was entered on March 4, 2026. This motion is filed within the one-year limitations period under 28 U.S.C. § 2255(f)(1), prior to Petitioner's surrender date of June 11, 2026.

## III. PROCEDURAL AND FACTUAL BACKGROUND

On March 3, 2025, Petitioner pleaded guilty pursuant to a written plea agreement to three counts of securities fraud, nine counts of wire fraud, and one count of aggravated identity theft in Criminal No. 24-270. Sentencing was conducted on March 4, 2026, before the Honorable John F. Murphy. The Court imposed 111 months - 87 months on the fraud counts to run concurrently, plus a mandatory consecutive 24 months on Count 8 (aggravated identity theft). Defense counsel requested a downward variance from the 102-121 month advisory range. The government requested 10 years. The Court denied any variance.

The plea agreement's satisfaction clause at paragraph 19 does not bar this motion. First, it was signed January 31, 2025 - over thirteen months before the sentencing that is the sole subject of this motion. A satisfaction statement at the time of the plea cannot waive IAC claims arising from conduct that had not yet occurred. Second, paragraph 19 cannot silently nullify the express IAC carve-out at paragraph 15(b)(iv) in the same agreement. Third, Petitioner's satisfaction at the time of the plea was evaluated against counsel's performance through that date - not against the specific sentencing failures documented here.

The Court asked Petitioner whether he was satisfied with his lawyers. Petitioner responded affirmatively. That response does not bar this motion. The exchange occurred at approximately minute 21 of the hearing, during the PSR colloquy - before victim statements,

9

before Eve Rosen testified, before counsel read the diagnoses into the open record, and before the obstruction enhancement was argued. Sentencing Tr. at 21:22. The specific failures this motion challenges had not yet occurred when Petitioner answered. A defendant cannot express dissatisfaction with conduct that has not yet happened.

Beyond timing, the in-court response cannot constitute a knowing waiver for five independent reasons. First, Petitioner was unaware that counsel had abandoned the specific documented evidence he had provided - including the Schulson buy-back agreement and bank records - which were only revealed through subsequent review of the sentencing audio. Second, the statement was made immediately preceding a 111-month sentence while Petitioner's mother - who appears on the government's victim and witness list - had been approaching him in the moments before the hearing, leaving him in a destabilized emotional state. Third, a sixteen-month documented record of performance concerns - beginning with the October 5, 2024 letter to the Chief Federal Defender (Exhibit H - Letter, Josh Verne to Lisa Evans Lewis, Chief Federal Defender, October 5, 2024) and continuing through multiple pre-sentencing communications - directly contradicts any characterization of a knowing, satisfied client. Fourth, the failures documented in this motion were not observable at the hearing and could not have been assessed by Petitioner in real time - exactly the circumstance for which collateral review exists. See Massaro v. United States, 538 U.S. 500, 504-05 (2003). Fifth, the March 6, 2026 email from Levy advising Petitioner that the only available challenge was a habeas petition barred by the plea agreement (Exhibit G - Email, Angela Levy to Josh Verne, March 6, 2026) - advice that was demonstrably wrong - proves no informed waiver of IAC rights was possible at or around sentencing. An attorney who gives legally incorrect advice about the right being waived cannot claim her client made a knowing, informed statement. The government may also present positive

10

communications Petitioner sent to counsel during the representation - messages expressing encouragement or acknowledging when specific tasks were handled - as evidence of satisfaction. That argument misreads those communications entirely. Any positive message sent during the representation reflects the reality of a client who needed his lawyers to continue functioning: on an active restitution proceeding, on ongoing case management, and on matters still requiring their attention. A client who criticizes counsel mid-representation risks destabilizing a relationship he still depends on. Maintaining a working relationship with counsel is not a waiver of the right to later challenge their performance - it is the practical reality of every criminal representation. Courts have consistently held that positive contemporaneous communications do not waive IAC claims, particularly where, as here, the client had a documented record of written complaints about performance and the specific failures being challenged only became apparent after the sentencing hearing concluded.

## IV. LEGAL STANDARD

To prevail under Strickland v. Washington, 466 U.S. 668 (1984), a petitioner must show: (1) deficient performance below an objective standard of reasonableness; and (2) a reasonable probability that but for the deficiency, the outcome would have been different. Id. at 687-88. At sentencing, prejudice means a reasonable probability of a shorter sentence. Glover v. United States, 531 U.S. 198, 203 (2001). Any increase in sentence attributable to counsel's deficiency satisfies prejudice. Id. IAC claims survive broad collateral-attack waivers in the Third Circuit - even without an express carve-out. United States v. Shedrick, 493 F.3d 292, 298 (3d Cir. 2007); see also United States v. Mabry, 536 F.3d 231, 237-38 (3d Cir. 2008) (establishing Third Circuit framework for evaluating collateral waivers and the court's independent obligation to ensure enforcement would not work a miscarriage of justice). Counsel's failure to investigate and

11

develop the factual record at sentencing is itself cognizable under § 2255 in this Circuit. United States v. Sepling, 944 F.3d 138 (3d Cir. 2019) (reversing denial of § 2255 motion where sentencing counsel failed to investigate an issue affecting the guideline calculation). This agreement contains an express carve-out at paragraph 15(b)(iv).

Where counsel actively represented conflicting interests, prejudice is presumed. Cuyler v. Sullivan, 446 U.S. 335, 348-50 (1980). Under Cuyler, once actual conflict adversely affecting performance is shown, no separate prejudice showing is required. This standard governs Ground E.

Petitioner specifically notes that any appointment of counsel to assist with this motion or at any subsequent proceeding must come from outside the Federal Community Defender Office for the Eastern District of Pennsylvania. This is not a preference - it is a structural necessity. Angela Levy and Michael McCrossen, whose performance is the entire subject of this motion, are both staff attorneys at that office. An attorney from the same office cannot be asked to argue that two of their institutional colleagues rendered constitutionally deficient performance. The conflict is inherent and cannot be waived by office policy or internal screening. The appropriate appointment mechanism is the CJA panel. Courts in this district and throughout the Third Circuit regularly recognize this conflict and accommodate it as a matter of course when it is properly flagged. Petitioner flags it now, at the threshold, to ensure the Court can address it before any appointment is made rather than after.

### V. GROUNDS FOR RELIEF

**A. Counsel Failed to Challenge Michael Schulson's Victim Impact Letter Despite Possessing a Signed Buy-Back Agreement, Mutual Release, and Bank Records Proving Full Repayment**

Michael Schulson's victim impact letter called Petitioner "a danger to the public" and claimed substantial financial loss. The Court described Schulson's characterization as "particularly significant" and cited it directly as the basis for its sentencing rationale. Sentencing Tr. at 1:48:16; 1:54:56. Counsel possessed documentary evidence that refuted both the financial claim and the credibility of the man making it - and used none of it.

Schulson was an investor. His initial financial exposure was real. It was also addressed: a fully executed Purchase Agreement dated February 28, 2020 documented a $426,581 buyback together with an unconditional mutual release of all claims at § 4(c) and a mutual non-disparagement clause at § 4(d). The corresponding payments are documented in bank records on the Ownable side, and Ownable's outside counsel, Baer Crossey McDemus LLC, billed 5.8 hours on February 28, 2020 specifically for "repurchase of various interests held by Schulson in ownable and OCP" — independently confirming the buyback agreement was drafted and executed on exactly that date. That billing record is in the government's discovery. Schulson never asserted — by filing, complaint, or communication — that any portion of the buyback was outstanding. Whatever the precise dollar reconciliation between the agreement face amount and the government's traced payment records, Schulson contractually confirmed he had no remaining claim and agreed not to disparage. (Exhibit B — Purchase Agreement, Josh Verne and Schulson Investments LLC, dated February 28, 2020.)

On September 11, 2025 — five months before sentencing — Petitioner transmitted to both McCrossen and Levy a fully executed Purchase Agreement dated February 28, 2020 documenting a $426,581 buyback of Schulson's interests in Ownable LLC and Ownable Capital Partners I LLC, accompanied by the unconditional mutual release at § 4(c) and the mutual non-disparagement clause at § 4(d), with the corresponding payments documented in available bank

13

records. (Exhibit C - Email chain, Josh Verne to Angela Levy and Michael McCrossen, September 11, 2025.) In the same email chain, Petitioner documented that the buyback was extracted under threat: Schulson had threatened to appear at Petitioner's [REDACTED — minor children] school and publicly shame them in front of their classmates. [REDACTED — ages of minor children]. The man who coerced a $426,000 payment by threatening [REDACTED — minor children] at their school then submitted a victim impact letter calling Petitioner "a danger to the public." Counsel had the documentation of both the repayment and the threat. Neither was placed before the Court.

The Purchase Agreement contained two additional provisions of direct relevance. Section 4(c) provided an unconditional mutual release of all claims. Section 4(d) provided a mutual non-disparagement clause prohibiting negative, disparaging, or false statements about Petitioner. Schulson's victim impact letter - which called Petitioner "a danger to the public" and characterized him as a person without remorse or empathy - violated both provisions of an agreement he had signed. Counsel had a fully executed document establishing that the witness claiming dispositive financial loss had contractually confirmed he was made whole and had further agreed not to make disparaging statements about Petitioner. None of this was placed before the Court.

The government will argue that the buyback is irrelevant to loss calculation because guidelines loss is assessed at the time of the offense, not at subsequent repayment - or alternatively, that the repaid amount was already credited against the loss calculation, giving Petitioner credit for it. Both arguments misframe the issue. This is not a loss calculation argument. It is a credibility argument. A witness who claims material financial harm to a sentencing court while holding a signed mutual release and non-disparagement clause — and

14

who has never, at any point, asserted that any portion of the underlying repayment was outstanding — is not a reliable source of financial harm testimony. He lied to the Court when he submitted a victim impact letter alleging the very harm he had contractually released. The Court called that testimony "particularly significant." Sentencing Tr. at 1:48:16. The buy-back agreement was the direct evidence that the Court's stated basis for the sentence rested on a materially incomplete picture. Counsel had it for five months. It was never used.

That this was not strategy is confirmed by counsel's own reaction. That afternoon of sentencing, Petitioner asked counsel directly why Schulson's letter had not been challenged as planned, and pointed out that Schulson's letter contained the operative language that tracked the Court's stated sentencing rationale - specifically, Schulson's assertions that "if given the chance, he will undoubtedly do it again" and that "there is no rehabilitation" for Petitioner - which aligned directly with the Court's conclusion that "there's nothing in this record that makes me think that Mr. Verne would have stopped." Counsel's initial response was that Petitioner was "being selfish by bringing it up afterwards." Her position changed only after she reviewed the record and confirmed that Schulson's letter contained the language that tracked the Court's stated rationale. An attorney who made a deliberate strategic decision to exclude evidence defends that decision. She does not express surprise when it turns out the excluded evidence was the foundation of the Court's rationale. The Schulson buyback agreement was partially credited in the post-sentencing restitution proceeding before this Court — limited to the amounts the government had already reflected on its own loss-table worksheet, without counsel placing the full $426,581 face amount of the agreement, the mutual release, or the non-disparagement clause before the Court.

The Court's own words establish prejudice. When addressing the public protection factor, the Court stated: "there's nothing in this record that makes me think that Mr. Verne would have stopped doing what he was doing, or this kind of behavior for any reason other than he was forced to." Sentencing Tr. at 1:55:03. That conclusion was drawn from a record from which the Schulson rebuttal had been entirely removed. Had the Court been shown the repayment agreement, the mutual release, the bank records, and the documentation of Schulson's own threats against Petitioner's family - all in counsel's possession - its assessment of whether Schulson's characterization of Petitioner as "a danger to the public" was reliable would have rested on materially different facts.

The government may argue that Schulson's threats against Petitioner's family are unsubstantiated because they rest on Petitioner's own description of them in pre-sentencing communications to counsel rather than independent documentary evidence. That argument does not defeat the ground for two reasons. First, the documented pre-sentencing communications to counsel are themselves evidence - they establish that counsel had specific written notice of the threats and chose not to investigate or raise them. The IAC is the failure to investigate, not the absence of a document counsel never sought. Second, Petitioner, along with his former spouse, received communications from Schulson directly; his former spouse could provide testimony or documentary evidence at any evidentiary hearing ordered by this Court. Petitioner does not have direct access to those communications because they came to his Ownable business email address, which is no longer accessible to him - but that system may remain obtainable through discovery. The record is incomplete not because no evidence exists, but because counsel never sought it.

**B. Counsel Failed to Challenge Eve Rosen's Unsubstantiated Threat Allegation - One of the Factors the Court Identified as Having \*\*"Really Jumped Out"\*\* at Sentencing**

The breach of trust at the core of this case is real and not challenged here. The issue in this ground is the specific, uncorroborated allegation that transformed the sentencing narrative from financial harm to physical threat. Eve Rosen appeared at sentencing, alleged that Petitioner had threatened her after she went to law enforcement, and offered no evidence, documentation, or corroboration. Counsel made no objection and offered no rebuttal. Two objective facts - both available to counsel, neither placed before the Court - made that allegation implausible.

Two facts about Rosen that counsel never placed before the Court were dispositive. First, Rosen is a licensed Pennsylvania attorney. She is not a lay victim unfamiliar with court proceedings. She understood precisely how a live, uncorroborated allegation of a personal retaliatory threat - delivered in open court where rebuttal is awkward - would land with a sentencing judge. A trained legal professional who helped organize the victim response campaign and then delivered a consequential testimony at sentencing was not a passive, grieving investor. She was a sophisticated advocate operating in a forum she understood. Second, and more tellingly: Rosen's first FBI interview, conducted on November 2, 2020, contains no mention of any physical threat from Petitioner. In that interview she described the fraud, the false wire transfer receipts, and the unfulfilled promises in detail. She did not mention a personal threat. That interview was the precise moment at which a threat allegation - if real - would have been reported: she was speaking to the FBI agent investigating Petitioner, in a proceeding specifically designed to document his misconduct. The threat was not mentioned. It appeared for the first time at sentencing, over five years later. A licensed attorney who genuinely believed she had been personally threatened in retaliation for cooperating with law enforcement does not omit that threat from the very first interview in which she is cooperating with law enforcement. That omission is objective, documentable evidence that the threat allegation did not exist in November

17

2020. Its appearance at sentencing over five years later is a credibility problem counsel never raised. Additionally, while Rosen may have reported this threat at some point, to the best of Petitioner's knowledge she never sought a restraining order, a protective order, or any form of personal protection against the specific physical threat she claimed Petitioner made against her. To the best of Petitioner's knowledge, he was also never contacted by any authority - local, state, or federal - regarding any such matter, which further undermines the notion that a credible threat was ever formally reported. A licensed attorney who knows every mechanism available to seek personal protection from a credible threat - and who was already in active contact with multiple law enforcement agencies - took none of those steps. The combination of the omission from her first FBI interview and the absence of any personal protective filing are the objective, documentable evidence the motion required. Counsel had both. Neither was raised.

The government will argue that the Court was entitled to credit Rosen's live testimony and that cross-examination or rebuttal at a sentencing hearing would have appeared callous. That argument confirms the problem rather than answers it. Precisely because a live witness making an emotional claim is difficult to rebut in real time, counsel had an obligation to present the objective evidence that made the claim implausible before the testimony was delivered - through the sentencing memorandum, through a motion in limine, or through a targeted objection placing Rosen's professional background and failure to take any protective action before the Court. None of that was done.

Critically, during Rosen's testimony Petitioner passed a written note to counsel - using the notepad paper Levy had herself provided at the outset of the hearing when she told Petitioner to slip her a note if he needed to communicate anything - specifically requesting that counsel challenge and rebut what Rosen was saying. Counsel did not act. This is contemporaneous,

18

documented proof that the failure to challenge Rosen was not a deliberate strategic judgment. Petitioner was actively directing intervention in real time. He was ignored.

The Court identified Rosen's testimony as one of the factors that "really jumped out" at sentencing, and used it to introduce the trust theme it discussed at length: "I'll start with what I thought was brought out by Ms. Rosen...And the one that really jumped out at me at the top...this question of trust." Sentencing Tr. at 1:45:14. "To me, that's a central theme...it's the building of trust that weaves into the methodology of the defendant, and it's the breach of trust that has caused so much of the harm." Sentencing Tr. at 1:45:14. Had the Court been given the objective evidence making Rosen's threat allegation implausible - her professional status, her coordinating role, her complete failure to take any protective action - the trust theme itself, while real, would have been materially weaker at its foundation. The failure to challenge Rosen was not merely a failure to contest one factual claim. It was the abandonment of the most direct available rebuttal to the entire framework the Court used to justify its sentence. Beyond the documentary evidence making the allegation implausible, the forensic clinical evaluation conducted at the defense's own request administered specific instruments designed to assess violent thoughts and threatening behavior - including [REDACTED — specific clinical instruments — see sealed version]. All returned results in the non-elevated range. The clinical testing established that Petitioner had [REDACTED — specific clinical risk profile finding — see sealed version]. That evidence directly answered the specific Rosen testimony the Court highlighted at sentencing. It was in the sealed report counsel possessed. It was never connected to the allegation.

**C. Counsel Failed to Rebut Steve Rosenberg's Letter Despite Documented Evidence Directly Contradicting His Characterizations - Cited by the Court as a Second Key Sentencing Factor**

The trust Petitioner's investors placed in him was real - and his guilty plea acknowledges the breach of it. What warranted rebuttal in Rosenberg's letter were the characterizations that went further: that an entire decade of community involvement was a calculated fraud vehicle constructed for the purpose of exploitation.

Rosenberg's letter framed a decade of charitable activity - Israel trips, Shabbat dinners, community leadership - as a "calculated performance" designed to defraud investors. The Court cited it immediately after Rosen: "Same goes for Mr. Rosenberg's letter. I mean, trust was everything for him." Sentencing Tr. at 1:46:29. That characterization was directly contradicted by evidence in counsel's possession. Three rebuttals were available and never used.

First, the investor base across Petitioner's entities was not exclusively Jewish - Petitioner had numerous non-Jewish investors- directly undercutting the narrative that Jewish community ties were deliberately cultivated as an instrument of fraud and that personal trust was systematically exploited. Second, Petitioner hosted Shabbat dinners and Jewish community gatherings for close to a decade before Ownable was ever formed - directly contradicting the characterization that these activities were a vehicle for investor solicitation rather than genuine faith expression. Third, and most powerfully: the sentencing transcript itself establishes that it was Rosenberg who personally organized and took Petitioner on two Israel trips - on the second of which Petitioner helped organize, lead, and raise funds. The conduct Rosenberg framed as exploitation was charitable community work in which Rosenberg himself was an active organizer. Rosenberg's own in-court account contains the seeds of its own rebuttal - counsel never planted them.

Petitioner provided counsel with written notice of Rosenberg's inaccuracies before sentencing - specifically requesting rebuttal - in both the February 23, 2026 letter and prior email

20

exchanges. The rebuttal evidence required no investigation: the Israel trip organizer role was documented in the sentencing transcript itself, and the documented timeline showing community involvement predating Ownable by close to a decade was available. Counsel had the notice, had the evidence, and said nothing. That is not strategy. It is abandonment.

Prejudice is established by the Court's own words. Rosenberg's letter served as the second direct citation in the Court's organizing trust framework. Had counsel used the available rebuttal evidence - that Rosenberg personally organized and invited Petitioner on two Israel trips, making him an active participant in the very community activity he characterized as exploitation; that Petitioner's community involvement predated Ownable's formation by close to a decade; and that many of Petitioner's investors were non-Jewish individuals - the Court's trust narrative would have been materially weakened at its second foundation. The conduct Rosenberg framed as deliberate cultivation was community work in which Rosenberg himself was an organizer, predating the company whose fraud it supposedly served.

Petitioner's participation in Shabbat dinners, Jewish community gatherings, and Israel trips predated Ownable's formation by close to a decade. The characterization of a decade of faith community involvement as a calculated fraud vehicle is contradicted by a timeline that predates the company itself.

**D. Counsel Violated Petitioner's Express Written Pre-Sentencing Instructions Regarding Sensitive Medical Information and Failed to Use the Cunliffe Report's Mitigating Conclusions**

The Cunliffe report was the direct answer to the Court's stated basis for denying any variance. After [REDACTED — specific volume of clinical evaluation and instruments — see sealed version] - including [REDACTED — specific clinical instrument — see sealed version] - Dr. Cunliffe documented [REDACTED — specific clinical findings on risk profile — see sealed

21

version] on every measure of future risk. He prescribed a specific, evidence-based treatment pathway. These findings directly answered the Court's question of whether there was any basis to conclude the conduct would stop. Counsel filed the report under seal, named only the diagnostic labels at sentencing, and never explained what the clinical findings established. (Exhibit A - Comprehensive Psychological Evaluation, Dr. Ted B. Cunliffe, Ph.D., dated August 25, 2025.) The Court's conclusion - that "nothing in this record" suggested Petitioner would have stopped, the stated basis for denying any variance - was drawn from a record that contained disorder names stripped of their clinical meaning. That is the primary deficiency in this ground. The secondary deficiency is the manner of disclosure: counsel named those diagnoses in the open court record in direct violation of a specific written client instruction prohibiting it, as well as the standard and customary practices of protecting medical records and diagnoses that should be sealed and not discussed in front of an audience. Both are addressed below.

On February 23, 2026, nine days before sentencing, Petitioner emailed McCrossen and Levy with an unambiguous written instruction: "Regarding my health, any medical findings, and anything related to my children - I want that handled privately. No one should be present in the courtroom for those portions and per our previous convos, no health related matters will be discussed with an audience." (Exhibit D - Email, Josh Verne to Angela Levy and Michael McCrossen, February 23, 2026.) Counsel had confirmed on multiple prior occasions that sensitive medical information would not be disclosed with an audience. The psychological evaluation of Dr. Ted Cunliffe had been filed under seal as docket number 52 specifically to protect this information. Notably, Angela Levy's January 7, 2025 email to Petitioner - fourteen months before sentencing - confirmed in writing that medical records and psychological evaluations are sealable and that the protection was available, establishing that counsel knew the

22

mechanism and its purpose before she violated it at sentencing. (Exhibit I - Email, Angela Levy to Josh Verne, January 7, 2025.)

At sentencing, Angela Levy read the following diagnoses into the open court record without clearing the courtroom, without requesting any protective procedure, and without honoring the client's written instruction:

"Dr. Cunliffe concluded that he suffers from [REDACTED — specific clinical diagnoses — see sealed version]." Sentencing Tr. at 1:25:00.

This was a direct violation of a specific, written, unambiguous client instruction. It was not a strategic judgment. The filing of Dr. Cunliffe's evaluation under seal as docket number 52 - a step taken by counsel herself - was a formal judicial recognition that this material warranted protection. Federal Rule of Criminal Procedure 32(d)(3) specifically authorizes courts to protect sensitive information in sentencing materials. By reading the clinical diagnoses aloud in open court, counsel nullified the protection that sealing was intended to provide. The diagnoses now appear in the open sentencing transcript. That harm cannot be undone. The independent violation of Rule 32(d)(3) warrants relief apart from the Strickland analysis entirely. The harm is compound, not cumulative. The privacy protection counsel's own sealed filing was meant to provide was nullified in open court. The mitigating value that would have justified the filing was never delivered. Each failure is independently consequential. Together they nullify the entire purpose of the sealing.

At sentencing, Levy stated: "I'm not going to go into a tremendous amount of detail from Dr. Cunliffe's report, because I know that you read, it's Exhibit A which we attached and filed under seal." Sentencing Tr. at 1:22:57.

23

Counsel's discussion of the Cunliffe report addressed historical misdiagnoses, [REDACTED — sensitive family content — see sealed version], and the general treatability of personality disorders. What counsel never addressed - on the entire sentencing record - were the forensic findings most directly responsive to the Court's stated concern about whether Petitioner would have stopped. [REDACTED — specific clinical findings — see sealed version] were never mentioned. The absence of [REDACTED — specific clinical finding — see sealed version] was never stated. The absence of [REDACTED — specific clinical finding — see sealed version] was never stated. The absence of predisposition toward violence was never stated. The specific [REDACTED — treatment modality — see sealed version] treatment pathway Dr. Cunliffe prescribed was never identified. The forensic content of the report - the portion that directly answered whether the conduct would have stopped - was not presented.

Counsel's stated rationale for not explaining the findings - "because I know that you read" the report - is the definition of deficient advocacy at sentencing. Filing a sealed expert report does not discharge the obligation to present and explain its mitigating content. The Court's subsequent finding that "nothing in this record" suggested the conduct would have stopped is the direct product of a record where the relevant forensic content was never explained.

[REDACTED — description of clinical instrument — see sealed version]. [REDACTED — specific clinical findings — see sealed version]. The Court's conclusion - "there's nothing in this record that makes me think that Mr. Verne would have stopped" - is the precise question that forensic risk assessment exists to answer. Placing the report in the file and assuming the Court would draw the clinical connection is not a strategic choice. It is an abdication of the obligation to present mitigating evidence in a form the Court can actually use. The fact that the Court read

24

the report and still reached that conclusion is not evidence the report was understood. It is evidence it was not explained.

[REDACTED — specific clinical findings — see sealed version]. Dr. Cunliffe explicitly concluded there was [REDACTED — specific clinical findings on risk profile — see sealed version]. The multiple [REDACTED — specific clinical scales and findings — see sealed version]. Dr. Cunliffe identified Petitioner's conduct as a product of [REDACTED — specific clinical conclusion — see sealed version]. He prescribed a specific, evidentially supported treatment pathway: [REDACTED — specific treatment modality — see sealed version].

The Court stated: "there's nothing in this record that makes me think that Mr. Verne would have stopped." Sentencing Tr. at 1:55:03. The Cunliffe report was exactly that something. It documented [REDACTED — specific clinical findings — see sealed version] - conditions that are addressable through the specific therapeutic pathway Dr. Cunliffe prescribed. The Court itself observed at sentencing: "I completely accept that Mr. Verne did not sit down one day and say, I've got this three-year scheme. And here are the steps... it's very much a let's see what the next day brings type of approach." Sentencing Tr. at 1:50:37. That is a clinical description of impulsive reactive decision-making under stress - the exact pathology Dr. Cunliffe documented and for which he prescribed a specific evidence-based treatment pathway. The Court made this observation, had access to the Cunliffe report, and still denied any variance based on a concern about whether Petitioner would have stopped that the report directly answered - because counsel never drew the connection. Counsel filed it under seal, announced only the disorder names in open court in violation of Petitioner's written instructions, and never explained what those labels meant or what the report's most significant findings established. The Court's conclusion - that

25

"nothing in this record" suggested Petitioner would have stopped - was drawn from a record that contained the disorder names and nothing else.

The record also contains two documented facts the Court never received that speak directly to its "would have stopped" concern. First, Petitioner's departure from Ownable is established by a fully executed Separation and Release of Claims Agreement bearing DocuSign certification, dated November 11, 2020, documenting that departure as a resignation effective October 7, 2020 with a negotiated benefits package: twelve months of health coverage and preservation of all vested equity under the Equity Redemption Agreement dated October 10, 2020. (Exhibit M - Separation and Release of Claims Agreement, November 11, 2020.) A termination for cause does not produce a twelve-month health benefits package. The documented departure occurred before any charge, before any indictment, before any arrest. Second, Petitioner sought treatment for substance abuse and the underlying mental health conditions Dr. Cunliffe later documented through clinical evaluation - entering rehabilitation prior to any criminal charge being filed. This is not a self-serving claim: it is established by four independent documents already in the government's own discovery. Eve Rosen's November 2, 2020 FBI interview - her first contact with the agent who investigated this case - states that Petitioner "is currently in rehab" and describes him as having been "released from a facility in California" and now in "a facility in Mississippi." Charles Kurtzman's June 2021 FBI interview states that Petitioner "advised that he was seeking rehabilitation for substance abuse." David Magerman's July 2021 FBI interview states that Petitioner told him directly in summer 2020 that "he was going to rehab, and would turn himself around." And Petitioner's own October 2020 email to KHV CRED investors - produced in discovery by the PA Attorney General - states that he was "entering into an inpatient facility to work on his health and mental wellness." Four independent

26

government-produced documents, all from 2020 and 2021, all predating any criminal charge by years, establish that Petitioner sought treatment and told those around him he was doing so. The conditions the Court cited as the basis for concluding the conduct would not have stopped were precisely the conditions Petitioner had already begun addressing. Counsel possessed the Separation Agreement. Counsel possessed the Cunliffe report prescribing a specific treatment pathway for those same conditions. All four corroborating documents were in the discovery file. None of this was presented to the Court as evidence of capacity for change.

Under Glover v. United States, 531 U.S. 198, 203-04 (2001), any measurable increase in prison time caused by counsel's deficient performance satisfies the prejudice prong. The Court denied any variance based on a concern about whether Petitioner would have stopped that the Cunliffe findings directly answered. A variance commensurate with a correctly understood forensic risk assessment - of any length - would have constituted cognizable Sixth Amendment prejudice.

**E. Counsel Failed to Investigate and Raise the Hockfield Structural Conflict of Interest**

Barry Hockfield served as Petitioner's personal and business attorney across documented engagements spanning 2015 through February 2021 - a relationship that, while the formal documentary record begins in 2015, predates that period given the longstanding family and professional connection. He is also Petitioner's former father-in-law. Approximately three years separate the last documented engagement from Petitioner's arrest in August 2024. Four documentary exhibits establish the prior attorney-client relationship as a matter of law. No formal retainer is required - under ABA Model Rule 1.9, the relationship is established by conduct.

27

First, January 2, 2015: Petitioner forwarded a non-compete agreement from the WorkPays/APA business transaction to Hockfield for legal review and served as his personal legal counsel for the matter.

Second, April 20, 2017: Petitioner wrote to Independence Blue Cross in writing: "I give complete authorization for you and whoever else from IBC/IBX to discuss all matters regarding me, Josh Verne, with my attorney Barry J. Hockfield (CC'd)." Hockfield was copied at his personal Gmail account. (Exhibit P - Email, Josh Verne to Independence Blue Cross, April 20, 2017.) This is the formal invocation of the attorney-client relationship in a written communication to a third-party institution. This is not family contact. This is the designation of an attorney in a formal written communication to a third party.

Third, April 21, 2020: Barry Hockfield's personal Gmail account was included on the Ownable investor meeting distribution list. Hockfield was not an Ownable investor. His access to investor communications was entirely derivative of his attorney-family relationship with Petitioner - giving him privileged inside knowledge of the company's investor base, business status, and financial condition that is the very subject matter of this prosecution.

Fourth, February 3, 2021: Attorney Neal Jacobs sent a joint email to both Petitioner and Barry Hockfield regarding a lawsuit in which Petitioner and his then-wife Kami were co-defendants, addressing settlement strategy, subpoenas, and Fifth Amendment considerations for both parties. Hockfield was acting as active co-counsel on litigation directly connected to this prosecution's business period.

Following his prior representation of Petitioner, Barry Hockfield appeared on the opposite side of this case in multiple documented capacities - all established by documentary evidence, not inference.

28

On or about July 6, 2021, AUSA Paul Shapiro sent a proffer letter to Barry Hockfield, Esquire, regarding Sherri Hockfield - the company's former Chief Financial Officer, key government financial witness, and Petitioner's former sister-in-law. The proffer letter documents on its face that Barry Hockfield was actively representing Sherri Hockfield in cooperation conversations with the government approximately three years before Petitioner's arrest. The government agreed to use derivative leads from her proffer statements in formulating "appropriate resolution of this matter" - meaning Petitioner's prosecution. AUSA Shapiro authored that letter and prosecuted Petitioner's case.

On or about the same date, AUSA Shapiro sent separate proffer letters to Barry Hockfield, Esquire, regarding Josh Block and Gayle Block - family members who appeared on the government's victim and witness list.

Three proffer letters, same attorney, same prosecutor, same month. This is not coincidence. This is documentary proof that Barry Hockfield - while bound by professional obligations arising from his prior representation of Petitioner spanning 2015 through 2021 - simultaneously orchestrated the formal cooperation of multiple witnesses drawn from Petitioner's own family and professional network through formal proffer agreements with the same prosecutor. All three proffer letters are in the discovery file and will be submitted as exhibits at any evidentiary hearing ordered by this Court.

Barry Hockfield also appears on the government's own victim and witness list in this prosecution. He was not an investor in Ownable or any of the charged entities. His inclusion reflects his status as a government witness - a witness whose substantive knowledge of Petitioner's business affairs, investor relationships, and financial condition derives directly from his prior representation of Petitioner. A former attorney appearing as a government witness in a

prosecution of his former client - testifying about matters within the scope of that prior representation - is not a neutral third party. He is a witness whose cooperation with the government is itself constrained by the professional obligations that representation created. The government's decision to include Hockfield as a witness without disclosing his prior attorney-client relationship with Petitioner to defense counsel is an independent basis for relief, and Petitioner's attorneys' failure to raise it compounds the deficiency documented in this ground. Notably, Petitioner had specifically raised the conflict with counsel on multiple occasions - verbally and in writing - and was assured when petitioner brought it up that it wasn't worth fighting at this time and can be used as a basis for sentencing mitigation. That mitigation argument was never made.

Additionally, Barry Hockfield appeared on a podcast prior to sentencing and made specific predictions about Petitioner's sentencing outcome, including statements about the likelihood of a guideline sentence and the absence of family support - statements that, made by a former attorney bound by professional obligations to his former client, raise a direct inference that privileged information was informing his public commentary. Angela Levy confirmed listening to that podcast in full. Counsel confirmed awareness of the specific statements. Nothing was raised.

The prejudice from this failure extends across multiple elements of the proceeding. Hockfield's fingerprints run through the entire case: he represented the CFO whose financial records the government relied upon; he made public statements about the sentencing with apparent inside knowledge drawn from his prior representation of Petitioner; and he induced at least one investor - Linda Sommer, who also submitted a victim impact letter - to invest by falsely representing that he had personally already invested. Sommer stated specifically in her

30

own letter: "After I had been working with Josh for a while (2016), I asked Barry about investing with Josh and he had already done so." Hockfield had not invested. He does not appear on the capitalization table nor did he sign any investment paperwork. He was Petitioner's own attorney when he made that representation to Sommer. A former client's attorney who solicited a third-party investment by falsely claiming personal involvement, who then represented cooperating witnesses against that former client, and who made public predictions about that former client's sentencing with apparent inside knowledge - is not a peripheral figure. He is a documented conflict that runs through the entire proceeding. Each of these facts individually raised questions about the objectivity and reliability of key government witnesses. Together they form a pattern that, had counsel investigated and raised it, would have given the Court a materially different picture of the reliability of the cooperation evidence at sentencing.

Counsel had documented notice of Hockfield's prior representation through the February 23, 2026 pre-sentencing letter and multiple prior communications. She had confirmed specific awareness of his podcast statements through her own listening. Basic competence required investigating a known conflict before sentencing - at minimum, filing a motion and seeking discovery on Hockfield's witness communications. Counsel did neither. The deficient performance exists regardless of whether the Court reaches the structural error analysis.

The Third Circuit's foundational conflict analysis begins with Government of Virgin Islands v. Zepp, 748 F.2d 125 (3d Cir. 1984), which held that the Sixth Amendment encompasses two correlative rights: the right to competent representation and the independent right to the attorney's undivided loyalty free from conflict. Under United States v. Moscony, 927 F.2d 742 (3d Cir. 1991) - the controlling Third Circuit precedent - a structural conflict exists where counsel has "divided loyalties due to concurrent or prior representation of another client

31

who is a co-defendant, a co-conspirator, or a government witness." Moscony held that prior representation of government witnesses creates a structural trap: cross-examination of those witnesses "if foregone would have deprived defendant of his Sixth Amendment right to effective assistance of counsel, and if pursued would have violated ethical standards regarding privileged communications." That is precisely the structural trap present here. In United States v. Bellille, 962 F.3d 731 (3d Cir. 2020), the Third Circuit reaffirmed the Moscony structural conflict standard, citing Moscony directly for the proposition that counsel cannot ethically cross-examine a government witness when divided loyalties exist from prior or concurrent representation - and held that this constitutional principle requires disqualification or withdrawal, not simply an ethics wall. Bellille confirms this remains current, settled Third Circuit law, not a novel or outdated theory. Under Cuyler v. Sullivan, 446 U.S. 335 (1980), once actual conflict adversely affecting performance is shown, prejudice is presumed as a matter of structural constitutional error. The adverse effect is established: the specific action foregone was the investigation and challenge of Hockfield's dual role and the reliability of the witnesses he represented. The constrained decision is documented.

The government will argue the Hockfield relationship was familial rather than professional. The IBX email forecloses this argument. Petitioner designated Hockfield as "my attorney" in a formal written communication to a third-party financial institution on a specific financial dispute. That is the formal invocation of the attorney-client relationship. The non-compete review, the investor communications, and the Jacobs co-counsel email confirm three additional specific professional engagements. ABA Model Rule 1.9 treats each spouse as a separate client with independent confidentiality rights even in joint representation. The burden to

32

prove no conflict is on the lawyer. No written conflict waiver exists anywhere in the record of this case.

The inclusion of Josh Block and Gayle Block on the government's victim list - through proffer agreements arranged by Barry Hockfield - demonstrates that his involvement was active, not passive: he leveraged his position within Petitioner's own family network to assist the government's case against his former client and former son-in-law. This is among the most direct evidence of adverse effect under Cuyler available in this motion.

The government may argue that the four documented engagements represent an attenuated prior representation too limited in scope to generate the professional duty Cuyler requires - that Petitioner cannot point to specific privileged information flowing from those engagements that Hockfield then used against him. That argument conflates the Strickland and Cuyler standards. Under Cuyler, the adverse effect showing does not require proof that specific privileged information was disclosed or used. It requires only that the conflict constrained a specific litigation decision. The constrained decision here is documented: Levy and McCrossen could not effectively cross-examine or challenge any Hockfield-represented witness without risking implication of Petitioner's own prior confidential communications. That structural trap exists regardless of the specific content of those communications. Moreover, the four emails in evidence are a floor, not a ceiling. Petitioner was unable to access the full record of his prior dealings with Hockfield due to the loss of the Ownable business email system and prior personal email accounts. The documented engagements span six years, include a formal written designation of Hockfield as 'my attorney' to a third-party institution, and include active co-counsel status on litigation directly connected to this prosecution's subject matter. An evidentiary hearing with subpoenas directed to Hockfield's files would establish the full scope of the prior

33

representation. Petitioner has produced what is accessible to him. The full record is obtainable through discovery.

## F. Counsel Failed to Research and Raise Pending Sentencing Guideline Changes and the Available § 3553(a)(6) Argument Based on Them

Counsel initiated this argument herself. During pre-sentencing discussions, Levy identified for Petitioner that pending Sentencing Commission amendments to the guidelines - affecting loss amount thresholds and victim count tiers - were potentially applicable to his case. She discussed it as a basis for mitigation. An attorney who flags a favorable argument, discusses it with her client, and then fails to research or raise it has not made a strategic choice to forgo it. She has abandoned an argument she initiated. Counsel never briefed the amendments, never developed the § 3553(a)(6) disparity argument they supported, and said nothing about them at sentencing.

The factual predicate for this argument is confirmed and on the record. The United States Sentencing Commission published proposed amendments to USSG § 2B1.1 in December 2025 and January 2026. The amendments restructure the loss table from 16 tiers to 8 broader tiers and adjust monetary thresholds for inflation unchanged since 1991. Commission statistical data indicates these changes would reduce offense levels for approximately 37 percent of economic crime defendants. The Commission voted on April 16, 2026 to adopt the amendments, which take effect November 1, 2026. Defendants sentenced after that date will benefit from the revised loss table. Defendants sentenced on March 4, 2026 — including Petitioner — will not. That is not a hypothetical disparity. It is a fixed one, and § 3553(a)(6) exists precisely to address it.

The same amendment package also narrows the "sophisticated means" enhancement under USSG § 2B1.1(b)(10)(C), clarifying that it applies only to conduct that is truly complex or intricate relative to the nature of the offense — not merely the use of common modern

34

technology. To the extent that enhancement was applied at sentencing, defendants sentenced after November 1, 2026 will be evaluated under a narrower standard. Petitioner was not. That is a second, independent disparity of exactly the same kind, arising from the same Commission action, and warranting the same § 3553(a)(6) analysis.

The Commission also adopted a new reduction for defendants who demonstrate significant, positive post-offense rehabilitative efforts or behavior prior to sentencing. Defendants sentenced after November 1, 2026 who can establish documented pre-sentencing rehabilitation will be eligible for a guideline reduction Petitioner could not obtain. Petitioner's pre-sentencing rehabilitation is not a self-serving claim — it is established by four independent government-produced documents all predating any criminal charge: Eve Rosen's November 2020 FBI interview noting Petitioner was "currently in rehab" in California and Mississippi, Charles Kurtzman's June 2021 FBI interview, David Magerman's July 2021 FBI interview, and Petitioner's own October 2020 email to investors stating he was entering an inpatient facility. A defendant with that same documented record, sentenced eight months from now, would be evaluated for a reduction Petitioner was denied. That disparity is fixed, not hypothetical, and § 3553(a)(6) addresses it directly. Counsel never raised any of this.

The government may argue that unenacted guidelines cannot support an IAC claim. That argument fails at two levels. First, counsel initiated this argument herself - it was her own flagged issue. An attorney who surfaces a favorable legal argument, discusses it with her client as mitigation, and then abandons it without research or explanation has not exercised strategic judgment. She has defaulted on an argument she chose to raise. Second, enactment was not required. A formally published Commission amendment is the Commission's own documented judgment that the current table overstates culpability for this category of offense. A § 3553(a)(6)

35

variance argument grounded in that judgment - that Petitioner was being sentenced under a framework the Commission itself was actively revising - was specific, articulable, and already resonating with the Court. The Court told counsel the disparity analysis "helped crystallize my thoughts." Sentencing Tr. at 1:56:10. Counsel had an open door. She never walked through it.

### G. Counsel Failed to Explain the Absence of Character Witnesses, Failed to Contact a Sitting Official Petitioner Identified, and Failed to Raise Documented Government Overreach Under § 3553(a)(1)

The government cited the absence of character witnesses as evidence that Petitioner had no genuine relationships or community standing. Counsel offered no explanation. The documented reason - which counsel possessed and never disclosed - is specific, serious, and directly attributable to the government's own conduct. The government's decision to place close to 100 individuals on the victim and witness list, including individuals who to the best of Petitioner's knowledge had never been contacted by investigators, created a chilling effect that eliminated the defense's ability to present character support. Once placed on that list, any individual who wrote a letter or showed up to the sentencing hearing supporting Petitioner's request for leniency risked being perceived as adverse to the government's case - a position most people with professional and community standing were unwilling to accept. The government manufactured the absence it then exploited. Counsel never told the Court any of this.

Although Petitioner did receive multiple character letters during the representation, he made the deliberate decision not to ask any of those individuals to appear at sentencing or submit letters - because the documented pattern of government overreach made him unwilling to expose them to the same treatment that had already cost him his job, severed an active consulting relationship, and turned his professional network into a minefield. The absence of character

36

witnesses at sentencing was the product of that overreach, not the absence of community. Counsel knew that distinction. The Court was never told it.

The atmosphere of overreach extended well beyond the formal victim and witness list. Four specific documented examples established that the reach of this prosecution had created real, concrete consequences for Petitioner's professional and personal network - consequences counsel possessed documentation of and never raised.

First: before the SEC/FBI investigation was even made public, a witness on the list connected to the government's case contacted Juice Financial - Petitioner's employer at the time - and disclosed the existence of the investigation. Petitioner was terminated as a direct result. The government's investigation had become visible in Petitioner's professional circles before it was a matter of public record, and that visibility cost him his job and his income before a single charge had been filed or had been made public.

Second: the government added Krishna Gopinathan to the victim and witness list. Gopinathan was the founder of a company that had acquired one of Petitioner's prior businesses; Petitioner had worked with him during 2013 and 2014 and then had continued as an active consulting relationship in more recent years that generated income. To Petitioner's knowledge, Gopinathan had never spoken to, either by email or phone, investigators before being placed on the list. The moment he was added, Petitioner was barred from communicating with him. A documented consulting engagement and business relationship was severed by a deliberate government decision made with full knowledge of that relationship. Counsel never told the Court that the government itself had cut off the relationship - and the income it produced, whether current or future.

37

Third: Schulson - a man who extracted a $426,000 settlement through threats against Petitioner's [REDACTED — minor children], signed a mutual non-disparagement agreement, and then submitted the victim impact letter the Court called "particularly significant" - was permitted by the government to submit that letter without challenge. The same government enforcing the victim and witness list against Petitioner's supporters enforced nothing against Schulson's contractual obligations. Petitioner's network saw that sequence clearly. The calculus of involvement was not hypothetical to them.

Fourth: the prosecutorial posture throughout this case was documented in writing as early as December 2022. Before indictment, Petitioner's prior counsel's partner Marc Durant contacted AUSA Shapiro to gather information before presenting a defense position - a standard pre-indictment step. Shapiro terminated the call, hanging up when the conversation did not proceed on his terms. His December 19, 2022 written follow-up accused defense counsel of obtaining the meeting "under false pretenses," called their posture "nothing short of bad faith," and demanded a confession-level position by 1:00 PM or he would cancel. (Exhibit N - Email, AUSA Paul Shapiro to defense counsel, December 19, 2022.) This occurred after only a brief reverse proffer meeting at which a thin, summary-level presentation was made. The clear message: the government would only engage if Petitioner admitted guilt. That posture was not invisible to people who knew this prosecution. The government's approach made participation as a character witness feel like a risk - one Petitioner did not want to put anyone through by asking them to speak on his behalf. That perception was grounded in documented reality. This documented prosecutorial conduct - threatening to cancel a pre-indictment meeting unless counsel immediately produced a confession-level admission - is precisely the kind of government overreach under § 3553(a)(1) that belonged before the sentencing Court. Counsel possessed the

38

email. Counsel never raised it. Petitioner does not raise this to challenge his guilty plea. He raises it to document that the government's overreach extended to the pre-indictment stage - context the Court never received.

The failure to explain this to the Court was not an oversight. It was a direct violation of a specific written instruction. Nine days before sentencing, in the February 23, 2026 pre-sentencing email (Exhibit D), Petitioner wrote in explicit terms: "I DO THINK YOU SHOULD BRING THIS UP AT THE HEARING AS TO WHY I DIDN'T WANT TO CALL ANYONE - THIS GOES ALONG WITH THEIR OVERREACH AT EVERY LEVEL." Petitioner documented the specific reasons in writing: that investors on the government's witness list had contacted his employer and caused him to lose his job before the SEC matter was public; that the government had added Gopinathan to the list without contacting him, cutting off any consulting arrangement as the petitioner was unable to speak to Gopinathan; that Petitioner reasonably feared that anyone who appeared as a character witness would face retaliation from the network of investors aligned against him; and that he did not trust a process in which the government accepted Schulson's letter in violation of a signed non-disparagement agreement while simultaneously suppressing the defense's ability to present counterweight. That is not a suggestion. It is a documented written directive, supported by four specific reasons, delivered with unmistakable emphasis. The explanation existed. The documentation supported it. The directive was in writing. Counsel did not comply.

Beyond the failure to explain the absence, counsel failed to follow through on a specific opportunity to obtain a character letter from an identified source. Petitioner had previously spoken with a sitting elected official who had expressed openness to writing a letter on his behalf and asked whether other public officials would also be writing letters. Petitioner provided

39

McCrossen with the official's direct cell phone number and specifically asked him to call to solicit the letter, which he agreed to do. Petitioner followed up in writing on November 10, 2025, specifically asking McCrossen whether he had made contact. Contact was never made. A sitting elected official willing to write a character letter would have carried significant institutional weight with the Court - weight that lay witnesses cannot replicate. Whether the official would have written remains permanently unknown through counsel's own inaction.

Counsel also never raised the § 3553(a)(1) argument that the government's own conduct created punishment beyond the guidelines. The government possessed documentation of Petitioner's legitimate consulting relationship with Gopinathan at the time it added him to the victim and witness list. Nothing in discovery shows the government contacted Gopinathan before doing so. The decision directly eliminated active, or future, legitimate income - a foreseeable, documented consequence of a deliberate government act made with full knowledge of the employment relationship. That is not collateral harm. It is pre-sentencing punishment the Court was never told about. The same applies to the Juice Financial termination: a witness's disclosure of a non-public investigation cost Petitioner a job before he was ever charged or the investigation was made public. Counsel said nothing. This pre-indictment harm is classic § 3553(a)(1) mitigation - history and characteristics, and the nature and circumstances surrounding the offense conduct. Counsel possessed the documentary record of both incidents and presented neither.

None of these failures was strategic. Every documented example of overreach was raised with counsel in pre-sentencing communications on a repeated basis. The written directive was explicit. The Gopinathan documentation was in the materials provided to counsel. Counsel had the facts, the documentation, and the instruction. None of it was used.

Prejudice runs through each element. The government argued unchallenged that Petitioner had no genuine community support - using an absence it had created. Had counsel explained to the Court that investors had contacted Petitioner's employer before the matter was public and caused his termination; that the government had added an active consulting relationship to the victim and witness list, severing post-charge income, and potential income, without first contacting that individual; that Schulson had submitted a letter in violation of a signed non-disparagement agreement while the government simultaneously suppressed the defense's ability to present character support; and that the same prosecutorial posture visible throughout this case had made supporters afraid to come forward - the Court would have had a materially different basis for assessing both the isolation narrative and the employment narrative.

## H. Counsel Failed to Challenge the Government's Contradictory Timeline and Failed to Present Evidence of Legitimate Business Value

Petitioner's guilty plea acknowledges that the fraud during Ownable's later period was real. What the plea does not - and should not - establish is that every enterprise Petitioner touched was fraudulent, or that he never created legitimate value. Those are not the same thing, and the sentence the Court imposed reflects a Court that was given only the former.

The government characterized the fraud as continuous from 2015 through 2020 - a five-year fraudulent enterprise. The government's own position at the change of plea acknowledged that conduct predating 2018 was not part of the fraudulent scheme. Petitioner operated FlockU from 2015 to 2018 - a venture the government itself acknowledged was not fraudulent. A five-year fraud narrative was directly contradicted by the government's own prior position on the record. Counsel never challenged this discrepancy or drew the Court's attention to it. The distinction between the government's five-year fraud narrative and the documented timeline is

41

not a technicality - it directly informed the Court's conclusion that nothing short of compulsion would have stopped Petitioner's conduct, and it went entirely unchallenged.

The government argued Petitioner had never built anything of genuine value. Counsel possessed documentary rebuttal evidence and used none of it. Petitioner ran the family furniture business as President from 1998 through 2011 - nine-figure annual retail revenues, over a decade of operation. He founded WorkPays (later Global Analytics), built it from startup, and sold it in a transaction that included both cash proceeds and substantial equity consideration - objective evidence of value created through legitimate enterprise. The government repeatedly cited the WorkPays transaction as producing only modest proceeds by referencing only the cash component of the Asset Purchase Agreement and omitting the significant stock consideration also included in that agreement. Counsel possessed the Asset Purchase Agreement and never used it to correct that characterization. Petitioner also forwarded to both Levy and McCrossen a news article reporting the Beatbox Beverages acquisition at a reported $490 million - a substantial return for the investors Petitioner had brought into BBB-I, the vehicle through which the investments were made - with a specific written request that it be raised at sentencing. The government's portrait of a career fraudster who built nothing stood unchallenged despite documentary evidence to the contrary.

The government's enterprise-was-always-fraudulent narrative was further undermined by the Blue Elephant Capital Management relationship - a sophisticated institutional lender that conducted months of arm's-length due diligence on Ownable, deployed capital, and made a profit on every rental contract it purchased. That relationship is addressed in detail in Ground K. The point here is simple: counsel was specifically and repeatedly directed to this evidence in writing before sentencing, with an explicit request that it be raised. It never was.

42

None of these failures was strategic. The government's own charging documents acknowledged FlockU was not fraudulent. The Beatbox acquisition was documented in news articles counsel possessed. Petitioner provided the Blue Elephant agreement in writing with a specific request it be raised. Counsel had the documents, had the notice, had the argument. The Court heard none of it.

Prejudice is established by the Court's own words. The Court concluded that "there's nothing in this record that makes me think that Mr. Verne would have stopped doing what he was doing, or this kind of behavior for any reason other than he was forced to." Sentencing Tr. at 1:55:03. That conclusion was built in part on the government's unchallenged characterization of a five-year fraudulent enterprise and an operator who built nothing of value. A properly constrained timeline - supported by the government's own prior position - would have materially weakened that conclusion. The Beatbox acquisition outcome, the up to nine-figure Blue Elephant approval, the nine-figure family furniture business retail revenues, and the WorkPays transaction value would have replaced the portrait of a serial fraudster with the documented reality of a businessperson who also committed fraud. Those are not the same thing, and the sentence imposed reflects a Court that only heard one of them.

The government may argue the Court was entitled to consider the full enterprise history as relevant conduct regardless of the 2015 versus 2018 distinction. That misframes the issue. The government affirmatively presented a five-year fraudulent enterprise as the basis for a longer sentence - and invited challenge to that narrative. Counsel's failure to challenge an affirmative factual argument the government chose to make is not cured by noting the Court might have considered the conduct anyway. The Court considered the narrative it was given. It was given only one.

43

## I. COUNSEL FAILED TO COUNTER THE GOVERNMENT'S MISREPRESENTATION OF A LOVING AND SUPPORTIVE FAMILY

The government told the Court: "He was raised with privilege. He was raised with opportunity. He was raised with support, a two parent home, a comfortable upbringing." Sentencing Tr. at 1:00:41. The Court benchmarked Petitioner against a defendant who had watched a parent murdered - and sentenced accordingly. Counsel possessed four documented, unchallengeable facts that demolished that framing. They presented none of them.

First, the family's pattern of conditional engagement predates this case by years. [REDACTED — sensitive family history — see sealed version]. [REDACTED — sensitive family history — see sealed version]. Contact resumed only after Petitioner's professional and financial standing recovered. The government's "loving family" did not merely fall apart after FBI contact - it had already demonstrated it was conditional on financial success long before this case existed. The FBI contact did not create that dynamic. It activated one that was already documented.

Second, before a single charge was filed, [REDACTED — sensitive family history — see sealed version]. Both had been in contact with FBI investigators and had formed their understanding entirely from one-sided law enforcement contact. Their refusal to produce basic records for their own son was not a reaction to proven criminal conduct. Whether they were hurt financially or not is not the point - it was entirely one-sided. A loving family examines all the evidence before aligning with law enforcement against their own child. It was the product of a view shaped entirely by the government before this case existed.

Third, when counsel reached out to Petitioner's mother about writing a character letter in support of Petitioner at sentencing, she declined. This was the same person who approached

44

Petitioner repeatedly in the moments before entering the courtroom on the day of sentencing - yet would not write a single word on his behalf. Counsel never disclosed this to the Court.

Fourth, the sealed Cunliffe report - which counsel possessed - [REDACTED — sensitive family history — see sealed version]. The report documented that the family "attempted to create the impression that they were a close and perfect family - it was not real" and that within the home, "discussing one's problems was not encouraged and was frequently not allowed." These findings, established through clinical interviews and record review, were available to counsel in actionable form. They were never presented.

None of these four facts reached the Court. [REDACTED — sensitive family history — see sealed version] was never mentioned. [REDACTED — sensitive family history — see sealed version] was never mentioned. The mother's refusal to write a single word on her son's behalf - known directly to counsel from her own outreach - was never disclosed to the sentencing judge who called this a loving and supportive family. The government's narrative went unanswered because counsel had the evidence to answer it and said nothing.

This failure was not strategic. Counsel initiated the family-history narrative when her own investigation uncovered [REDACTED — sensitive family history — see sealed version], induced Petitioner to disclose painful personal history on the basis that it was important to the defense and then abandoned the argument at sentencing without explanation. That is not strategy. That is the development of a mitigation theory followed by its complete abandonment after the client had already committed to it.

The government will argue that whatever [REDACTED — sensitive family history — see sealed version] existed was a product of Petitioner's own conduct — that a loving family was damaged by his crimes. That argument fails on the timeline alone. [REDACTED — sensitive

45

family history — see sealed version] did not begin with criminal charges. As documented above, it predates this entire case by years. The conditional pattern — engagement tied to financial success, withdrawal tied to financial failure — was already established and documented long before a single charge existed.

The government will also argue that the parents' presence at sentencing demonstrates family support. The presence of parents who attended as observers — having refused to write a single letter of support when directly asked by counsel — reflects the same conditional, performative dynamic that characterized the entire relationship. The Court was never told this. The Court was permitted to assume the parents' presence meant what the government implied it meant.

The Court's own remarks illustrate what was missing. In discussing sentencing disparities, the Court referenced a recent defendant whose mother murdered his father in front of him at age six — noting that those circumstances represent "a real challenge." The statute does not require reaching that level. What it requires is that the Court have an accurate factual record from which to conduct its § 3553(a)(1) analysis. The Court reached for an extreme case as a reference point because counsel gave it nothing concrete about Petitioner's actual family history.

Had the Court been presented with [REDACTED — four specific items of sensitive family history — see sealed version] — the Court would have had a concrete record to anchor its § 3553(a)(1) analysis. The point is not that Petitioner's background rivals the extreme case the Court described. The point is that counsel left the government's characterization entirely unanswered.

**J. Counsel Failed to Adequately Challenge the Two-Level Obstruction Enhancement - A Failure With Direct, Calculable Impact on the Guideline Range**

46

The Court overruled the defense objection to the two-level obstruction enhancement under USSG § 3C1.1, directly increasing the advisory guideline range from 87-102 months to 102-121 months total. This is not a speculative impact - it is a specific, calculable guideline increase, and successful challenge to this enhancement alone would have placed Petitioner in a materially lower sentencing range.

The enhancement arose from three texts Petitioner sent to Jon Dorfman and his wife Jamie on September 12, 2022 - hours after learning for the first time at a reverse proffer that his closest friend of 35 years had been cooperating against him. Seven specific arguments against the enhancement were available, documented, and raised with counsel in writing before sentencing. None were developed at the hearing.

During McCrossen's argument on the obstruction enhancement, Petitioner passed a written note to Levy - using the notepad paper she had herself given him at the outset of the hearing with instructions to slip her a note if he needed to communicate anything - specifically requesting that counsel ensure McCrossen raised the fact that after the initial contact, Petitioner never again contacted the relevant witnesses, directly undermining the obstruction premise. Levy ignored the note. This mirrors the ignored note during Rosen's testimony documented in Ground B. Together, they establish a documented pattern of counsel disregarding Petitioner's contemporaneous written instructions at the hearing itself.

The specific arguments that were available and never developed: First, Jon Dorfman was the named victim of Count 8 - the aggravated identity theft charge that added a mandatory consecutive 24 months to Petitioner's sentence. His victim letter therefore carried the weight of someone with a specific, targeted personal grievance rooted in the most serious individual count on the indictment. That direct financial and legal stake goes to the objectivity of his

47

characterizations, and counsel never raised it as context. Second, Dorfman was Petitioner's closest friend since third grade - approximately 35 years at the time of the incident. Dorfman knew Petitioner's personality, including his tendency toward impulsive communication, as supported by Dr. Cunliffe's forensic report documenting Petitioner's impulsive communication style. The texts were sent within minutes of Petitioner learning for the first time that this lifelong friend had spoken against him. Counsel acknowledged the shock of the revelation at the hearing but failed to develop the full human context or argue that conduct driven by immediate emotional shock - rather than planned coercion - is fundamentally different from the calculated witness intimidation the obstruction enhancement is designed to address. Third, Petitioner never contacted Dorfman or his wife before or after September 12, 2022, regarding this matter. Three impulsive texts on a single afternoon/evening - separated from sentencing by close to four years of complete silence - are fundamentally inconsistent with an intent to obstruct rather than a momentary reaction. Dorfman's cooperation with the government was not affected. The government's own position was that this was attempted - not successful - obstruction. Counsel never hammered this distinction.

Fourth, Dorfman's own attorney, when the texts were first reported to the government, stated that Petitioner and Dorfman's wife "received texts from Verne, which on their face are not direct threats." That is the characterization of the alleged victim's own legal counsel - directly contradicting the Court's conclusion that obstruction was "the only inference available to me." Counsel possessed this and never used it.

Fifth, the actual content of the September 12, 2022 message — confirmed in discovery — establishes that the Court's characterization of obstruction was built on a foundation that Dorfman himself could not substantiate. The text Petitioner sent read, in relevant part: "If this

48

goes forward — you should expect other natural questions like bachelor party conversations and other conversations you think would be relevant…" This is a vague reference to potentially embarrassing social information — the kind of impulsive, emotionally raw statement sent within hours of learning that his closest friend of 35 years had been secretly cooperating against him. When the FBI interviewed Dorfman, he told agents that he "does not know what VERNE meant when he referenced the bachelor party" and confirmed that "there was nothing that happened at any party that could be used to coerce DORFMAN." The threat had no content behind it. Dorfman knew it. His own attorney confirmed it in writing to the government. What the Court characterized as the only available inference of obstruction was a vague reference to a social event whose meaning the alleged victim himself could not explain and whose coercive content he affirmatively denied. Petitioner did not act on the statement — not before, not after, not ever. The four years of complete silence following three texts on a single afternoon/evening are the strongest available evidence of what they were: a momentary, impulsive reaction to a shocking revelation, not a calculated campaign of witness intimidation. Threats of embarrassing information exposure are a different category of conduct than physical witness intimidation, and that distinction is dispositive when applying an enhancement designed to address threatening conduct directed at witnesses.

Sixth, Dorfman did not appear at sentencing. His letter stated he declined due to "mental and emotional stress." His stated reason is at least as consistent with someone who did not view himself as a genuine victim of threatening conduct.

Seventh, and most significantly, this same Court had already ruled in Petitioner's favor on the government's earlier motion to maintain GPS monitoring based on the identical text messages as evidence of threatening conduct. The Court rejected that argument at the time. Counsel never

49