**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO. 24-270** |
| | : | |
| **JOSH S. VERNE** | : | |

# MEMORANDUM

**MURPHY, J.** **September 4, 2026**

This memorandum addresses two post-sentence motions: one to appoint counsel, and another to vacate, set aside, or correct a sentence. Last year, Josh Verne pled guilty to orchestrating a wide-ranging, three-year scheme to defraud investors of over $22 million. A few months ago, we sentenced Mr. Verne to approximately nine years of incarceration, four years of supervised release, and various special assessments for these crimes. Mr. Verne was represented by two attorneys from the Federal Community Defender Office in Philadelphia throughout these proceedings. Shortly after sentencing, Mr. Verne filed a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 based on his counsel's alleged ineffectiveness, followed by a motion to be appointed new counsel. In a thorough motion, Mr. Verne raises a slew of ineffectiveness claims — fifteen of them in total. His comprehensiveness and attention to detail in this motion leads us to conclude that he is fully capable of representing himself in this matter. But the standard for constitutional ineffectiveness is a demanding one, and it is clear from this record that none of Mr. Verne's claims meets this high bar. For the following reasons, and without holding an evidentiary hearing or issuing a certificate of appealability, we deny Mr. Verne's motions to be appointed counsel and to vacate, set aside, or correct his sentence.

## I. FACTUAL BACKGROUND

On July 25, 2024, Josh Verne was indicted on three counts of securities fraud, twenty-

two counts of wire fraud, one count of aggravated identity theft, one count of witness retaliation, one count of witness intimidation and attempted witness intimidation, and aiding and abetting in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, 18 U.S.C. §§ 1343 & 1349, 18 U.S.C. § 1028A, 18 U.S.C. § 1513(e), 18 U.S.C. § 1512(b)(1), and 18 U.S.C. § 2. DI 1-1. These charges arose out of a series of schemes from 2018-2020 through which Mr. Verne defrauded more than 100 investors, prospective investors, employees, and business partners of over $22 million through misrepresentations and the misappropriation of funds. DI 1 at 1, 6-8, 10-12; DI 33 at ¶ 1; DI 72 at ¶ 1; PSR at 3. Mr. Verne perpetrated his schemes using limited liability companies called Ownable LLC (Ownable)[1] and Ownable Capital Partners I LLC (Ownable Capital), as well as various investment pools. DI 1 at 3, 5, 8, 10, 23, 35. Among other acts, he stole the identity of a former Ownable employee and forged the employee's signature in a sales agreement regarding that employee's stock shares. DI 1 at 13; DI 33 at 9; DI 44 at 11.

On March 3, 2025, Mr. Verne pled guilty to: (1) counts 1, 2, 5, 8, 9, 11, 12, 13, 16, 17, 20, 21, and 24 of the indictment charging him with securities fraud, in violation of 15 U.S.C. § 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; (2) wire fraud, in violation of 18 U.S.C. § 1343; and (3) aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(l), (c)(5). DI 33 at ¶ 1. Mr. Verne received a sentence of 87 months' incarceration, with 3 years of supervised release and a special assessment, followed by a consecutive sentence of 24 months' incarceration, 1 year of supervised released (to run concurrently to the 3 years of supervised released), and a special assessment for Count 8 (the aggravated identity theft charge). DI 59 at

[1] Prior to forming Ownable, Mr. Verne ran FlockU LLC (FlockU), an online content platform designed for college students. DI 1 at 2.

3-4 (also recommending that Mr. Verne be evaluated for participation in the Residential Drug Abuse Treatment Program (RDAP)). The parties disputed restitution, so we held a hearing to finalize restitution on May 12, 2026, after which we issued the final restitution order in the amount of $22,498,416.79. DI 61; DI 72. In the interim, Mr. Verne filed the instant motion to vacate, set aside, or correct his sentence (DI 65), and following prior counsel's motion to withdraw as counsel (DI 67) — which we granted (DI 71) — the instant motion to appoint counsel (DI 68).

## II. MOTIONS AT ISSUE

### A. Motion to vacate, set aside, or correct his sentence

Mr. Verne moves to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 based on ineffective assistance of counsel. DI 65. He asserts 15 ineffectiveness grounds regarding the two attorneys who handled his case, Attorneys Angela Levy, Esq. and Michael McCrossen, Esq., from the Federal Community Defender Office for the Eastern District of Pennsylvania. *Id.* at 2. These grounds pertain to Mr. Verne's March 4, 2026 sentencing hearing and the attorney-client communications surrounding that hearing. *Id.* at 3. Mr. Verne argues that his counsel was ineffective in 13 different ways by failing to:

1. Challenge M.S.'s victim impact letter, despite possessing documents showing that Mr. Verne had fully repaid M.S. and that there was a mutual non-disparagement clause in the agreement regarding that repayment. *Id.* at 2, 37-41.

2. Challenge E.R.'s victim impact statement — which she read aloud at the sentencing hearing — in which she claimed, for the first time, that Mr. Verne had threatened her. *Id.* at 3, 8, 41-44.

3. Rebut S.R.'s victim impact letter, which was also read aloud at sentencing and which characterized Mr. Verne as manipulating people in the Jewish community to defraud them. *Id.* at 3, 44-46.

4. Follow Mr. Verne's express instructions not to disclose sensitive medical information during sentencing and failure to use the mitigation conclusions contained in Dr. Cunliffe's forensic report. *Id.* at 3, 46-52.

5. Investigate and raise a structural conflict of interest regarding Barry Hockfield, who Mr. Verne claims was previously his attorney and was involved in organizing government witnesses in this matter. *Id.* at 11-12, 52-59.

6. Research and raise a disparity argument based on pending amendments to the Sentencing Guidelines. *Id.* at 12-14, 59-61.

7. Explain the absence of character witnesses on Mr. Verne's behalf, and raise the issue of government overreach. *Id.* at 14-15, 61-66.

8. Challenge the government's contradictory timeline and present evidence of his legitimate business activity. *Id.* at 15-16, 66-69.

9. Counter the government's misrepresentation of a loving and supportive family. *Id.* at 16-18, 69-72.

10. Adequately challenge the two-level obstruction enhancement he received. *Id.* at 18-19, 72; DI 65-1 at 6.

11. Present at sentencing the Blue Elephant Forward purchase agreement, which demonstrated Ownable's legitimacy. DI 65 at 19-20; DI 65-1 at 6-9.

12. Investigate or raise *Brady-Giglio* questions concerning S.H., Ownable's former

Chief Financial Officer (CFO) upon whose records the government relied. DI 65 at 20-21; DI 65-1 at 9-11.

14. Request a judicial RDAP recommendation prior to the sentence being ordered. DI 65 at 23-24; DI 65-1 at 17-18.

In addition to the purported failures listed above, Mr. Verne's 13th and 15th grounds are catch-alls where Mr. Verne argues that:

13. Counsel's ineffectiveness at sentencing was part of a documented, ongoing pattern of ineffectiveness during this case. DI 65 at 21-23; DI 65-1 at 11-17.

15. He was prejudiced by the cumulative effect of counsel's deficiencies. DI 65 at 24-25; DI 65-1 at 19-20.

Mr. Verne's 15 grounds will be referred to throughout this memorandum as they are numbered above.

In explaining the prejudice that he suffered from these alleged errors, Mr. Verne asserts numerous correlations between counsel's failures and the reasons relied upon for the sentence. DI 65-1 at 20-24. These are: (1) E.R.'s statement; (2) S.R.'s statement; (3) the government's characterization of him as a fraudster without honest paths; (4) victim impact letters describing financial devastation; (5) the obstruction enhancement; (6) the purported lack of anything in the record to make us think that Mr. Verne would have stopped what he was doing were he not forced to; and (7) that we seemed open to a variance when we stated that defense counsel's comparative sentencing argument helped crystallize our thinking. *Id.*

Mr. Verne asks us to (1) vacate his sentence; (2) order a new sentencing hearing; (3) appoint him counsel to assist with a reply and any proceedings related to this § 2255 filing, as

well as with any resentencing and appeal; (4) alternatively, grant him an evidentiary hearing; and (5) provide other just and proper relief. DI 65 at 4; DI 65-1 at 25-26.

The government opposes Mr. Verne's motion, asserting that it should be denied on the current record without an evidentiary hearing. DI 86 at 16, 52-53. In the government's view, Mr. Verne cannot satisfy the *Strickland* test because his facts do not demonstrate that his counsel was ineffective. *Id.* at 18. The government avers that each of Mr. Verne's examples of ineffectiveness constitute his counsel's legitimate strategic choices, and such strategic decisions cannot meet *Strickland*'s deficiency standard. *Id.* at 22. Moreover, it asserts that Mr. Verne "intentionally deceived the Court" when he expressed his satisfaction with his counsel at his change of plea and sentencing hearings, given his present claims that he was dissatisfied with counsel nearly five months before his plea hearing. *Id.* at 18-19. And because each of Mr. Verne's asserted grounds for ineffectiveness fail, the government insists that no hearing is required to decide this motion. *Id.* at 52-53. Nor, it maintains, should we issue a certificate of appealability because Mr. Verne has not made a substantial showing of a denial of any of his constitutional rights. *Id.* at 53-55.

**B. Motion to appoint counsel**

Mr. Verne asks us to appoint counsel, noting that his prior counsel withdrew following the filing of his § 2255 motion. DI 68; DI 69. He cites both the restitution matter[2] and his § 2255 application for relief as the bases for his request for counsel. DI 69 at 3. Mr. Verne seeks counsel that (1) has substantive § 2255 experience and is familiar with *Strickland v. Washington* and *Cuyler v. Sullivan*; (2) lacks any current or prior affiliation with the Federal Community

[2] As explained below, this matter has resolved since the filing of Mr. Verne's motion.

Defender Office for the Eastern District of Pennsylvania; and (3) is capable of litigating a 15-ground motion with sealed exhibits and a likely evidentiary hearing. *Id.*

The government makes no argument respecting Mr. Verne's motion to appoint counsel.

## III. LEGAL STANDARDS

### A. Motions to vacate, set aside, or correct a sentence

Under 28 U.S.C. § 2255(a), a criminal defendant sentenced in federal court may move the court "to vacate, set aside or correct [his] sentence" if, *inter alia*, the sentence is "subject to collateral attack." 28 U.S.C. § 2255(a). We must hold a hearing to adjudicate a § 2255 motion, unless the motion, records, and files conclusively demonstrate "that the [defendant] is entitled to no relief." 28 U.S.C. § 2255(b); *United States v. McCoy*, 410 F.3d 124, 134 (3d Cir. 2005). It is within our discretion to determine whether to hold such a hearing, and in exercising our discretion, we must accept the movant's factual claims as true, unless they are clearly frivolous on the face of the record. *Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989). If we find that the defendant is entitled to relief under § 2255, we "shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

### B. Ineffective assistance of counsel claims

Under the Sixth Amendment, a criminal defendant is guaranteed "the effective assistance of counsel at critical stages of a criminal proceeding, including when he enters a guilty plea." *Lee v. United States*, 582 U.S. 357, 363 (2017) (citation modified) (citations omitted). To obtain relief based on his counsel's ineffectiveness, a defendant must meet the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). First, he must show that his

attorney's performance was deficient — e.g., that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. We strongly presume that counsel performed adequately. *Id.* at 689. Second, the defendant must demonstrate that this deficient performance prejudiced him — e.g., that there is a reasonable probability that the outcome of the proceeding would have been different but-for counsel's deficient performance. *Id.* at 687, 694. At sentencing, counsel's ineffectiveness may result in prejudice as "any amount of [additional] jail time has Sixth Amendment significance." *Lafler v. Cooper*, 566 U.S. 156, 165 (2012) (citation omitted); *Glover v. United States*, 531 U.S. 198, 203 (2001). We may dispose of an ineffectiveness claim on one prong only, and if it is easier to dispose of such a claim on the prejudice prong, then we should do so "to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." *Strickland*, 466 U.S. at 697.

**C. Appointment of counsel**

Under 18 U.S.C. § 3006A, we may appoint counsel for any financially eligible individual seeking § 2255 relief when "the interests of justice so require[.]" 18 U.S.C. § 3006A(a)(2)(B). We must appoint counsel in § 2255 proceedings to an individual who qualifies for such appointment "if an evidentiary hearing is required[.]" *United States v. Iasiello*, 166 F.3d 212, 213 (3d Cir. 1999) (citing U.S.C. § 2255 Pro. R. 8(c)).

**IV. DISCUSSION**

**A. We decline to appoint Mr. Verne counsel at this stage because the interests of justice do not require such appointment**

Mr. Verne's comprehensive and detailed motion to vacate, set aside, or correct his sentence demonstrates his ability to fulsomely articulate his claims and represent himself.

Although Mr. Verne was not yet incarcerated when he filed his motions, this remains true despite the constraints of incarceration. Though it will doubtlessly be more difficult for Mr. Verne to litigate his motion while incarcerated, we consider him fully capable of representing himself despite these challenges — challenges facing every incarcerated individual, many of whom litigate without the benefit of appointed counsel. For those reasons, and because the bulk of the work is behind Mr. Verne, the interests of justice do not require the appointment of counsel. 18 U.S.C. § 3006A(a)(2)(B). Indeed, based upon our review of the record and Mr. Verne's claims, we find that no evidentiary hearing is required to adjudicate Mr. Verne's § 2255 motion because the motion and record conclusively demonstrate that he is not entitled to relief. 28 U.S.C. § 2255(b); *McCoy*, 410 F.3d at 134. Thus, although Mr. Verne financially qualifies for appointed counsel, he is not entitled to counsel because an evidentiary hearing is not required. *Iasiello*, 166 F.3d at 213; U.S.C. § 2255 Pro. R. 8(c). And, as noted above, the restitution matter that was pending at the time of Mr. Verne's motion to appoint counsel has since resolved, DI 72, so this does not provide a basis for appointing him counsel. As a final note, considering the entirety of the record, we do not see any significant way that counsel would help clarify the issues that Mr. Verne has presented. We therefore decline to appoint Mr. Verne counsel.

**B. Mr. Verne's motion to vacate, set aside, or correct his sentence is denied without an evidentiary hearing because the motion and record conclusively demonstrate that he is not entitled to relief based on constitutional ineffectiveness**

We deny Mr. Verne's motion to vacate, set aside, or correct his sentence under § 2255. This motion is denied without an evidentiary hearing because the motion and record conclusively demonstrate that Mr. Verne "is entitled to no relief" based on ineffectiveness of counsel. 28 U.S.C. § 2255(b); *McCoy*, 410 F.3d at 134. As explained in detail below, Mr. Verne cannot

meet the *Strickland* standard.

**i. Victim impact statements from M.S., E.R., and S.R. (grounds 1-3)**

Mr. Verne alleges three ineffectiveness grounds based on the victim impact statements of M.S., E.R., and S.R. He first claims that counsel failed to challenge M.S.'s victim impact letter at sentencing despite possessing documents showing that (1) Mr. Verne fully repaid M.S. under threat by M.S.; and (2) the purchase agreement contained a mutual non-disparagement clause applicable to both M.S. and Mr. Verne. DI 65 at 2, 37-41. He asserts that he provided his counsel with these documents, but that counsel never presented this evidence at sentencing, despite the purchase agreement being partially credited at the restitution hearing. *Id.* at 6, 39. Mr. Verne notes that we described M.S.'s letter as "particularly significant" and highlighted his characterization of Mr. Verne as "a danger to the public" in explaining our sentencing rationale. *Id.* at 6, 38-39. In his view, counsel's failure to challenge M.S.'s letter was not strategic, and he emphasizes that Attorney Levy confirmed (following sentencing) that our language at sentencing tracked the language in M.S.'s letter — specifically M.S.'s claim that Mr. Verne would "undoubtedly do it again" if given the opportunity to do so and could not be rehabilitated, which Mr. Verne contends tracks our statement that "there's nothing in this record that makes me think that Mr. Verne would have stopped." *Id.* at 40.

Mr. Verne next asserts that counsel was ineffective for failing to challenge the victim impact statement read aloud by E.R., in which she alleged that Mr. Verne had threatened her. DI 65 at 3, 41-44. He insists that this was the first time that she made any such allegation of a threat by him against her, and he emphasizes that E.R. never brought any such threat up in her FBI interview five years prior. *Id.* at 7, 42. Mr. Verne notes our statement, while explaining the

sentencing rationale, that E.R.'s testimony "really jumped out" as one of the sentencing considerations. *Id.* at 7, 44. In his view, challenging E.R. was "the most direct available rebuttal to the entire framework the Court used to justify its sentence" — the theme of him abusing people's trust in him — and that Dr. Cunliffe's assessment that he showed no predisposition toward violence or threatening behavior would have provided a good rebuttal. *Id.* at 44. Mr. Verne asserts that he wrote a note to Attorney Levy during the sentencing hearing, specifically asking counsel to challenge and rebut what E.R. was saying, but that counsel asked no questions, did not cross-examine E.R., and did not otherwise challenge the threat allegation. *Id.* at 7-8, 43.

Mr. Verne also argues that counsel was ineffective for failing to rebut S.R.'s victim impact letter, which was read aloud at sentencing by an FBI agent, and which characterized Mr. Verne as using his Jewish-community ties to exploit and defraud people in that community under the guise of "charitable activity." DI 65 at 3, 8, 44-46. He says that we identified S.R.'s characterization of him as a key sentencing factor, explaining that "trust was everything for [S.R.]." *Id.* at 8, 45. Mr. Verne insists that counsel had three items of documentary rebuttal evidence to challenge S.R.'s characterization but used none of them: (1) that his investor base included numerous non-Jewish investors; (2) that his involvement in the Jewish community substantially predated his formation of Ownable by nearly a decade; and (3) that S.R. himself organized and invited Mr. Verne on two trips to Israel. *Id.* at 9, 45-46.

The government responds that Mr. Verne's attorneys were not ineffective for failing to raise these arguments regarding M.S., E.R., and S.R. DI 86 at 22-25. It maintains that the decision not to raise these arguments was not only strategic, but good strategy; in its view, attacking these victims at sentencing would have harmed Mr. Verne's prospects of obtaining a

more favorable sentence. *Id.* at 23-25. Thus, the government asserts that counsel neither performed deficiently nor prejudiced Mr. Verne by failing to raise these arguments. *Id.*

We agree with the government that neither *Strickland* prong is satisfied here. Counsel's decision to raise, or not raise, these arguments respecting M.S., E.R., and S.R. were reasonable strategic decisions. Mr. Verne's attorneys at sentencing pursued a strategy of mitigation: they acknowledged Mr. Verne's wrongdoing, highlighted Mr. Verne's personal and health-related struggles and efforts to address them, and clarified differences between this case and other fraud cases to try to achieve a lower sentence. Having overseen this case, we find that this was a reasonable strategy, and we give substantial deference to such reasonable strategic decisions. *Strickland*, 466 U.S. at 681; *Marshall v. Hendricks*, 307 F.3d 36, 85 (3d Cir. 2002) (noting that "it is critical that courts be 'highly deferential' to counsel's reasonable strategic decisions and guard against the temptation to engage in hindsight.") (citing *Strickland*, 466 U.S. at 689-90). Moreover, counsel's decision to avoid this line of argumentation avoided, rather than caused, prejudice toward Mr. Verne. If pursued, such arguments would have undermined Mr. Verne's acceptance of responsibility and representations that he was a changed man, considerations of which we weighed in Mr. Verne's favor. We also note that the statements of M.S., E.R., and S.R. were among more than two dozen victim impact statements, many of which emphasized a similar theme of Mr. Verne breaching trust. As Mr. Verne has demonstrated neither deficient performance nor prejudice, his claim for ineffectiveness on these grounds fails.

**ii. Use of mitigation evidence at sentencing (grounds 4, 7, and 9)**

Mr. Verne also raises three grounds of ineffectiveness based on counsel's use, or non-use, of various mitigation evidence at sentencing. First, he argues that counsel was ineffective

because counsel (1) disclosed his sensitive medical information during the sentencing hearing, despite his prior express instruction not to do so; and (2) failed to use the mitigating conclusions contained within Dr. Cunliffe's forensic report. DI 65 at 3, 46-52. He explains that counsel retained a forensic psychologist, Dr. Ted B. Cunliffe, and that Dr. Cunliffe conducted a 14-hour evaluation of Mr. Verne using 16 validated clinical instruments. *Id.* at 10. Mr. Verne maintains that the report's findings and evidence-based treatment recommendation directly answered our question regarding whether the conduct would stop — an issue we emphasized during sentencing. *Id.* at 46-47. He notes that he instructed the full report to be filed under seal, and it was so filed; he also states that he told counsel that the diagnostic labels (*i.e.*, the names of his diagnosed disorders) were not to be read aloud in open court, and that any reference to such labels at the hearing were to be limited to general descriptive language. *Id.* at 10, 47. Yet, Mr. Verne asserts that Attorney Levy read the diagnostic labels from the report aloud in open court, directly against his instructions. *Id.* at 10, 48. Mr. Verne also avers that counsel did not address his historical misdiagnoses and family dysfunction, the PCL-R (*i.e.*, psychopathy) findings, the absence of psychopathy, antisocial personality disorder, or a predisposition toward violence, nor the specific treatment prescribed by Dr. Cunliffe. *Id.* at 10, 49. This was important, Mr. Verne claims, because we stated that nothing in the record made us "think that Mr. Verne would have stopped doing what he was doing, or this kind of behavior for any reason other than he was forced to." *Id.* at 10, 50. He maintains that Dr. Cunliffe's report demonstrated that his conduct "arose from untreated personality pathology – conditions that are addressable through the specific therapeutic pathway Dr. Cunliffe prescribed." *Id.* at 50. Additionally, Mr. Verne underscores that he voluntarily left Ownable before any charge, indictment, or arrest, and that he

sought substance abuse treatment and mental health treatment before any criminal charge. *Id.* at 51.

Next, Mr. Verne claims that counsel was ineffective because they failed to explain the absence of character witnesses on his behalf, which Mr. Verne asserts was partly due to the government putting nearly 100 people on the victim and witness list, including people like K.G. (with whom he had an active and legitimate consulting relationship), whom he was never alleged to have defrauded. DI 65 at 14, 61-66. Anyone on this list, Mr. Verne explains, was prohibited from contact with Mr. Verne. *Id.* at 14. Nine days before sentencing, he alleges that he wrote to counsel that they should bring up at sentencing why he didn't call anyone due to the government's overreach, identifying four bases for this argument: (1) investors on the government's witness list contacted his employer and caused him to lose his job before the SEC investigation against him became public; (2) the government added K.G. to the witness list without first contacting K.G., thus severing an active consulting income source; (3) he feared retaliation against any character witness who appeared on his behalf; and (4) the government accepted M.S.'s victim impact letter despite the non-disparagement agreement. *Id.* at 14, 62-64. Mr. Verne also noted that he identified to counsel a sitting elected official who had expressed openness to writing a character letter for Mr. Verne, and that he had given counsel the official's direct cell phone number and asked counsel to call him for the letter. *Id.* at 14, 64-65. Yet, Mr. Verne asserts that counsel never contacted the official, nor raised any argument at sentencing about the government's overreach with the witness list or the lack of witnesses on his behalf. *Id.* at 14, 65. He also mentions a December 19, 2022 email from AUSA Shapiro, in which the government "demand[ed] a confession-level admission by 1:00 PM under threat of cancellation."

*Id.* at 14, 63-64. Finally, he faults counsel for not raising an argument that the government's conduct created punishment beyond the Guidelines. *Id.* at 65.

Mr. Verne further argues that counsel was ineffective because they did not rebut the government's false narrative of Mr. Verne having a loving and supportive family. *Id.* at 16-17, 69-72. At sentencing, he claims that the government framed his upbringing as one of privilege, opportunity, and support, and that we adopted the framing of Mr. Verne as not suffering serious adversity. *Id.* at 16, 69. Yet, he insists that his attorneys possessed four documented facts contradicting this framing, which they did not raise: (1) the estrangement with his father and family after the family business failed; (2) his parents' refusal to provide credit card payment statements reflecting Ownable payments, which he needed to respond to the SEC investigation; (3) his mother's refusal to write a letter on his behalf and repeated approaches of him right before sentencing began; and (4) clinical findings from Dr. Cunliffe report's regarding his family dysfunction. *Id.* at 16-17, 69-70. Attorney Levy, according to Mr. Verne, initiated the family dysfunction narrative, induced him to disclose his painful personal history for a purported sentencing argument, and then abandoned that argument at sentencing. *Id.* at 70-71. He maintains that we thus lacked a reference point due to counsel's failure to develop the dysfunction argument, leaving us to use an extreme example of a defendant who, at six years old, saw his mother murder his father, as a reference point. *Id.* at 71-72.

The government responds that Mr. Verne's mitigation-related claims lack merit because counsel's use of mitigation evidence was a tactical decision and such evidence was before us at sentencing. DI 86 at 25. It highlights that (1) we received Dr. Cunliffe's report; (2) we noted our receipt of this report at sentencing; and (3) Mr. Verne's counsel extensively discussed this

report (and the family dysfunction themes contained therein) in both Mr. Verne's sentencing memorandum and during her sentencing argument. *Id.* at 25-28. The decision regarding how much of the report to use, the government insists, was a reasonable strategic decision that did not prejudice him, given that we had the materials before us. *Id.* at 26-30. The government further argues that counsel was not ineffective for failing to explain the absence of character witnesses for Mr. Verne at sentencing, suggesting that this also was a reasonable and non-prejudicial strategic decision. *Id.* at 30-31. And it notes that Mr. Verne's counsel contacted several witnesses with whom Mr. Verne could have no contact, some of whom wrote letters for him. *Id.* at 32 n.3.

We conclude that counsel was not ineffective with respect to its presentation of the mitigation evidence above. As the government correctly notes, we were given the full report from Dr. Cunliffe prior to sentencing, which contained Dr. Cunliffe's findings regarding Mr. Verne's mental health and family dysfunction. DI 52. We reviewed this document and expressly acknowledged it among the documents considered for sentencing. DI 78 at 5:16-25 to 6:1. Likewise, we reviewed and considered arguments by Mr. Verne's counsel regarding this report — which arose, at length, in counsel's sentencing memorandum and sentencing argument. DI 51 at 2-7; DI 78 at 63:17-25 to 67:1-8. In our view, the decision regarding the time spent by Mr. Verne's counsel focusing on this report and the themes contained therein was a reasonable strategic choice to which we give substantial deference. *Strickland*, 466 U.S. at 681; *Marshall*, 307 F.3d at 85. Counsel dedicated an appropriate amount of their argument to discussing the report's findings and the relevance of such findings to our sentencing determination, while leaving sufficient space for other important considerations. Given that we fully considered the

report ourselves, in addition to counsel's arguments regarding it, we also find that Mr. Verne was not prejudiced by counsel's presentation of such evidence; more emphasis on this report would not have changed our sentencing determination. And to the extent that Mr. Verne was upset or embarrassed by counsel's disclosure of personal information from the report, such disclosure and Mr. Verne's reaction thereto do not constitute prejudice because this did not change the outcome of his sentencing. We further conclude that counsel's decision not to blame the government for the lack of character witnesses present at sentencing was a reasonable strategic choice that caused no prejudice to Mr. Verne. Counsel wisely avoided highlighting this absence and instead relied upon the character letters submitted on Mr. Verne's behalf — letters of which (1) counsel emphasized in Mr. Verne's sentencing memorandum and during sentencing; and (2) we reviewed and considered when fashioning Mr. Verne's sentence. DI 51 at 7-11; DI 78 at 5:16-23; 69:18-25 to 70:1-19. Counsel would not have helped Mr. Verne's case by arguing that the government was responsible for the lack of witnesses present at the hearing on his behalf. Mr. Verne's ineffectiveness claims regarding the mitigation evidence thus do not satisfy *Strickland*.

**iii. Arguments regarding Mr. Verne's business activities (grounds 8 and 11)**

Mr. Verne raises two ineffectiveness claims based on counsel's presentation of evidence regarding his legitimate business activities. First, he asserts that counsel failed to challenge the government's erroneous presentation of the fraud scheme as extending from 2015-2020 because FlockU was not a fraudulent enterprise. DI 65 at 15-16, 66. And Mr. Verne insists that counsel had various rebuttal evidence concerning his prior legitimate business history yet failed to introduce it at sentencing, despite his requests to do so, such as his operation of the family business from 1998-2011, his founding of WorkPays, his successful bringing in of investors for

Beat Box Beverages, and the profit recovered by Blue Elephant Capital Management regarding its investments in Ownable. *Id.* at 15-16, 67.

Mr. Verne further argues that counsel was ineffective for failing to present the purchase agreement with Blue Elephant Forward, which he asserts confirms the institutional validity of Ownable's business model and assets. *Id.* at 19-20; DI 65-1 at 6. He claims that counsel possessed the purchase agreement, its related due diligence record on Ownable, and the documentation showing the deployment of capital and recovery of profit by Blue Elephant, before sentencing. DI 65 at 19; DI 65-1 at 6-7. Mr. Verne insists that Ownable had institutional validity, contrary to the government's claim that Ownable was a sham from the start. DI 65 at 19. But, he says, counsel did not present this agreement, raise the due diligence record, nor advise us that Blue Elephant had profited from Ownable. *Id.* at 20.

The government responds that Mr. Verne's counsel did make an argument regarding Mr. Verne's "prior legitimate business history" and that we credited this argument when we found that he did not set out to commit fraud. DI 86 at 34. The government notes the irrelevancy of arguments that Beat Box Beverage ultimately profited or that Ownable had a credible and viable business model, emphasizing that Mr. Verne's fraud respecting these entities was not related to their success or sound business models. *Id.* at 35. Thus, it maintains that counsel's representation on this point was neither deficient nor prejudicial. *Id.* at 34. As for Mr. Verne's claim regarding the government's framing of FlockU, it asserts that (1) it did not accept Mr. Verne's claim that FlockU was not a "scam" during his change of plea hearing; (2) Mr. Verne's view of FlockU did not affect the essential elements of the crimes to which he pled guilty; and (3) the pre-sentence report (PSR) found that Mr. Verne's fraudulent scheme began with FlockU.

*Id.* at 36-37. The government therefore insists that Mr. Verne's counsel was not ineffective for failing to raise a meritless argument. *Id.* at 37.

Mr. Verne's ineffectiveness claims regarding his legitimate business history lack merit. Contrary to Mr. Verne's representations, his counsel emphasized Mr. Verne's arc of legitimate, successful businesses during her sentencing argument. DI 78 at 61:17-25 to 63:1-16. Mr. Verne's counsel argued that "there was a period of legitimacy" in which Mr. Verne's business "was operating as a legitimate business." *Id.* at 68:5-12. She also highlighted that the relevant time period was between 2018 and 2020, and that Mr. Verne set out "to create a successful enterprise" and did not start Ownable with the intent to defraud. *Id.* at 61:17-25 to 62:1-18; 67:21-25 to 68:1-12. And counsel specifically clarified that FlockU was neither a fraud nor a scheme. *Id.* at 75:5-12. Counsel thus made the arguments Mr. Verne now faults her for not making at sentencing. Moreover, we do not think that it was unreasonable or prejudicial for counsel to make these arguments without mentioning Beat Box Beverages or Blue Elephant Capital: we got the point that Mr. Verne had legitimate businesses (indeed, this was the start of the story no matter who was telling it), we accepted this point at sentencing, and we would have found immaterial any argument that some of the businesses impacted by his fraud proved successful. *Id.* at 81:17-22. Because Mr. Verne has not shown that his counsel performed deficiently or prejudiced him, these grounds for ineffectiveness fail.

#### iv. Barry Hockfield's structural conflict of interest and related *Brady-Giglio* concerns (grounds 5 and 12)

Mr. Verne next argues that counsel was ineffective for failing to investigate and raise a structural conflict of interest regarding Barry Hockfield and its supposed impact on the evidence received from S.H., Ownable's former CFO. DI 65 at 11-12, 20-21, 52-59. First, Mr. Verne

asserts that Mr. Hockfield is his former father-in-law who served as his personal and business attorney from January 2015 through February 2021. *Id.* at 11. To demonstrate this relationship, Mr. Verne highlights the following: (1) a January 2, 2015 non-compete agreement that Mr. Hockfield reviewed; (2) an April 20, 2017 letter to Independence Blue Cross to communicate with his attorney, Mr. Hockfield; (3) an April 21, 2020 document showing Mr. Hockfield's personal email on the Ownable investor meeting distribution list, which provided access to investor communications; and (4) a February 3, 2021 email from another attorney to Mr. Verne and Mr. Hockfield regarding a lawsuit in which Mr. Verne and his then-wife were co-defendants, discussing legal strategy. *Id.* at 11, 53. Mr. Verne asserts that AUSA Shapiro sent three proffer letters to Mr. Hockfield, the first concerning S.H., Ownable's former CFO and a key government witness in this case, and the second and third concerning J.B. and G.B., family members who were on the government's victim and witness list. *Id.* at 11, 54. Mr. Verne says that these letters show that Mr. Hockfield was simultaneously orchestrating the cooperation of government witnesses from Mr. Verne's family and professional network. *Id.* at 11-12. Mr. Verne also notes that Mr. Hockfield was listed on the government's victim and witness list, that Mr. Hockfield himself induced an investor through false representations, and that he made specific predictions about Mr. Verne's sentencing outcome on a podcast. *Id.* at 12, 54-56. Attorney Levy, Mr. Verne claims, listened to this podcast. *Id.* at 12, 55. And Mr. Verne insists that he brought this issue up with counsel several times, only to be told that it wasn't worth fighting at the time but that it could be used as a basis for sentencing mitigation. *Id.* at 55. Despite this, he states that counsel did not investigate any conflict with Mr. Hockfield, file any motion regarding such a conflict, seek discovery on Mr. Hockfield's witness communications, or otherwise raise the conflict at

sentencing. *Id.* at 12.

Mr. Verne next argues that counsel was ineffective because they did not investigate or raise *Brady-Giglio* questions concerning S.H., upon whose records the government relied in its investigation. *Id.* at 20-21; DI 65-1 at 9-11. Again, Mr. Verne asserts that there was a dual representation issue because Mr. Hockfield represented S.H. during her cooperation with the government, while Mr. Hockfield was also Mr. Verne's personal and business attorney from 2015-2021. DI 65 at 20; DI 65-1 at 9. Mr. Verne thus insists that there are *Brady* and *Giglio* issues regarding the reliability and independence of S.H.'s cooperation, the scope of privileged communications shared between her attorney (Mr. Hockfield) and Mr. Verne (while he was still represented by Mr. Hockfield), and the potential for the selective production of financial records. DI 65 at 20-21; DI 65-1 at 9-10. He argues that counsel did not move for a *Brady* or *Giglio* inquiry regarding S.H.'s cooperation, seek discovery concerning Mr. Hockfield's communications with S.H. or with the prosecutors, or raise these questions with us during sentencing. DI 65 at 21. Mr. Verne highlights a statement in board member W.G.'s victim impact statement, in which he said that S.H. "was also complicit in these lies; therefore documentation sent to the board was also false[,]" but that S.H. was never charged with anything. DI 65-1 at 9-10. And Mr. Verne emphasizes that her financial records were the government's primary evidence for its loss calculation, which drove the Guideline range. *Id.* at 9. Mr. Verne suggests that had we known of this credibility issue, we would have had "a materially different basis for evaluating whether the loss figure accurately reflect[ed] the offense conduct[.]" *Id.* at 11.

The government responds that Mr. Verne is incorrect for several reasons. DI 86 at 38.

Assuming for argument's sake that Mr. Hockfield was Mr. Verne's former attorney at the time that Mr. Hockfield participated in the proffer interviews, the government asserts that Mr. Verne has not established that Mr. Hockfield's representation during the proffer interviews created an actual conflict of interest because he has not shown that those interviews (1) regarded the same or a substantially related matter to a matter in which he represented Mr. Verne; or (2) involved a situation where the interests of those doing the proffer interviews were materially adverse to the interests of Mr. Verne. *Id.* at 38-39. Even if there is an actual conflict, the government insists that any such conflict is not "structural" because a structural error involves a defendant who is represented at trial by a lawyer laboring under an actual conflict; here, Mr. Verne's counsel labored under no such conflict. *Id.* at 39-40. Thus, the government urges that counsel was not ineffective for failing to raise a meritless argument. Further, the government also asserts that defense counsel's decision not to raise that argument did not prejudice Mr. Verne because his guilty plea (1) foreclosed the possibility of cross-examining Mr. Hockfield or these witnesses at trial; and (2) these individuals were in no way involved in Mr. Verne's sentencing. *Id.* at 40-41. Relatedly, the government maintains that Mr. Verne's argument that it violated its *Brady*-*Giglio* obligations respecting S.H. — whom Mr. Hockfield represented — cannot carry prejudice because Mr. Verne has not identified a single relevant document or piece of evidence that the government should have disclosed but did not (or that his counsel would have obtained with additional effort), and S.H. was irrelevant to Mr. Verne's sentencing proceeding. *Id.* at 41-42.

Mr. Verne has not demonstrated that his counsel was ineffective with respect to his concerns about Mr. Hockfield or S.H. The Third Circuit has described "the established categories of structural error" as (1) the deprivation of a defendant's right to counsel of his

choice; (2) the deprivation of a defendant's right to knowingly and intelligently represent himself; and (3) a conflict of interest impacting a defendant's attorney, including an irreconcilable conflict between the defendant and his attorney such that the defendant was "deprived of the effective assistance of any counsel whatsoever." *United States v. Senke*, 986 F.3d 300, 314 (3d Cir. 2021) (footnotes omitted). None of these types of structural error is present here. Mr. Verne does not assert either of the first two categories of structural error (nor could he, on this record), and his apparent attempt to invoke the third category does not persuade. To demonstrate a violation of his rights under the Sixth Amendment, Mr. Verne "must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). *Cuyler* involved a question of whether there was multiple representation of defendants by defense counsel in his criminal case and whether that multiple representation involved a conflict of interest. *Id.* at 337-38. In *Stewart*, the Third Circuit explained that conflicts also arise when a defendant's "counsel may have divided loyalties due to concurrent or prior representation of another client who is a co-defendant, a co-conspirator, or a government witness." *United States v. Stewart*, 185 F.3d 112, 121 (3d Cir. 1999) (citation omitted). As the government correctly underscores, Mr. Hockfield was not Mr. Verne's counsel in the matter before us — Attorneys Levy and McCrossen from the Federal Defenders were his counsel. And there is no reason to believe that either federal defender labored under an actual conflict while representing Mr. Verne. 204 Pa. Code R. 1.9 (describing a lawyer's duties to former clients and the circumstances in which an actual conflict arises). Nor does Mr. Verne argue that his attorneys labored under such a conflict. Thus, any structural argument based on Mr. Hockfield's former representation of Mr. Verne would have been meritless, so counsel was

not deficient for failing to raise such an argument. *United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999) (citations omitted). Even if they had challenged Mr. Hockfield's involvement in this case, we see no causal link between Mr. Hockfield's involvement and our sentencing determination. None of the individuals who worked with Mr. Hockfield on their proffer letters — S.H., J.B., or G.B. — submitted victim impact statements, spoke at the sentencing hearing, or were otherwise involved with Mr. Verne's sentencing. And Mr. Verne pled guilty to the conduct alleged against him by the government. DI 34. Our sentencing determination was based upon the conduct admitted to by Mr. Verne, the parties' sentencing memoranda and attached documents (including Dr. Cunliffe's report, Mr. Verne's character letters, and the victim impact letters), and the presentation by both parties at the sentencing hearing (including the parties' arguments, victim impact statements, and Mr. Verne's statement). DI 78 at 5:16-25 to 7:1. Mr. Verne's sentence was not impacted by Mr. Hockfield and any potential conflict of interest he may have had. Accordingly, counsel was not ineffective for failing to investigate or argue this issue.

As for Mr. Verne's allegations of *Brady-Giglio* issues, we agree with the government that there is no basis for ineffectiveness here. *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In *Giglio*, the Court concluded that a new trial was required when the government failed to disclose an alleged promise regarding non-prosecution that it made to its key witness, where the government's case nearly entirely depended on the witness' testimony, such that the witness' credibility was critical to the case.

*Giglio v. United States*, 405 U.S. 150, 150-51, 154-55 (1972). Here, Mr. Verne does not identify any document or piece of evidence that the government withheld but should have disclosed to him. Moreover, S.H.'s involvement in Ownable's bank records, and her potential liability in Mr. Verne's scheme, were facts known to Mr. Verne — given that Mr. Verne orchestrated the fraud scheme and was S.H.'s boss. Thus, Mr. Verne has not shown that there was a viable *Brady*-*Giglio* argument for his counsel to raise, so his counsel was not deficient for failing to raise a meritless argument. *Sanders*, 165 F.3d at 253. Nor are we persuaded that S.H.'s cooperation prejudiced Mr. Verne. Though he emphasizes that S.H.'s financial records were the government's primary evidence for its loss calculation, we note that (1) defense counsel hired their own expert to determine the loss amount; (2) the government utilized an FBI analyst who verified the loss amount through steps that went beyond reviewing S.H.'s records at face value; and (3) based on their calculations, the parties agreed to a range of $9.5 million to $25 million for the loss amount, which resulted in the Guideline range applied to Mr. Verne at sentencing. And, again, Mr. Verne admitted to committing the fraudulent acts alleged by the government when he pled guilty. Accordingly, Mr. Verne's *Brady*-*Giglio*-based grounds for ineffectiveness fail.

**v. Pending amendments to the Sentencing Guidelines (ground 6)**

Mr. Verne insists that counsel was ineffective for not researching and raising a § 3553(a)(6) disparity argument based on pending amendments to the Sentencing Guidelines. DI 65 at 12-13, 59-61. He notes that prior to sentencing, Attorney Levy told him that the U.S. Sentencing Commission had pending amendments to USSG § 2B1.1, which affected the loss amount thresholds and victim count tiers, and that such pending amendments could be a basis for

mitigation. *Id.* at 12, 59. Mr. Verne explains that the proposed amendments were published in December 2025 and January 2026, and officially adopted on April 16, 2026, to be effective on November 1, 2026. *Id.* at 13. According to him, these amendments restructure the loss table from 16 to 8 tiers, adjust the monetary thresholds for inflation, narrow the "sophisticated means" enhancement under USSG § 2B1.1(b)(10)(C), and add a new reduction for defendants who demonstrate significant pre-sentencing rehabilitative efforts. *Id.* at 13, 59-60. Mr. Verne maintains that counsel did not brief any of the three pending amendments, nor raise the § 3553(a)(6) disparity argument supported by such amendments, and said nothing about the amendments during the sentencing hearing. *Id.* at 13, 59. And he highlights four government-produced documents which he claims would have supported a pre-sentence rehabilitation argument: (1) E.R.'s November 2020 FBI interview noting that Mr. Verne was "currently in rehab"; (2) C.K.'s June 2021 FBI interview stating that he was "advised that [Mr. Verne] was seeking rehabilitation for substance abuse"; (3) D.M.'s July 2021 FBI interview stating that Mr. Verne told him in summer 2020 that "he was going to rehab, and would turn himself around"; and (4) Mr. Verne's October 2020 email to investors stating that he was "entering into an inpatient facility to work on his health and mental wellness." *Id.* at 13. Attorney Levy's actions couldn't have been strategic, Mr. Verne insists, given that she herself raised the favorable legal argument, discussed it with him as mitigation, and then abandoned it without research or explanation. *Id.* at 60-61. He also asserts that the formally published amendment demonstrates the Sentencing Commission's judgment that the current table overstated culpability for this type of offense. *Id.* at 61.

The government rejects Mr. Verne's purported basis for ineffectiveness, asserting that

another district court in our district recently rejected the argument that a lawyer's failure to seek the application of the Guideline amendments prematurely did not constitute deficient performance. DI 86 at 42-43 (citing *United States v. Douglas*, 2025 WL 1748353, at *6 (E.D. Pa. June 24, 2025)). Moreover, the government notes that most of the proposed amendments that Mr. Verne focuses upon were not adopted, such that his counsel could not have been ineffective for failing to seek their application. *Id.* at 43. As for the loss amount amendment, the government highlights that we found that the loss amount was $24.6 million, which resulted in a 20-level increase based on the Guideline loss range of $9.5 million to $25 million. *Id.* The government explains that the November 2026 Guideline amendment would have changed the Guideline range applicable for the 20-level increase to a loss amount of $15 million to $35 million — so Mr. Verne's $24.6 million loss amount would still fall within this range. *Id.* at 43-44. Thus, the government maintains that it was reasonable for Mr. Verne's counsel to forgo this argument, such that his counsel neither deficiently performed nor prejudiced him. *Id.* at 44.

Counsel was not ineffective for failing to raise the Guideline amendments as an argument at sentencing. We generally must "use the Guidelines Manual in effect on the date that the defendant is sentenced[,]"[3] applying the Manual in its entirety when sentencing him. 18

[3] If we determine that using the Guidelines Manual effective on the date that the defendant is sentenced would violate the Constitution's ex post facto clause, then we must use the Guidelines Manual effective on the date that the offense of conviction was committed. 18 U.S.C.S. app. § 1B1.11(b)(1) (P.L. 119-102, approved July 12, 2026). This situation does not apply here because the application of the Guidelines Manual effective when Mr. Verne was sentenced did not subject him to a harsher sentence compared to the Guidelines Manual effective when he committed the offenses. *See Peugh v. United States*, 569 U.S. 530, 533 (2013) (holding that "[t]here is an ex post facto violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense").

U.S.C.S. app. § 1B1.11(a), (b)(2) (P.L. 119-102, approved July 12, 2026). Section 1B1.10 of the Guidelines specifies the amendments that have retroactive effect. *United States v. Marmolejos*, 140 F.3d 488, 491 (3d Cir. 1998). As of July 12, 2026, § 1B1.10 of the Guidelines does not include any of the amendments cited by Mr. Verne among the retroactively applied amendments. 18 U.S.C.S. app. § 1B1.10(d) (P.L. 119-102, approved July 12, 2026).[4] However, certain Guideline amendments may have retroactive effect regardless of whether they are listed in § 1B1.10 of the Guidelines; upon a § 2255 motion, we may give retroactive effect to a clarifying amendment, but not to a substantive amendment, even if it is not listed in § 1B1.10. *Marmolejos*, 140 F.3d at 490-91. An amendment is considered substantive when, for example, it (1) has "the purpose and effect of narrowing the scope of the [sentencing] enhancement," rendering its prior version inconsistent with the amended version; (2) narrows "the scope of offenders subject to the enhancement"; or (3) "overrule[s] [ ] existing precedent and revise[s] the enhancement's language, not just the language of the commentary." *Prophet*, 989 F.3d at 238-39 (citation omitted). The proposed amendments cited by Mr. Verne strike us as substantive (and thus, non-retroactive) amendments because they would narrow the scope of § 2B1.1's offense-level enhancement by increasing the loss amount threshold applicable to the tiered offense-level increases, narrow the scope of the "sophisticated means" enhancement, and provide a new reduction based on rehabilitative efforts. So, we do not find it unreasonable that counsel chose to

[4] Though the list provided in § 1B1.10 only is relevant upon a motion for resentencing under 18 U.S.C. § 3582(c)(2) based on a sentencing range subsequently lowered by the Sentencing Commission, *United States v. Prophet*, 989 F.3d 231, 238 (3d Cir. 2021), we note for completeness purposes that the amendments discussed by Mr. Verne are not on this list. When a petitioner seeks relief under § 2255, we assess whether the amendment is substantive or clarifying, without consideration as to whether it is included in § 1B1.10's list. *Id.* at 238-39.

forgo an argument based on the pending amendments, especially when (1) our default is to apply the Guidelines Manual in effect at the time of sentencing; (2) these amendments were not adopted at the time of Mr. Verne's sentencing;[5] and (3) such amendments, which are not included in the § 1B1.10 list of retroactively applied amendments, appear substantive and thus non-retroactive. This was a reasonable strategic decision to which we defer. *Strickland*, 466 U.S. at 681; *Marshall*, 307 F.3d at 85. Additionally, though Mr. Verne faults his counsel for not raising a § 3553(a)(6) disparity argument based on these pending amendments, his counsel did raise a fulsome and compelling § 3553(a)(6) disparity argument based on the sentences imposed in cases involving similar schemes. DI 78 at 53:19-25 to 59:1-7. When explaining our basis for the sentence imposed, we specifically acknowledged this argument as "very well taken" and noted that it "really helped . . . crystallize" our thoughts and enabled us to properly account for this disparity consideration. *Id.* at 85:8-18. In our view, counsel's decision to focus her disparity argument in this fashion was not only a reasonable strategic decision, but one that helped Mr. Verne achieve a more favorable sentence. Because Mr. Verne has not shown that his counsel performed deficiently or prejudiced him by not making an argument based on the pending Guideline amendments, his ineffectiveness claim fails.

**vi. Two-level obstruction enhancement (ground 10)**

Mr. Verne maintains that counsel was ineffective for failing to adequately challenge the

[5] Indeed, as the government notes, the only amendment ultimately adopted was the change to the loss amount range, and this change would not have affected Mr. Verne's Guideline range because the loss amount here ($24.6 million) still fell within the range carrying the 20-level Guideline enhancement. DI 86 at 43-44; *Amendments to the Sentencing Guidelines*, UNITED STATES SENTENCING COMMISSION (Apr. 30, 2026), https://perma.cc/2EUA-GQNA. So, even if Mr. Verne's counsel had argued for the application of the not-yet adopted amendment to the loss amount range, Mr. Verne's Guideline enhancement would have remained the same.

two-level enhancement he received for obstruction under USSG § 3C1.1, which was predicated upon text messages that he sent to his former employee and the employee's wife. DI 65 at 18, 72; DI 65-1 at 1-6. According to Mr. Verne, counsel should have contested this enhancement by arguing that (1) the employee was a named victim, so he had a direct legal stake in Mr. Verne's sentencing; (2) the employee was his lifelong friend who knew of Mr. Verne's "impulsive communication style" — a style documented by Dr. Cunliffe's report; (3) the four-year period of silence following the texts; (4) the statement by the employee's attorney to the government that the messages "on their face are not direct threats"; (5) the employee's statement in his FBI interview that he did not know what Mr. Verne meant with the bachelor party reference and that nothing happened at any party that could be used to coerce him; (6) the employee didn't attend the sentencing; and (7) we previously ruled in Mr. Verne's favor on the government's motion to maintain GPS monitoring based on these text messages. DI 65 at 18; DI 65-1 at 1-3, 6. He also asserts that his relationship with the employee was not as described by the employee in his victim impact letter, yet counsel did not raise this issue. DI 65-1 at 3-4. And Mr. Verne claims that, while Attorney McCrossen was arguing obstruction, he passed a note to Attorney Levy asking her to ensure that Attorney McCrossen raised the fact of no further contact with the relevant witnesses after September 12, 2022, but that she ignored the note. DI 65 at 18, 72. He maintains that the failure to effectively challenge the enhancement prejudiced him by increasing his Guideline range to 15-19 months — a range within which he was sentenced. DI 65-1 at 5.

The government rejects Mr. Verne's argument, asserting that he has demonstrated neither deficient performance nor prejudice. DI 86 at 44. It notes that Mr. Verne's counsel argued at length against the application of an obstruction enhancement during sentencing and in the

sentencing memorandum, and that counsel made some of the arguments that Mr. Verne now claims were not raised.[6] *Id.* at 45-46. As the government explains we observed that we could draw no inference from Mr. Verne's text messages other than that he intended to threaten the recipient. *Id.* at 45 (citation omitted). The government also argues that we knew that the recipient was the same person who was the victim of the aggravated identity theft charge and that this individual did not attend the sentencing, so any further argument regarding these facts would not have helped Mr. Verne's case. *Id.* at 46. Nor, it maintains, would it have mattered if Mr. Verne's attorneys argued that (1) the recipient's lawyer did not describe the threats as facially threatening; (2) the recipient did not know what alleged embarrassing acts Mr. Verne was referring to; or (3) we removed the pre-trial GPS location monitoring condition on Mr. Verne because it was not justified due to a continuing threat concern. *Id.* at 47-48.

Counsel's performance respecting the obstruction enhancement was neither deficient nor prejudicial to Mr. Verne. Section 3C1.1 of the Guidelines provides for a two-level offense level enhancement "if (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." USSG § 3C1.1. Minutes after meeting with his attorneys and government representatives, in which the government detailed its evidence against him — which included his forgery of his employee's

[6] The government underscores that Mr. Verne's counsel raised the following arguments, that: (1) the recipient was Mr. Verne's lifelong friend; (2) this was an "off-the-cuff" non-threatening comment; (3) Mr. Verne did not communicate with the recipient in the subsequent four years; and (4) it is unknown what alleged embarrassing facts were referenced in the messages. *Id.* at 45-46.

name and theft of the proceeds from that employee's stock — Mr. Verne texted that employee: "Just got off the phone with the appropriate people that spoke to u. Interesting what you told them." DI 49 at 20. Less than two hours later, after no response from the employee, Mr. Verne texted the employee: "If this goes forward – you should expect other natural questions like bachelor party conversations and other conversations you think would be relevant. No prob will make Happen[.]" *Id.* at 21. Later that evening, again after receiving no response from the employee, Mr. Verne texted the employee's wife, stating, "Hi. Unfortunately [your husband, Employee 1,] gave some misinformation [to] the authorities on me and therefore you will be brought into the conversation. Just wanted to give you a heads up." *Id.* Our view has not changed since the sentencing hearing, DI 78 at 35:4-9, that the only viable inference is that Mr. Verne willfully intended to threaten the employee in an attempt to obstruct or impede the government's investigation into and prosecution of him for the instant offenses. At a bare minimum, it is more likely than not. *United States v. Soto*, 122 F.4th 503, 508 (3d Cir. 2024) (explaining that the standard of proof for determining the willful obstruction of justice under § 3C1.1 is preponderance of the evidence). Mr. Verne's counsel raised several arguments to try to convince us otherwise — including that (1) the employee was Mr. Verne's lifelong friend; (2) this was an off-the-cuff reaction by Mr. Verne and an effort to learn what information was shared with the government; (3) Mr. Verne didn't necessarily know that the employee was a material witness at this time; (4) the messages lacked a facial threat; (5) the content of the alleged embarrassing facts was unknown; and (6) Mr. Verne never texted either the employee or his wife after this date or otherwise tried to influence their testimony or conduct. DI 78 at 26:20-25 to 29:1-18, 33:16-25 to 34:1-15. These were spirited and creative arguments. But nothing said

then or now by Mr. Verne could change our conclusion that Mr. Verne more likely than not willfully intended to obstruct or impede the investigation or prosecution of him by threatening the employee. We knew that the employee was a named victim in this case and that he did not attend the sentencing. And our decision to remove GPS monitoring as a condition for Mr. Verne's pre-trial release — which involved the application of a different standard, under the Bail Reform Act,[7] compared to the standard for an obstruction enhancement — was not a recognition that Mr. Verne had not threatened this employee; instead, we noted that GPS monitoring was unrelated to the witness intimidation concern because he was allowed to have a phone while on release and there was a no-contact order. DI 82 at 6-10, 21. Counsel made a reasonable strategic decision to tailor the arguments against obstruction, and this decision did not prejudice Mr. Verne. This ineffectiveness claim fails.

**vii. Judicial RDAP recommendation (ground 14)**

Mr. Verne also faults counsel for not requesting a judicial Residential Drug Abuse Treatment Program (RDAP) recommendation before his sentence was pronounced, claiming this constitutes ineffectiveness. DI 65 at 23; DI 65-1 at 17-18. He notes that Dr. Cunliffe's evaluation of him rendered him eligible for RDAP. DI 65-1 at 18. Mr. Verne asserts that a pre-sentence judicial recommendation for RDAP screening is a standard mechanism for facilitating the reduction achieved through RDAP. DI 65 at 23. Three days before sentencing, Mr. Verne states that he emailed counsel about RDAP and whether it was "part of the paperwork and

[7] 18 U.S.C. § 3142 governs the release or detention of defendants pending trial and provides that, if a defendant is released on conditions, that those conditions be "the least restrictive" conditions that will "reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(B).

application you guys put in place after sentencing." DI 65 at 23; DI 65-1 at 17. He says that Attorney McCrossen responded that it would not be part of such paperwork but that they could ask the judge to recommend him for RDAP screening, while noting that the decision ultimately rests with the BOP. DI 65 at 23; DI 65-1 at 17. Mr. Verne claims that counsel did not request an RDAP recommendation prior to the pronouncement of his sentence, and instead raised RDAP as a facility designation preference after this pronouncement. DI 65 at 23; DI 65-1 at 17. He insists that RDAP gives us "a concrete statutory mechanism to reduce the effective sentence through an RDAP recommendation in the judgment and commitment order" when raised before the sentence pronouncement, but that RDAP is merely "a facility preference the BOP may or may not honor" when raised after this pronouncement. DI 65-1 at 17-18.

The government argues that Mr. Verne's claim fails as a matter of fact and law. DI 86 at 48. It observes that counsel asked us to recommend Mr. Verne's placement in RDAP, and it insists that the timing of this recommendation after the sentence pronouncement had no effect on the recommendation's inclusion in the judgment of conviction. *Id.* at 48-49. Regardless, because RDAP participation or non-participation is not a component of a defendant's sentence, the government maintains that any failure to request such a recommendation is not cognizable via a § 2255 post-conviction motion. *Id.* at 49-50.

Mr. Verne's ineffectiveness claim based on the RDAP recommendation lacks merit. As the government notes, Mr. Verne's counsel specifically requested that we recommend Mr. Verne for RDAP, DI 78 at 89:8-12, and we made this recommendation, DI 59 at 3. Counsel did so after we pronounced Mr. Verne's sentence because, when she asked our preference for when she should raise her specific designation requests, we told her that we would discuss them after

pronouncing the sentence. DI 78 at 71:6-11. It makes sense to handle such designation requests after pronouncing the sentence because RDAP participation "is not a component of [a defendant's] sentence[.]" *United States v. Saul*, 2014 WL 3508640, at *1 (E.D. Pa. July 16, 2014). As the Supreme Court has explained, "the BOP has plenary control, subject to statutory constraints, over the place of the prisoner's imprisonment . . . and the treatment programs (if any) in which he may participate[.]" *Tapia v. United States*, 564 U.S. 319, 331 (2011) (citation modified) (citations omitted). "A sentencing court can recommend that the BOP place an offender in a particular facility or program . . . [b]ut decisionmaking authority rests with the BOP." *Id.* (citation modified) (citation omitted). Our RDAP recommendations are only recommendations; we cannot order a defendant to be placed in RDAP. *See id.* Counsel's decision to request an RDAP recommendation after we pronounced Mr. Verne's sentence was thus not only reasonable — given our instruction to raise this recommendation at this time and the fact that such a recommendation was not a component of his sentence — but also non-prejudicial to Mr. Verne because his participation in RDAP is in the BOP's hands. Mr. Verne's ineffectiveness claim on this ground therefore fails.

**viii. Ongoing pattern of ineffectiveness (ground 13)**

Mr. Verne's thirteenth ineffectiveness claim asserts that counsel's deficient performance at the sentencing hearing was part of a documented, ongoing pattern of ineffective representation. DI 65 at 21-22; DI 65-1 at 11-17. He cites an October 5, 2024 letter he sent to Chief Federal Defender Lisa Evans Lewis, in which he asserted specific performance concerns about counsel. DI 65 at 21; DI 65-1 at 11. Mr. Verne references a November 12, 2025 email in which he memorialized to counsel that submitted materials had not been reviewed and that

counsel ended the call that day by hanging up, as well as another written communication to counsel on December 26, 2025. DI 65 at 22; DI 65-1 at 12. Mr. Verne asserts that counsel wasn't granted access to the file-sharing platform containing his records until three months after his arrest, and that counsel solely had read-only access until May 15, 2025. DI 65 at 22; DI 65-1 at 15. In the discovery folder, he claims that the last documented activity by either attorney was more than six months before the sentencing date. DI 65 at 22. Mr. Verne also mentions that an FBI 302 interview report was missing in the discovery materials, despite the interviewee completing a proffer letter, and that counsel never flagged this absence as an issue. *Id.* He says that counsel left 12 emails from him unanswered from January 7, 2025, through February 25, 2026, and that on February 17, 2026, Attorney Levy emailed him stating that they didn't "contemplate a fulsome loss hearing with presentation of expert evidence" at sentencing. *Id.* Mr. Verne notes that Attorney Levy asked for the Bart Blatstein press documentation showing that he had made false statements about Mr. Verne personally repaying him, but that she never used this after he provided it. DI 65-1 at 14. He criticizes counsel for selectively focusing energy on the loss calculation, which did not change the Guideline range, while ignoring the other issues raised in the instant motion. *Id*. Mr. Verne further alleges that, after sentencing, Attorney Levy emailed him advising that the plea agreement prohibited any § 2255 challenge and recommending that he pursue a pardon instead — an email in which she omitted the express ineffective assistance of counsel carve-out in the agreement. DI 65 at 22; DI 65-1 at 15-16. Finally, he claims that the sentencing memorandum was sparse and lacked the specific arguments he had raised with them (which are raised in the instant motion). DI 65-1 at 13-14.

The government rejects Mr. Verne's ineffectiveness claim based on his historical issues

with counsel, arguing that he "cannot establish prejudice regarding matters relating to the trial that his plea foreclosed" and that his other complaints do not demonstrate prejudice. DI 86 at 50-51 (citation omitted). Specifically, it urges that counsel's alleged hanging up on him during a phone call, failure to respond to his emails, and provision of limited insight into their sentencing strategy did not prejudice him at sentencing. *Id.* at 51. As for counsel's advice regarding the scope of his collateral attack waiver, the government maintains that this did not prejudice Mr. Verne, given that he filed a § 2255 motion here, and we are addressing it. *Id.* at 51-52.

Mr. Verne's issues with counsel do not satisfy the *Strickland* standard for ineffectiveness. His pre-plea hearing complaints center on communication issues with counsel, his delayed receipt of the list of individuals subject to his no-contact order, frustration with the slow resolution of bail condition issues, and counsel's inadequate or slow-moving review of discovery. While we recognize Mr. Verne's frustrations, such issues do not constitute "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Frankly, legal representation is a difficult and uncertain task in any case, and certainly in one such as this. The record indicates that Mr. Verne remained in contact throughout his case with his counsel. We acknowledge the relatively long period of unanswered emails from Mr. Verne by his counsel, and Mr. Verne's evident desire for more frequent contact, but we cannot conclude that Mr. Verne was deprived of counsel on this basis. His no-contact list and bail conditions issues also were resolved. And, based on our experience overseeing this matter, we have no reason to believe that counsel was not sufficiently familiar with the evidence — even if counsel's pace or timing with discovery review did not meet Mr. Verne's expectations. Nor has Mr. Verne persuaded us that there is "a reasonable

probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Lee v. United States*, 582 U.S. 357, 364-65 (2017) (citation omitted). The record indicates that counsel had detailed discussions with Mr. Verne, both virtually and in writing, in which they specifically discussed the decision whether to plead guilty or go to trial and described both scenarios. DI 65-2 at 10-12. Mr. Verne responded to the written explanation by stating, "This is all very helpful." *Id.* at 10. At the change of plea hearing, Mr. Verne acknowledged that he read and understood the indictment and plea agreement, spoke with his lawyers about the agreement and had enough time to do so, was satisfied with his lawyers, and had no questions — all before he pled guilty. DI 44 at 8:19-25 to 10:1-13, 28:21-25 to 29:1-8. At no point did he raise any issues regarding counsel's performance. Based on the nature of the issues raised by Mr. Verne, the record before us, and Mr. Verne's representations at the change of plea hearing, we do not think that there is a plausible argument that Mr. Verne would not have pled guilty had these issues not occurred.

Mr. Verne's examples of post-plea issues do not satisfy *Strickland*, either. These issues involve communication frustrations, strategic decisions by counsel while preparing for sentencing, and counsel's erroneous advice that the plea agreement barred a § 2255 challenge. Again, such communication issues were not so serious that they effectively deprived Mr. Verne of his right to counsel. Counsel's strategic decisions while preparing for sentencing were reasonable choices to which we substantially defer under *Strickland* and *Marshall* — and we acknowledged the efficacy of counsel's sentencing argument while explaining the basis for Mr. Verne's sentence. DI 78 at 83:20-24 (noting as "well taken" the argument that Mr. Verne lacked "the judgment or insight to step away and start telling the truth"); *id.* at 85:8-10 (stating that

counsel's sentencing disparities argument was "very well taken"). We also note that, when asked at sentencing whether he was satisfied with his lawyers, Mr. Verne stated, "Absolutely." *Id.* at 24:8-10. As for counsel's advice regarding the ability to bring a § 2255 challenge, we agree with the government that this error did not prejudice Mr. Verne: he timely filed the instant (and comprehensive) § 2255 petition, indicating that he understood he could do so and was not thwarted in his efforts to seek such relief. Because Mr. Verne has not satisfied *Strickland* with respect to any of the above alleged errors by his counsel, this ineffectiveness claim fails.

**ix. Cumulative effect of counsel's deficiencies (ground 15)**

Finally, Mr. Verne argues that he was prejudiced by the cumulative effect of his counsel's deficiencies. DI 65 at 24-25; DI 65-1 at 19-20. In doing so, he highlights each of the individual ineffectiveness claims discussed above. DI 65 at 24-25; DI 65-1 at 19-20. He maintains that his counsel's failure to utilize the arguments and documents provided to them respecting these instances demonstrated "the structural collapse of an adequate defense at the sentencing stage" and created a one-sided sentencing record. DI 65-1 at 20. The government replies that, because his fourteen individual claims of ineffectiveness lack merit, his claim based on their cumulative effect also fails. DI 86 at 52.

Mr. Verne has not demonstrated ineffectiveness based on the cumulative effect of counsel's alleged errors. "Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process." *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) (citation omitted). A petitioner must demonstrate actual prejudice to prevail on a claim of cumulative error. *Id.* (citation omitted). To assess cumulative prejudice,

we must examine both the specific instances of alleged effectiveness and the impact of those instances in combination. *See id.* (discussing its consideration of the individual claims, as well as the claims in combination, when evaluating a cumulative error claim). We have examined in detail Mr. Verne's fourteen individual claims of ineffectiveness and concluded that the instances raised therein did not prejudice Mr. Verne under *Strickland*. In combination, Mr. Verne's alleged instances of ineffectiveness do not prejudice him, either: even if none of these purported errors had been made, we are not persuaded that this case would have concluded any differently. Mr. Verne faced significant evidence against him. He acknowledged that he committed the crimes charged by the government when he pled guilty. Even if counsel's communication, pace, and strategic choices did not always meet his expectations, Mr. Verne had able counsel throughout this case who advised him on his decision to plead guilty (as opposed to go to trial) and provided compelling arguments at his sentencing. As Mr. Verne cannot demonstrate actual prejudice based on cumulative error, this ineffectiveness claim also fails.

## V. CONCLUSION

We deny both of Mr. Verne's motions. The interests of justice do not require the appointment of counsel for Mr. Verne, nor is an evidentiary hearing necessary to adjudicate Mr. Verne's motion for § 2255 relief. Accordingly, we deny Mr. Verne's motion for the appointment of counsel. Mr. Verne also has not demonstrated that his counsel was constitutionally ineffective, as none of the fifteen ineffectiveness grounds raised satisfy the *Strickland* standard. Mr. Verne's motion to vacate, set aside, or correct his sentence, which solely relies upon these ineffectiveness grounds, thus is denied. Because Mr. Verne has not "made a substantial showing of the denial of a constitutional right[,]" we decline to issue a certificate of appealability. 28

U.S.C. § 2253(c)(2). An appropriate order accompanies this memorandum.